## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ANDREW WOLFINGTON,** *individually and on behalf of all others similarly situated* | **CIVIL ACTION**<br><br>**NO. 16-4935** |
| **v.** | |
| **RECONSTRUCTIVE ORTHOPAEDIC ASSOCIATES II, P.C., ROTHMAN INSTITUTE, DOES 1 through 10** | |

### MEMORANDUM

**Baylson, J.**[1]                                                               **December 22, 2016**

### I.  Introduction

This case is an example of litigation out of control, of audacious greed, and a lack of professional diligence.  Plaintiff requested Defendant to perform surgery on his knee, but claimed he could not afford to pay the deductible under his insurance policy before the operation, which was Defendants' policy.  At Plaintiff's request, Defendant agreed to perform the operation, with Plaintiff paying a small down payment towards the deductible and agreeing to pay the balance of the deductible after the operation, without interest.  Plaintiff never paid any part of the balance due, but instead sued Defendant for failing to provide Plaintiff with information allegedly required under the Truth in Lending Act ("TILA").

The Court will not only dismiss the Complaint with prejudice, but will also *sua sponte* institute Rule 11 proceedings to determine whether sanctions should imposed against Plaintiff and/or his counsel.  The grounds for the dismissal are simple and straightforward, but the Court has prepared an extensive opinion with appropriate citations showing that Plaintiff's counsel at

---

[1]      The undersigned discloses that he was a patient for two medical procedures approximately six and twelve years ago, which were successfully completed by physicians who were on Defendant's medical staff.

1

least, if not Plaintiff himself, had reason to know that this suit was groundless and could be construed as an attempt at extortion to avoid an obligation to pay the deductible.  It appears that Plaintiff's operation was successful and he is recovering without any problems.  In an era of constantly increasing medical costs, meritless litigation against physicians is a scourge that should concern judges; we should impose sanctions when warranted.

The Court finds that Plaintiff's counsel filed this lawsuit without any regard to the requirements of the statute or the implementing regulations.  Indeed, Plaintiff's brief in opposition to the Defendant's motion for judgment on the pleadings is devoid of any citation to the statute or the regulations, or to any case that in any way arguably supports the sufficiency of the Complaint.  Many cased are filed under TILA, and many have merit.  However, the lack of a finance charge or written agreement precludes any claims under TILA, as a matter of law. Defendant did not have any obligation to provide Plaintiff with any disclosures, but the institution of this lawsuit has required the Defendant to pay legal fees to secure this dismissal.

Plaintiff Andrew Wolfington ("Plaintiff"), on behalf of himself and all others similarly situated, alleges that defendant Reconstructive Orthopedic Associates II, P.C. a/k/a The Rothman Institute[2] ("Defendant") violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*, and its implementing regulation, Regulation Z, 12 C.F.R. § 1026.1, *et seq.*[3]

The following facts are taken from the Complaint (ECF 1), and are accepted as true for purposes of the pending motions.  See Fed. R. Civ. P. 12(b)(6); United States Express Lines, Ltd. V. Higgins, 281 F.3d 383, 388 (3d Cir. 2002).  Plaintiff suffered an "anterior cruciate ligament

---

[2]      Plaintiff designated "DOES 1 through 10" as potential defendants.  However, because he did not identify them, they will be ignored.

[3]      In Plaintiff's Opposition to Defendant's Motion for Judgment on the Pleadings (ECF 16 at 7 n.4), Plaintiff withdrew his claim under the Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et seq.*

2

tear and meniscus tear in his left knee" in the Fall of 2015, requiring reconstructive knee surgery, which was performed on January 21, 2016 at an ambulatory facility affiliated with Defendant. (Id. ¶¶ 15-16).  Prior to the surgery, Plaintiff signed a document he received from Defendant called "Financial Policy," which stated, in pertinent part, that to the extent Plaintiff's insurance plan had a deductible, Plaintiff "will be required to pay any outstanding deductible prior to [his] procedure."[4]  (Id. ¶ 17).  After signing the document, but a few days before the surgery, Defendant contacted Plaintiff to tell him that the surgery could not be completed unless and until he paid the insurance deductible, which "exceeded $2,000." (Id. ¶ 18).  Plaintiff alleges that he could not pay the entire deductible in one lump sum, so Plaintiff's father called Defendant the day before the surgery, on January 20, 2016, "to discuss payment of his son's deductible." (Id. ¶ 19).

According to Plaintiff, "Defendant agreed to extend credit to Plaintiff to cover the balance owed, which consisted of an initial credit card payment of $200 on January 20, 2016, and subsequent monthly payments of $100, until the balance of the deductible was fully satisfied." (Id. ¶ 20).  Also, a condition of the "financing" was that Plaintiff "voluntarily agreed to monthly electronic payment deductions from his personal checking account by [Defendant]." (Id. ¶ 21).  Plaintiff alleges he received two emails from Defendant: (1) confirmation of a $200 payment he made on January 20, 2016; and (2) a "thank you" email for entering into "an online bill payment plan" which states that Plaintiff will pay Defendant $100/month beginning on February 21, 2016.  (Id. ¶¶ 23-24).

The gravamen of Plaintiff's Complaint is that Defendant violated TILA when it entered into a "financing plan" without Plaintiff receiving "any written information regarding the

---

[4]       (See ECF 10-4, Ex. A).

financing[.]"  (Id. ¶ 22).  Plaintiff does not allege that Defendant charged any fee or interest for the alleged extension of credit.

On October 12, 2016, Defendant filed an Answer, in which it denied the factual allegations contained in the Complaint, and asserted 15 affirmative defenses.  (ECF 3, ¶¶ 15-32).  Defendant also asserted a common law Counterclaim alleging that Plaintiff breached his agreement with Defendant, i.e. the "Financial Policy," to pay the deductible in full prior to the surgery.  (Id. at 15).

## II.    Procedural History

On October 27, 2016, Plaintiff filed a motion to dismiss Defendant's Counterclaim on the basis that the Court lacked subject matter jurisdiction over its exclusively state law claim (ECF 8, Pl.'s Mot. Dismiss Counterclaims "Pl.'s Mot"), to which Defendant filed an Opposition on November 7, 2016 (ECF 11, Def.'s Opp'n to Pl.'s Mot. Dismiss Counterclaims ("Def.'s Opp'n"), and Plaintiff filed a Reply on November 11, 2016 (ECF 13, "Pl.'s Reply Br.").

Following a telephonic Rule 16 pretrial conference on October 28, 2016, the Court issued an Order (1) directing Defendant to file a motion to bifurcate discovery, and (2) directing the parties to promptly make mandatory disclosures and exchange documents, including those "pertaining to the Plaintiff's specific medical procedures and financial transaction with the Defendant" and "showing the number of creditors [Defendant] has had for the 18 months prior to the filing of this suit."  (ECF 9).

On November 7, 2016, Defendant filed a Motion for Judgment on the Pleadings or in the alternative to Bifurcate Discovery (ECF 10, Def.'s Mot. for Judgment on Pleadings "Defs.' Mot."), to which Plaintiff filed an Opposition on November 28, 2016 (ECF 16, Pl.'s Opp'n to

4

Defs.' Mot. for Judgment on Pleadings "Pl.'s Opp'n"), and Defendant file a Reply on December 5, 2016 (ECF 17, "Def.'s Reply Br.").[5]

On December 12, 2016, Plaintiff moved for leave to file a sur-reply to Defendant's Motion for Judgments on the Pleadings on the basis that Defendant raised certain contentions in its Reply for the first time, including "that the Court should rely on materials outside of the record and that Defendant would concede that it was a 'creditor' for purposes of [TILA]," and that Defendant "did not enter into any agreement or contract for Plaintiff to pay over a period of time." (ECF 19 at 5-6). Plaintiff argues that he "could not have (and did not) address these arguments previously." (Id.). On December 13, 2016, Defendant filed an opposition to Plaintiff's motion. (ECF 20).

On December 14, 2016, the Court held a recorded telephonic conference with counsel for both parties, during which Plaintiff's counsel conceded (1) Plaintiff had made no payments to Defendant after the initial $200 payment on January 20, 2016; and (2) the parties did not enter into any written agreement after Plaintiff received the initial "Financial Policy," which required Plaintiff to pay the deductible *in full prior to the surgery*. The Court also granted Plaintiff's motion to file a sur-reply.

## III.   Legal Standard

Federal Rule of Civil Procedure 12(c) provides that "after the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Judgment on the pleadings is appropriate only when the movant "clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." Rosenau v.

---

[5]   In a letter, dated December 7, 2016, Defendant requested a "stay of all discovery until the Defendant's motion for judgment on the pleadings or in the alternative to bifurcated discovery is decided," which Plaintiff opposed.

5

Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008). "The standard for deciding a motion for

judgment on the pleadings filed pursuant to Federal Rule of Civil Procedure 12(c) is not

materially different from the standard for deciding a motion to dismiss filed pursuant to Federal

Rule of Civil Procedure 12(b)(6)." Zion v. Nassan, 283 F.R.D. 247, 254 (W.D. Pa. 2012).

Either motion may be used to seek the dismissal of a complaint based on a plaintiff's "failure to

state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6), (h)(2)(B).  The only

difference between the two motions is that a Rule 12(b) motion must be made before a

"responsive pleading" is filed, but a Rule 12(c) motion can be made "[a]fter the pleadings are

closed."

      The Supreme Court has established a two-part test to determine whether to grant a motion

to dismiss or judgment on the pleadings. See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); Bell

Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  First, the court must ascertain whether the

complaint is supported by well-pleaded factual allegations. Iqbal, 556 U.S. at 679.  "Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." Twombly, 550 U.S. at 555.  In turn, these factual allegations must be sufficient to

provide a defendant the type of notice contemplated in Rule 8. See Fed. R. Civ. P. 8(a)(2)

(requiring a short and plain statement of the claim showing the pleader is entitled to relief); see

also Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).

      Taking the well-pleaded facts as true, the court must then determine whether the plaintiff

is "plausibly" entitled to relief. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir.

2009).  That is, the pleadings must contain enough factual content to allow a court to make "a

reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at

679.  In short, a complaint must not only allege entitlement to relief, but must also demonstrate

6

such entitlement with sufficient facts to push the claim "across the line from conceivable to plausible." Id. at 683; accord Holmes v. Gates, 403 F. App'x 670, 673 (3d Cir. 2010).

When parties attach new factual averments to a motion for judgment on the pleadings under Rule 12(c), this may have the effect of converting the motion to one for summary judgment. Federal Rule of Civil Procedure 12(d) provides: "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." However, Rule 12(d) is not triggered for undisputedly authentic documents on which the plaintiff's claims are based. See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").

Defendant attaches certain documents to the Motion for Judgment on the Pleadings that the Court cannot consider, pursuant to Rule 12(d), unless they are undisputed, without converting the instant Motion into one for summary judgment.[6]

## IV.   Motion for Judgment on the Pleadings

### a.   Statutory Requirements Under TILA

Congress enacted TILA "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and

---

[6]     Defendant attached to its Motion the Certification of Gina Pino, Defendant's Director of Business Services, and three accompanying exhibits, including (1) a copy of the "Financial Policy," (2) a copy of Plaintiff's Complaint; and (3) a copy of an email from Plaintiff's father to Defendant. (See ECF 10-4, Ex. A-C).  There is no dispute as to the Defendant's Financial Policy.  The Court is not considering the e-mail on the merits of the pending Motion.  The factual contents of the Certification are not disputed.

avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). Under TILA, "creditors" that extend "credit" to "consumers" must make certain disclosures, including, *inter alia*, (1) the amount financed; (2) the sum of the amount financed; and (3) the number, amount and due dates or period payments scheduled to repay the total of payments. 15 U.S.C. § 1638(a).

To implement TILA, Congress "delegated expansive authority to the Federal Reserve Board to elaborate and expand the legal framework governing commerce in credit." Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 559-60 (1980). "The Board exerted its responsibility by promulgating Regulation Z, 12 C.F.R. Part 226 (1979)," id., which "absent some obvious repugnance to the statute should be accepted by the courts, as should the Board's interpretation of its own regulation." Anderson Brothers Ford v. Valencia, 452 U.S. 205, 219 (1981).

As the Supreme Court has noted, "traditional acquiescence in administrative expertise is particularly apt under TILA, because the Federal Reserve Board has played a pivotal role in setting the statutory machinery in motion [and] . . . the Act is best construed by those who gave it substance in promulgating regulations thereunder." Ford Motor, 444 U.S. at 566 (internal citations omitted); see generally, Chevron, U.S.A., Inc. v. Nat. Resources Def. Council, Inc., 467 U.S. 837 (1984) (discussing deference to administrative regulations, under what has become known as "Chevron deference.")

An important issue in this case is whether Defendant and its actions falls within the definition of certain terms defined in Section 1602 of TILA and Section 226.2 of Regulation Z, namely, whether Defendant is a "creditor" and whether it extended "credit" to Plaintiff.

TILA defines "creditor," in pertinent part, as:

> [A] person who both (1) **regularly extends**, whether in connection with loans, sales of property or services, or otherwise, consumer

8

> credit which is **payable by agreement** in more than four
> installments or for which the payment of a **finance charge** is or
> may be required, and (2) is the person to whom the debt arising
> from the consumer credit transaction is initially payable on the face
> of the evidence of indebtedness or, if there is no such evidence if
> indebtedness, by agreement.

15 U.S.C.A. § 1602(g) (emphasis added).  Regulation Z, however, provides:

> A person who **regularly extends** consumer credit that is subject to
> a **finance charge** or is **payable by written agreement** in more
> than four installments (not including a down payment), and to
> whom the obligation is initially payable, either on the face of the
> note or contract, or by agreement when there is no note or contract.

12 C.F.R. § 226.2(17)(i) (emphasis added).  "[W]hether one is a TILA creditor is a bifurcated

question, requiring a person both to be a 'creditor' in general, by extending credit in a certain

minimum number of transactions, and to be the 'creditor' in the specific transaction in dispute."

Pollice v. Nat'l Tax Funding, L.P., 225 F.3d 379, 411 (3d Cir. 2000) (internal citations omitted).

Additionally, TILA defines "credit" as:

> The right granted by a creditor to a debtor to defer payment of debt
> or to incur debt and defer its payment

15 U.S.C.A. § 1602(f), whereas Regulation Z defines "credit" as:

> [T]he right to defer payment of debt or to incur debt and defer its
> payment

12 C.F.R. § 226.2(14).

The Third Circuit considered the terms "credit" and "creditor" within the meaning of

TILA in Pollice, 225 F.3d at 401.  In that case, various government entities—which had

accumulated thousands of claims against homeowners who did not fully pay their property taxes

or water or sewer bills—sold their claims to the National Tax Funding, L.P. ("NTF") via a

purchase agreement.  Under the agreement, NTF delegated collection activities to another entity

and required it to offer homeowners "payment plans," which some homeowners took advantage

9

of. Several homeowners brought suit under, *inter alia*, TILA, alleging that "NTF, through [its

collection entity], has collected unlawfully high interest and penalties on the assigned claims."

Id. at 387.

The Court held that the defendants were "creditors" under TILA. Specifically, because

of the way Congress defined "credit," the homeowners' original "debt"—or obligation to pay the

water and sewage bills—was "arising from" the payment play notwithstanding the fact that it

existed before the homeowners entered into the payment plans. The Court explained,

> The definition of "credit" . . . encompasses not only a right granted
> by a creditor to "incur debt and defer its payment" but also a right
> to "defer payment of debt." See section 1602(e). This latter
> phrase must encompass situations in which a debtor is granted the
> right to pay over time a pre-existing debt. Yet, in such situations,
> the argument may be raised that the grantor of the right to defer
> payment is not a "creditor" under section 1602(f) because the debt
> does not arise from the consumer credit transaction. We reject
> such a construction, as we believe the term "creditor" was intended
> to apply to one who confers such a right to defer the payment of a
> pre-existing obligation.

Id. at 412 (internal citations omitted). Based on this interpretation of "credit," the Court next

rejected NTF's argument that a person who grants a right to defer payment of a pre-existing debt

is a "creditor" only if he agrees to modify the relationship so as to give rise to some obligation.

Parsing the language of TILA, the Court explained,

> Indeed, the language of section 1602(f) indicates that a person may
> be a creditor even if he does not impose any charge for the
> extension of credit—the first prong of the definition of "creditor"
> refers to a person who regularly extends consumer credit which
> *either* involves a finance charge or is payable in more than four
> installments. Thus, the definition contemplates that one who
> confers a right to pay a pre-existing debt in more than four
> installments will be a "creditor" regardless of whether any charge
> is imposed as an incident to such extension of credit. We believe
> that a consumer who is given the right to pay a pre-existing debt in
> installments may benefit from TILA-mandated disclosures even if
> no charge is imposed for the extension of credit.

10

Id. at 413 (internal citation omitted).

The court in Pollice, however, was consciously not focused on the portion of the definition of the term "creditor" at issue in this case.  225 F.3d at 411 ("NTF does not present an argument on appeal, and apparently did not present an argument in the district court, regarding the first prong of the definition requiring that a person "regularly extends" consumer credit."). Accordingly, this Court must independently construe that term.

### b.  Parties' Arguments

Plaintiff argues that he entered into an agreement with Defendant whereby Defendant agreed to extend Plaintiff credit and "had Plaintiff enter into a payment plan" which "consisted of an initial $200 payment followed by monthly payments of $100 until the deductible was fully satisfied." (Pl.'s Opp'n at 2).  Plaintiff argues that at "the time Plaintiff entered into the agreement, Plaintiff did not receive" any TILA disclosures.  He argues he should survive Defendant's motion for judgment on the pleadings because he has "plainly alleged that Defendant failed to comply with [TILA]," and that courts are reluctant to dismiss plaintiffs' TILA claims at the pleading stage.  (Id. at 4).

Defendant does not dispute that it did not make TILA disclosures to Plaintiff.  Instead, Defendant argues that no lending transaction that would implicate TILA was ever "consummated."[7]  Defendant argues that the only agreement into which Plaintiff and Defendant entered was the "Financial Policy"—in which Plaintiff agreed to pay the deductible at once—and that "[w]hile Plaintiff was presented with an offer to pay the outstanding balance of the amount he personally owed to [Defendant] resulting from his surgery on a monthly basis, there was

---

[7]     Regulation Z defines "consummation" as "the time that a consumer becomes contractually obligated on a credit transaction."  12 C.F.R. § 226.2(13).

never a payment agreement that was consummated." (Def.'s Mot. at 3). Defendant argues that the email Plaintiff transcribes in the Complaint constituted an "offer" that Plaintiff never accepted, either explicitly or by performance, because Plaintiff never actually paid any of the $100 monthly payments. (Id.).

Defendant relies on Bright v. Ball Memorial Hospital Association, Inc., 616 F.2d 328 (7th Cir. 1980) to support its position. There, the plaintiff, who was a patient at the defendant hospital, was given a form which stated, "you are requested to remit the balance due on your account with the hospital at the time of discharge," and also advised that "if it is necessary," patients can pay the account balance in installments, subject to a 3/4% finance charge. Id. at 330. The plaintiff never signed the form, nor did he ever make arrangements with the hospital to pay the bill. He then received 5 bills and reminders to pay the bill. A few months after his stay at the hospital, the plaintiff orally agreed to a payment plan where he would pay his bill in $15 monthly installments, and several days later modified the plan to $20 monthly installments. Several months after that, the plaintiff paid the hospital $30. The District Court—converting the motion to dismiss into one for summary judgment—granted summary judgment in the hospital's favor because the hospital did not constitute a "creditor" within the meaning of TILA.

The Seventh Circuit affirmed, but on a different basis. It held that the hospital was, in fact, a "creditor" within the meaning of TILA because it "clearly 'in the ordinary course of business regularly' both (1) extends credit which is payable in more than four installments and (2) extends credit for which the payment of a finance charge in required." Id. at 336.

However, it held that the oral agreements between the plaintiff and the hospital were not "consummated" TILA transactions because they did not involve "the extension of 'credit' so as to require disclosure under [TILA]." Id. at 334. In reaching this conclusion, the court relied on

12

staff interpretations from the Federal Reserve Board ("FRB"), which "consistently indicate[s] that 'informal workout arrangements' reached between a vendor and a customer do not require disclosures under [TILA] even though the workout involves more than four installments or payments in full of the underlying obligation." Id. According to the FRB, a "formal workout arrangement," by contrast, "would involve some new evidence of indebtedness executed by the consumer, such as a new note, contract or other form of written agreement. . . [A] unilateral written communication by either the creditor or the customer (such as a letter confirming matters previously discussed either orally or in writing) renders a workout arrangement formal and subject to the disclosure requirements of Regulation Z[.]" Id. The Court held the plaintiff never made an explicit agreement with the hospital to pay her bill that "indicat[ed] acceptance of the [h]ospital's installment payment option," and the oral agreements "were reached without a new written evidence of [the plaintiff's] indebtedness in a manner consistent with [FRB] interpretations." Id. at 335. As a result, the agreements were considered "'informal workout agreements' not requiring the disclosures provided by TLA even though these agreements contemplated payment in more than four installments[.]" Id.

### c. Discussion

In Bright, the Seventh Circuit held that the defendant could not be liable under TILA because the payment agreements reached between the parties were not "consummated" TILA transaction, even though the defendant there did qualify as a "creditor" under TILA. 616 F.2d at 336. The parties have not cited, and this Court has not found, any more recent precedent with any similarity to the facts of this case, following Bright. The Court similarly concludes that no TILA transaction had ever been "consummated" between Plaintiff and Defendant because the only agreement between Plaintiff and Defendant, the "Financial Policy," contemplated payment

of the deductible in full, and any subsequent discussions between Defendant and Plaintiff's

father were merely "informal workout arrangements" not subject to TILA disclosures. (See,

e.g., Def.'s Mot. at 5).

As stated above, in the Third Circuit, "whether one is a TILA creditor is a bifurcated

question, requiring a person both to be a 'creditor' in general, by extending credit in a certain

minimum number of transactions, and to be the 'creditor' in the specific transaction in dispute."

Pollice, 225 F.3d at 411.  Accordingly, Plaintiff was required to allege facts sufficient to show

*both* that Defendant "regularly extends consumer credit that is subject to a finance charge or is

payable by written agreement in more than four installments," and that Defendant specifically

did so for Plaintiff.  § 226.2(17)(i)

Plaintiff has not alleged facts sufficient to satisfy the "specific transaction" prong of the

definition of "creditor" under TILA.[8]  As Plaintiff admits—he was not extended "credit" that

was "payable by **written agreement** in more than four installments" or that was "subject to a

finance charge."  § 226.2(17)(i) (emphasis added).

Regulation Z provides that individuals who "regularly extend[]" credit not subject to a

"finance charge" must do so by "written agreement," whereas TILA requires only that they do so

by "agreement."  (Compare 12 C.F.R. § 226.2(17)(i) with 15 U.S.C.A. § 1602(g)).  Plaintiff does

not argue that the inclusion of the word "written" in Regulation Z constitutes an "obvious

repugnance to the statute."  Anderson Brother Ford, 452 U.S. at 219.  Plaintiff has ignored

---

[8]    In its Reply brief, Defendant appears to concede that it fell within the "general" prong of
the definition of "creditor" for purposes of a summary judgment motion in this case. (Def.'s
Reply Br. at 9); see Pollice, 225 F.3d at 411. Pursuant to Regulation Z, "[a] person regularly
extends consumer credit only if it extended credit . . . more than 25 times (or more than 5 times
for transactions secured by a swelling) in the preceding calendar year." § 226.2(17)(v). Plaintiff
has not alleged any facts to allow a legal conclusion that Defendant was a "creditor" for purposes
of the "specific" agreement alleged in the Complaint.

14

Regulation Z in his brief. Regulation Z was promulgated to implement TILA, which Regulation Z achieved by requiring that an "agreement" be "written." Therefore, as the Supreme Court has stated, Regulation Z "should be accepted[.]" Id.

Adherence to the language of the regulation is also consistent with the purpose of TILA more generally, which is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a); Roberts v. Fleet Bank (R.I.), 342 F.3d 260, 265 (3d Cir. 2003), as amended (Oct. 21, 2003).

By requiring the "agreement" to be "written," the Regulation serves the purpose of the statute. Oral agreements would be subject to endless credibility disputes and lengthy evidentiary explorations on conversations between the consumer and creditor. A writing presumably states the terms clearly, and without dispute.

TILA violations are taken very seriously. Wisely or otherwise, Congress enacted a system of strict liability in favor of consumers when mandated disclosures have not been made. See 15 U.S.C. § 1640(a). "[O]nce the court finds a violation, no matter how technical, it has no discretion with respect to liability." Smith v. Fidelity Consumer Discount Co., 898 F.2d 896, 898 (3d Cir. 1990) (internal citations omitted).

Against this backdrop, it is clear that Congress did not intend for TILA liability to extend to encompass the facts of this case. Defendant indisputably did Plaintiff a favor. Defendant was permitted to proceed with his needed operation and expediently begin recovery without prepayment of the deductible; and further, to pay the deductible he owed for the operation gradually over time, free of any finance charge. Plaintiff was not in a position to "compare . . .

15

various credit terms" because he was simply extended the courtesy of deferring payment for a medical service he requested from Defendant. In this case, Regulation Z's provision that Defendant cannot be a "creditor" absent a "written agreement" or a "finance charge" protects Defendant against an otherwise absurd outcome.

Requiring a physician to make TILA disclosures to a patient under these circumstances would only (further) transform the medical arts into a paper-pushing proxy for government regulators. Plaintiff came to Defendant for a cure, requested a favor, and received the operation without prepaying his deductible. Imposing a requirement of financial disclosure under these facts would establish the most unfortunate precedent, imposing TILA disclosure operations on any verbal agreement to delay payment, which probably happens about a million times a day in the United States. If Plaintiff's theory of this case would succeed, every time the "butcher, the baker or the candlestick maker" allows a customer to delay payment for a few weeks, financial disclosures would be required.

In this Court's view, the Federal Reserve should consider revising the regulations so it is clear that TILA does not extend to mere "accommodations" of delay in payment, as held by Bright and this Court.

The reference to "greed" in the first sentence of this Memorandum, refers to the apparent motivation of Plaintiff to secure Defendant's services without payment of the clearly explained and legally obligatory deductible, and then "rewarding" this act of generosity with this lawsuit, where Defendant would be liable for statutory damages and attorney's fees. If this indeed is

Plaintiff's scheme, he has tried to turn a legitimate debt that he owes into a bounty that he does

not deserve.  In law enforcement circles, Plaintiff's conduct can be called common law larceny.[9]

Defendant's Motion for Judgment on the Pleadings, pursuant to Rule 12(c), will be

granted.[10]  The Court, in reaching this conclusion, referenced facts outside the pleadings, but

under the concession of Plaintiff's counsel during the recorded telephone conversation on

December 14, 2016, there is no longer any dispute as to any material fact, establishing that there

was no finance charge and no "written agreement" between the parties.  Alternatively,

Defendant's motion will be converted into one for summary judgment, pursuant to Rule 12(d),

which will also be granted.  Given the undisputed facts, there is no need for any further

discovery.[11]

### V.      Plaintiff's Motion to Dismiss Defendant's Counterclaim

The Court next considers Plaintiff's Motion to Dismiss the Defendant's Counterclaim for

breach of contract.

#### a.  Parties' Arguments

Plaintiff argues that the Court should dismiss Defendant's counterclaim for lack of

jurisdiction because (1) pursuant to Rule 13, it is "permissive" rather than "compulsory"; and (2)

pursuant to 28 U.S.C. § 1367, the Court should not exercise supplemental jurisdiction because

---

[9]      Incurring a debt one knows he does not intend to satisfy is dangerous.  In Wagner's Ring,
the god Wotan promised to pay the Giants for building Valhalla, a debt he was unable to satisfy
without using stolen gold—which initiated a series of events leading to his demise.

[10]      The Court notes that the e-mail described in footnote 6 above, which is not being
considered in reaching the decision, may nonetheless be relevant to the Rule 11 proceedings.  Its
author, the Plaintiff's father, who operates a financing business, was apparently trying to
convince Defendant to retain his services, which Defendant declined to do.  Thus, the inquiry on
Rule 11 is whether that communication had any role in the initiation or prosecution of this
lawsuit.

[11]      The Court need not reach Defendant's alternative motion for bifurcation of discovery,
since this case will not proceed to discovery.

the Counterclaim does not "form part of the same case or controversy" as the TILA claim. (Pl.'s

Mot. at 5-11).

Defendant argues that the fact that the counterclaim is not "compulsory" is not

dispositive of the issue, and that the Court should exercise supplemental jurisdiction, pursuant to

Section 1367, because Defendant's "claim for breach of contract against Plaintiff is so related to

Plaintiff's claim under TILA that it forms a part of the same case or controversy." (Def.'s Opp'n

at 6). In particular, the Counterclaim and TILA claim "revolve around the same facts," such as

"whether Plaintiff reached an agreement with Defendant for payment on a debt, the terms

disclosed and whether that agreement was consummated." (Id.).

### b. Discussion

Rule 13 establishes two kinds of counterclaims: compulsory and permissive. A

counterclaim is compulsory if it "arises out of the transaction or occurrence that is the subject

matter of the opposing party's claim." Fed. R. Civ. P. 13(a)(1)(A). A compulsory counterclaim

does not require an independent jurisdictional basis to be brought in federal court, even when it

is purely a state-law claim. Ambromovage v. United Mine Workers of Am., 726 F.2d 972, 988

(3d Cir. 1984) (internal citations omitted). A permissive counterclaim, on the other hand,

requires a basis for federal jurisdiction independent of the opposing party's claim. Aldens Inc. v.

Packel, 524 F.2d 38, 52 (3d Cir. 1975). A permissive counterclaim is broadly defined to include

"any claim that is not compulsory." Fed. R. Civ. P. 13(b).

28 U.S.C. § 1367, which authorizes "supplemental jurisdiction," provides an alternative

basis on which the Court can exercise jurisdiction over a state law counterclaim. Pursuant to

Section 1367, "in any civil action of which the district courts have original jurisdiction, the

district courts shall have supplemental jurisdiction over all other claims that are so related to

claims in the action within such original jurisdiction that form part of the same case or

controversy under Article III of the United States Constitution." Even if the claims are so

related, courts may still decline to exercise supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State law;
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction;
> (3) the district court has dismissed all claims over which it has original jurisdiction; or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. §1367(c)(1)-(4).

The weight of the case law suggests that breach of contract is not a "compulsory"

counterclaim to TILA claims. While the Third Circuit has never squarely addressed the question

of whether a breach of contract counterclaim to a TILA claims is "compulsory" or "permissive,"

many other circuits have concluded that such claims are "permissive," as have many district

courts in the Third Circuit to consider the issue. For instance, in <u>Agostine, et al. v. Sidcon

Corp.</u>, 69 F.R.D. 437, 442 (E.D. Pa. 1975), the court explained, "[i]t is obvious that the issues of

fact and law are quite different. Plaintiff's claims, based upon the [TILA], will require a

determination of whether a consumer credit transaction took place without the requisite

disclosures, while [defendants'] counterclaims seek to recover default payment on the

outstanding debt obligations." Similarly, a year later in <u>Zeltzer, et al. v. Carte Blanche Corp.</u>,

414 F. Supp. 1221, 1223-24 (W.D. Pa. 1976), that court explained:

> while the two claims stem from the same underlying business transaction, they involve entirely distinct legal issues; plaintiff's claim concerns the application of the [TILA]; the counterclaim does not concern the [TILA] or any other federal law. Moreover, the factual issues are distinct. Plaintiff's claim entails proof of a limited set of facts relating to the nature of the disclosure made by defendant. The counterclaim involves proof of a contract, its validity, the record of payments and plaintiff's default. In these circumstances, where claim and counterclaim lack even a close

19

similarity of factual and legal issues, [the court found] that the respective claims are 'offshoots' of the same basic transaction, but not the same basic controversy between the parties," and that separate trial on each distinct claim will not involve a "substantial duplication of effort and time by the parties and the courts."

In this case, if Defendant cannot bring its counterclaim as a "compulsory" one, then it may not bring it under Rule 13 at all because in order to consider "permissive" counterclaims, there must be an independent basis on which the Court can exercise jurisdiction. See Fed. R. Civ. P. 13(b). Here, the parties are not diverse, so no independent basis exists.

This is not dispositive of whether the Court can consider the breach of contract claim, however, because the Court must also consider whether it may exercise supplemental jurisdiction, pursuant to Section 1367. See Ayres v. Nat'l Credit Mgmt. Corp., No. 90-cv-5535, 1991 WL 66845, at *2 (E.D. Pa. Apr. 25, 1991) ("The Third Circuit has expressly stated that federal jurisdiction over state-law counterclaims is not dependent on whether the counterclaim is designated as compulsory or permissive"). Some courts have even called into question the viability of the compulsory/permissive analysis in light of Section 1367, which was enacted in 1990. See Korrow v. Aaron's, Inc., 300 F.R.D. 215, 223 (D.N.J. 2014) ("[T]he First, Second, and Seventh Circuit Courts of Appeals have concluded that the compulsory/permissive distinction of Rule 13 was superseded by the enactment of 28 U.S.C. § 1367 in 1990").

The operative difference between the two test is that Rule 13 asks whether the claim and counterclaim arise from the same "transaction or occurrence," whereas Section 1367 asks whether the claim and counterclaim arise under a "common nucleus of operative facts." One court has noted that "several transactions may share an intersection of 'operative facts.'" Ambromovage, 726 F.2d at 990.

In <u>Ayres</u>, 1991 WL 66845, at \*3, a Fair Debt Collections Practices Act ("FDCPA") case,

15 U.S.C. §§ 1692-1692*o*, the court recognized the analytical distinction between Rule 13 and

Section 1367, and framed the issue as whether defendant's counterclaim and Plaintiff's FDCPA

claim "arise under a broader 'common nucleus of operative facts'" notwithstanding the fact that

"the defendant's counterclaim cannot be said to arise from the same transaction or occurrence as

plaintiff's FDCPA claim." In declining to exercise supplemental jurisdiction, the court held that

the "debtor-creditor relationship is a fact common to both claims[,] [y]et the key operative facts

supporting the claims are clearly distinct[]" in that at trial, "[p]laintiff need not offer proof that

the debt is invalid; the validity of the debt is legally irrelevant to the FDCPA claim." <u>Id</u>.

Other courts, even without explicitly referencing the analytical distinction between Rule

13 and Section 1367,[12] generally decline to exercise supplemental jurisdiction over state law

counterclaims to federal consumer protection claims when (1) the plaintiff disputes it or (2) there

is no independent basis, such as diversity jurisdiction, on which to do so.[13] For instance, in

<u>Kimmel</u>, 747 F. Supp. at 427, the Court explicitly declined to reach a Section 1367 analysis

because the parties were diverse, so there was an independent basis for jurisdiction.

Additionally, in <u>Korrow</u>, the court held that supplemental jurisdiction over the defendant's

breach of contract claim was warranted, but only because the defendant had failed to object, so

---

[12] The analytical distinction between the "transaction or occurrence" (Rule 13) and the "common nucleus of operative facts" (Section 1367) tests is, at most, subtle, and courts frequently conflate them. For instance, in <u>Kimmel</u>, the court found that breach of contract counterclaims did not arise out of the same "common nucleus of facts" as the TILA claim because "Plaintiff's claim involves factual and legal questions as to whether Defendant used improper means to collect an alleged debt, while Defendant's Counterclaim raises separate issues regarding whether and to what extent a debt existed at all." 747 F. Supp. 2d at 432. This is the same basis on which courts have declined to find a counterclaim compulsory under Rule 13.

[13] The Court can locate only one case in this Circuit where the district court explicitly decided to exercise supplemental jurisdiction over a breach of contract counterclaim in a TILA action. <u>See</u> <u>Kuenzi v. EuroSport Cycles, Inc.</u>, No. 08-cv-3906, 2011 WL 1883052, at \*4 (E.D. Pa. May 17, 2011).

21

the issue was considered waived.  300 F.R.D. at 221 ("To some extent, the Section 1367(a)

analysis is less of an issue here.  [Defendant] has a counterclaim against [plaintiff] for breach of

contract in the Amended Answer, and [plaintiff] did not contest the Court's jurisdiction to decide

it [so] for purposes of the motion only, the Court finds there is a sufficient basis for the

[complaint] to survive a 1367 challenge.").  In Orloff v. Syndicated Office Sys., while the court

did dismiss the breach of contract counterclaim in a consumer protection action, it did so based

on Rule 13 alone, without even considering Section 1367.  No. 00-cv-5355, 2003 WL 22100868,

at *3 (E.D. Pa. Aug. 20, 2003) ("Based upon the foregoing we are satisfied that Defendants'

counterclaim is not compulsory and must be dismissed.").

      Based on the foregoing case law, the Court declines to exercise supplemental jurisdiction,

pursuant to Section 1367, over Defendant's breach of contract counterclaim.  Moreover, even if

the exercise of supplemental jurisdiction was appropriate, the Court will exercise its discretion,

pursuant to Section 1367(c), to decline to do so since the Court is dismissing the TILA claim,

which is "the only claim[] over which it has original jurisdiction."  Defendant is free to pursue its

claim in state court.

## VI.    Conclusion

For the foregoing reasons, Defendant's Motion for Judgment on the Pleadings will be

**GRANTED** with prejudice, or the Court will grant Summary Judgment in favor of Defendant.

Plaintiff's Motion to Dismiss Defendant's Counterclaim will be **GRANTED**, without prejudice.

An appropriate Order follows.

O:\CIVIL 16\16-4935 Wolfington v Reconstructive Ortho\Memo Re Judgment on Pleadings and Counterclaim.docx