UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

ANDREW WOLFINGTON,      .   Case No. 2:16-CV-04935-MMB
                       .
         Plaintiff,    .
                       .   U.S. Courthouse
     v.            .   601 Market Street
                       .   Philadelphia, PA 19106
RECONSTRUCTIVE         .
ORTHOPAEDIC ASSOCIATES II.
P.C. et al,          .
         Defendant.    .   May 16, 2017
. . . . . . . . . . . ..   10:08 a.m.

HEARING TRANSCRIPT
BEFORE HONORABLE MICHAEL M. BAYLSON
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff<br>Andrew Wolfington: | ROBERT LEVANT, ESQUIRE<br>ALAN TAUBER, ESQUIRE<br>Levant Martin Tauber & Levin PC<br>320 North 18th Street<br>Philadelphia, PA 19103 |
| For the Defendant<br>Reconstructive<br>Orthopaedic Associates,<br>II, P.C.: | LAURA RUCCOLO, ESQUIRE<br>Capehart and Scatchard, P.A.<br>8000 Midlantic Drive<br>Suite 300<br>Mount Laurel, NJ 08054 |
| Audio Operator: | J. LUTZ |
| Transcribed by: | KELLI RAY, CER-349<br>Lawrence Court Transcription & Video<br>P.O. Box 530790<br>DeBary, FL 32753<br>386.216.5921 |

Proceedings recorded by electronic sound
recording, transcript produced by transcription service.

2

I N D E X

                                                        PAGE

WITNESSES FOR THE PLAINTIFF:

     ARKADY RAYZ
          COURT ADDRESSES WITNESS                        8
          CROSS-EXAMINATION BY MS. RUCCOLO              33
          REDIRECT EXAMINATION BY MR. TAUBER            48

     MICHAEL YARNOFF
          COURT ADDRESSES WITNESS                       58
          CROSS-EXAMINATION BY MS. RUCCOLO              72
          REDIRECT EXAMINATION BY MR. TAUBER            75

     GERALD WELLS
          COURT ADDRESSES WITNESS                       78
          REDIRECT EXAMINATION BY MR. TAUBER            86
          RECROSS EXAMINATION BY MS. RUCCOLO            90
          FURTHER REDIRECT EXAMINATION BY MR. TAUBER    92
          FURTHER RECROSS EXAMINATION BY MS. RUCCOLO    93

EXHIBITS                                     ID.   EVD.

NONE

3

1              JUDGE MICHAEL BAYLSON:  We're here for a hearing in

2   Andrew Wolfington vs. Reconstructive Orthopaedic Associates, a

3   civil action, 16-4935.  And I just want to review the

4   appearances for the plaintiff.  We have Robert Levant, good

5   morning.  How are you?

6              MR. ROBERT LEVANT:  Good morning, Your Honor.  How

7   are you?

8              THE COURT:  And Mr. Alan Tauber, good morning.

9              MR. ALAN TAUBER:  Yes, good morning, Your Honor.

10             THE COURT:  How are you?  And for the defendant we

11  have Laura Ruccolo, correct?

12             MS. LAURA RUCCOLO:  Good morning, Your Honor.

13             THE COURT:  All right.  And do you want to introduce

14  any of your colleagues at counsel table?

15             MS. RUCCOLO:  Your Honor, these are employees of

16  Rothman.  This is Gina Pino (Phonetic).

17             MS. PINO:  Good morning, Your Honor.

18             MS. RUCCOLO:  And Carolyn Mona (Phonetic).

19             MS. MONA:  Good morning.

20             THE COURT:  Well, are they lawyers with you or

21  they're with your client?

22             MS. RUCCOLO:  They're the clients.

23             THE COURT:  Okay.  All right.  Well, in this case

24  this was a civil action filed under the Truth and Lending Act

25  primarily.  And we had some motion practice as a result of

1    which I granted a motion of the defendant to dismiss the

2    complaint.  And in doing so, for reasons that I indicated in

3    the memorandum, I felt it was appropriate to initiate a

4    proceedings under Rule 11.  And I found out subsequently that

5    the defendant had also given notice about that as well.

6            And in response Mr. Levant entered his appearance on

7    behalf of the law firms representing the plaintiff in this

8    case.  And is now joined by Mr. Tauber.  Maybe you were on the

9    case from the beginning, Mr. Tauber?  I don't remember.

10           MR. TAUBER:  No, Your Honor.  Just for the -- just

11   for the post-judgment matters, these matters.

12           THE COURT:  Right.  Okay.  Okay.  And subsequently

13   then the attorneys representing the plaintiff filed several

14   declarations, which I've reviewed.  And I indicated then in an

15   order March 23rd that there appeared to be certain conflicts

16   and that I thought the most appropriate way to resolve them was

17   to have the evidentiary hearing where all individuals with

18   personal knowledge of the events in question could be heard,

19   including through cross-examination.  And scheduled that for

20   today, which is why we're here.  And I appreciate everybody

21   having filed the materials that they did, which I've reviewed.

22           All right.  Having said that, I want to just say one

23   -- two preliminary things.  I'm going to treat the declarations

24   filed by the plaintiff's counsel as basically their direct

25   testimony.  Okay.  And I think I may have indicated that in a

1  phone call that we had.  And then assuming that the plaintiffs
2  and the plaintiff's law firm want me to consider the
3  affidavits, I'm going to be -- require them to testify because
4  I have some questions and I'm going to give counsel for the
5  defendant the opportunity to ask some questions.  And that's
6  how we're going to proceed.

7        And then we'll have redirect.  And I'll be generous
8  in redirect, Mr. Levant and Mr. Tauber, to the extent you want
9  to bring out anything that was not in the declaration.  But I
10  don't see a need for the purposes of this Rule 11 hearing to
11  have repetition of what is in the declarations, okay?  They
12  are, you know, filed of record and they, you know, devote
13  considerable time to the experience and the background of the
14  -- of each declarant.

15        And then when I am done my questions and I give Ms.
16  Ruccolo a chance to answer some questions -- ask some
17  questions.  And then I'll allow for redirect and if necessary
18  recross.  So that's how I intend we're going to proceed.

19        Now, the other thing I want to say relates to the
20  *Bright* case.  So the *Bright* case is a TILA case that was in the
21  Seventh Circuit.  And I am not concerned for purposes of this
22  hearing with what the *Bright* case held or didn't hold.  All
23  right.  I take it that -- and I have no dispute that the
24  plaintiff's counsel were aware of the case, that they
25  considered it.  It's not a Third Circuit case.  The facts are,

6

1  some facts are similar, some facts are different.  No

2  obligation on me or any lawyer to -- in this case to have to

3  consider the *Bright* case as precedent.  And so I don't intend

4  either in this hearing or in the briefing or in any reason for

5  whatever decision I may make, which I haven't decided what it

6  will be, is going to have any concerns with the *Bright* case.

7  So I just -- that might save some time.  So I wanted to make

8  that statement.  Okay.

9           So I think what I would like to suggest, if Mr.

10  Arkady Rayz is here.  He --

11           MR. RAYZ:  Yes, Your Honor.

12           THE COURT:  All right.  Since he signed the

13  complaint, I'd like to start with him.  Is that acceptable, Mr.

14  Levant?

15           MR. LEVANT:  Yes.

16           THE COURT:  Mr. Tauber?

17           MR. TAUBER:  That's fine with us, Your Honor.

18           MR. LEVANT:  Yes, Your Honor.  That's how we intended

19  to proceed.

20           THE COURT:  All right.

21           MR. TAUBER:  Analytically, yes, I think it makes --

22           THE COURT:  Okay.  So I'm going to sequester

23  everybody else who's going to testify in this case.  You'll

24  have to step outside, include the defendant's representatives.

25           So anybody else who's going to testify -- is the

1  plaintiff here, Mr. Wolfington?

2              MR. LEVANT:  No.

3              MR. TAUBER:  No, he's not.

4              MR. LEVANT:  But we had discussed in the on the

5  record phone conference that that was not subject to --

6              THE COURT:  That's right.

7              MR. LEVANT:  -- what Your Honor wanted to inquire.

8              THE COURT:  Now, what about his father?

9              MR. LEVANT:  Your Honor, we had the same discussion

10 and based on our conversation --

11             THE COURT:  All right.  Let --

12             MR. LEVANT:  -- he would be available if the Court

13 needs him, but not --

14             THE COURT:  I only ask because I'm not -- I wasn't

15 preventing you from bringing him, I said it wasn't required.

16             MR. LEVANT:  No, I understand.  I -- my

17 understanding --

18             THE COURT:  Yeah.

19             MR. LEVANT:  -- our understanding was we would work

20 from the affidavit -- from the --

21             THE COURT:  Yeah, okay.

22             MR. LEVANT:  -- declarations.

23             THE COURT:  Mr. Rayz?  Okay.

24             MR. LEVANT:  Thanks, Your Honor.

25             THE COURT:  So I assume that all the individuals who

1  are here now in back of you are not going to testify?

2          MR. TAUBER:  That's correct.

3          THE COURT:  Okay.  Swear the witness, please.  Oh,

4  what happened to him?  All right.  Raise your right hand.

5              ARKADY RAYZ, PLAINTIFF'S WITNESS, SWORN

6          THE WITNESS:  I do so affirm.

7          THE COURT:  Thank you.  Have a seat.  All right.

8  Keep your voice up, please.

9          All right.  Now, Mr. Rayz, I'm going to place in

10 front of you a clean copy of the complaint that was filed in

11 this case.  And I'm going to ask you some questions.

12          Is that your signature at the end of that document?

13         THE WITNESS:  Yes, Your Honor.

14         THE COURT:  Okay.  And can you just tell me briefly

15 what role you had in drafting the complaint, if any?

16         THE WITNESS:  Sometime in the summer of 2016 I

17 received a rough draft of this complaint.  I edited it,

18 primarily for grammatical purposes, justification.  Read

19 through it before I did.  That's what I -- that's what I

20 remember.  That was my role.

21         THE COURT:  Okay.  Was -- is there -- is the fact

22 that you signed it, did that indicate that you were going to be

23 lead, so-called lead counsel on this case or principle counsel?

24         THE WITNESS:  Yes, Your Honor.

25         THE COURT:  Okay.  All right.  Now, there's another

1  name here, Demetri Braynin, B-R-A-Y-N-I-N; is that correct?

2          THE WITNESS:  Yes, Your Honor.

3          THE COURT:  And who is that?

4          THE WITNESS:  That's an associate who works in our

5  firm.

6          THE COURT:  Okay.  Did he work on this case?

7          THE WITNESS:  He did not, no.

8          THE COURT:  Okay.  Is he here in the courtroom?

9          THE WITNESS:  He's not, Your Honor.

10         THE COURT:  Okay.  All right.  But he had nothing to

11  do with this complaint?

12         THE WITNESS:  No, Your Honor.

13         THE COURT:  Okay.  All right.  Now, had you ever met

14  Andrew Wolfington, the plaintiff?

15         THE WITNESS:  No, I have not.

16         THE COURT:  All right.  Were you ever on a telephone

17  conference with him?

18         THE WITNESS:  No, I was not.

19         THE COURT:  Okay.  Did you ever review any of his

20  bank account records?

21         THE WITNESS:  His bank account records -- the only

22  thing I reviewed, Your Honor, were the emails that he received

23  from Rothman.  I don't think that they're bank account records,

24  but that's the only thing that I reviewed.

25         THE COURT:  Well, did you ever ask to look at his

1  bank account records?

2          THE WITNESS:  No, Your Honor, I did not.

3          THE COURT:  Did you ever see any credit card

4  statement of his, of Andrew Wolfington?

5          THE WITNESS:  No, Your Honor, I did not.

6          THE COURT:  Do you know what bank Andrew Wolfington

7  used?

8          THE WITNESS:  No, Your Honor, I do not.

9          THE COURT:  Do you have any knowledge if he used any

10 bank for checking or savings?

11         THE WITNESS:  I believe that he did, Your Honor.

12         THE COURT:  What's your basis for knowing that?

13         THE WITNESS:  The basis was that during discussions

14 at -- while we were preparing this complaint, what I knew --

15 what I found out was that the initial payment, the deductible,

16 was paid by his father through a credit card.

17         THE COURT:  Okay.

18         THE WITNESS:  But the subsequent payments were to be

19 subtracted or deducted from his bank account.

20         THE COURT:  Okay.  No, I understand that and we'll

21 get to that.  But that's in the complaint.  But you never

22 actually looked at any credit card records or bank account

23 statements of Andrew Wolfington?

24         THE WITNESS:  No, Your Honor.

25         THE COURT:  All right.  Did you ever ask to see the

1 father's credit card account statement or any papers relating

2 to the father's credit card?

3          THE WITNESS:  No, Your Honor.

4          THE COURT:  Was it your understanding the $200 --

5 we're talking about the $200 down payment.  Is your

6 understanding that was paid by the father on the father's

7 credit card or something else, if you know?

8          THE WITNESS:  I believe that it was -- it was my

9 understanding that it was paid by the father through the

10 father's credit card.

11          THE COURT:  Okay.  Would you look at -- wait a

12 minute.  I gave you the wrong document.  All right.  I'm going

13 to show you -- here's the clean copy.  The copy I gave you --

14 yeah, okay.

15          All right.  I handed you a clean copy.  All right.

16 Would you look at paragraph 4 of the complaint?  I'm going to

17 read the first -- well, it's all one sentence and I'm going to

18 read it out loud: (Reading)

19          "Despite these plain truths, defendant defined

20          herein, extended credit to plaintiff and obtained

21          plaintiff's personal banking information so as to

22          execute electronic transfers to repay the loan, yet

23          failed to provide the necessary disclosures and

24          written authorizations in accordance with the TILA,

25          T-I-L-A, Regulation Z, the EFTA, E-F-T-A, and

1            Regulation E."

2            Did I read that correctly?

3            THE WITNESS:  Yes, Your Honor.

4            THE COURT:  What knowledge did you have that -- that

5   the defendant obtained plaintiff's personal banking

6   information?

7            THE WITNESS:  Your Honor, if you look at paragraph 24

8   of the complaint, that is a --

9            THE COURT:  Well, no.  Yeah, all right.  Just a

10  minute.

11           Okay.  Go ahead.

12           THE WITNESS:  Okay.  In paragraph 24 of the

13  complaint, that is a verbatim copy from an email that Mr.

14  Wolfington received from Rothman.  And if you look at the

15  bottom portion of that snippet where -- that begins with,

16  here's your payment information, you will see that there is the

17  credit card, what's listed as a credit card with the -- with

18  most of the numbers being redacted with the exception of 8430.

19  And I, having spoken with my co-counsel, I understood that the

20  paid via credit card language was incorrect, that it was

21  actually the payments were not being subtracted from a credit

22  card but from a bank.  So to me that meant that this is a bank

23  account that the plaintiff used --

24           THE COURT:  Well --

25           THE WITNESS:  -- based on the --

1          THE COURT:  -- is the only -- is your testimony, sir,

2    that the only information, the only facts you had to

3    substantiate the allegation that defendant obtained plaintiff's

4    personal banking information is the information contained in

5    paragraph 24?

6          THE WITNESS:  No, Your Honor.  This paragraph 24 is

7    just -- is the paragraph that's in the complaint.  We also had

8    the subsequent emails that were sent from Rothman to our client

9    saying that the transaction that they initiated to his bank

10   account were not successful.

11         THE COURT:  Were not what?

12         THE WITNESS:  Were not successful.

13         THE COURT:  Okay.  And do you know why they weren't

14   successful?

15         THE WITNESS:  I, that I didn't know.

16         THE COURT:  Did you ever inquire why they weren't

17   successful?

18         THE WITNESS:  I did not, Your Honor, because I didn't

19   speak with Mr. Wolfington.

20         THE COURT:  What?

21         THE WITNESS:  I did not because I didn't speak with

22   Mr. Wolfington.

23         THE COURT:  Well, have you since learned as of now

24   that the reason there were no payments from Mr. Wolfington's

25   bank account because -- the reason that Mr. Wolfington never

1 supplied any information as to his bank account information

2 from which Rothman could make a deduction or a payment?

3        THE WITNESS:  My understanding is the reason why the

4 transactions didn't go through is because Mr. Wolfington did

5 not have any money in the account.

6        THE COURT:  Mr. Wolfington?

7        THE WITNESS:  Did not have any money in the account.

8 This was his --

9        THE COURT:  Did he have an account?

10        THE WITNESS:  He had an account.

11        THE COURT:  How do you know that?

12        THE WITNESS:  Based on my conversations with my co-

13 counsel.

14        THE COURT:  Which co-counsel?

15        THE WITNESS:  I spoke with Mr. Wells.

16        THE COURT:  Mr. Wells?

17        THE WITNESS:  Mr. Wells.

18        THE COURT:  Wells, yeah.

19        THE WITNESS:  Mr. Grey.

20        THE COURT:  How do you spell that, R-E-Y?

21        THE WITNESS:  G-R-A-Y.

22        THE COURT:  G-R -- yeah, okay.

23        THE WITNESS:  Mr. Yarnoff.

24        THE COURT:  Okay.  And what did they tell you?  Do

25 you remember what Mr. Wells said on this point?

1            THE WITNESS:  Your Honor, I don't remember
2   specifically what was said, but I know that the gist of the
3   conversation was that Mr. Wolfington did not have funds in the
4   account.  And that's why the subsequent payments did not -- did
5   not result in the transfer of the funds from the account.
6            THE COURT:  Do you have any knowledge of facts that
7   Mr. Wolfington ever gave Rothman any information about his bank
8   account?
9            THE WITNESS:  Your Honor, when I -- when I, looking
10  at paragraph 24 and the fact that that email, that that
11  language comes from an email that was sent from Rothman to Mr.
12  Wolfington, I had no reason to believe that that information
13  was erroneous, namely the credit -- the account number that was
14  given.
15           THE COURT:  Well, do you draw a distinction between
16  credit card information and bank account information?
17           THE WITNESS:  I do, Your Honor.
18           THE COURT:  Okay.  Well, in the -- in going back to
19  paragraph 4, this says, plaintiff's personal banking
20  information.  Do you see that phrase?
21           THE WITNESS:  Yes, Your Honor.
22           THE COURT:  You were aware that was in the complaint?
23           THE WITNESS:  Yes.
24           THE COURT:  And that -- that's different than
25  personal credit card information, correct?

1              THE WITNESS:  Yes, Your Honor.

2              THE COURT:  Right.  Now, let me go back to paragraph

3    24.  What is in paragraph 24 that has anything to do with bank

4    account information?

5              THE WITNESS:  Your Honor, as I indicated earlier, it

6    was my understanding that within paragraph 24, that email that

7    was sent to -- by Rothman to my client where it said, paid via

8    credit card, that paid via credit -- paid via, the language,

9    credit card was incorrect, that in fact it was a bank account

10   that the payments were being subtracted out of.

11             THE COURT:  Well, did you ever inquire as to whether

12   Mr. Wolfington conveyed that error to anyone at Rothman?

13             THE WITNESS:  I -- no, I did not ask.

14             THE COURT:  Or his father?  What?

15             THE WITNESS:  I did not ask, Your Honor.

16             THE COURT:  Okay.  All right.  Now, in this -- and

17   also in paragraph 4, on the bottom line, there's a reference to

18   Regulation Z.  Do you see that?

19             THE WITNESS:  Yes, Your Honor.

20             THE COURT:  Are you familiar with Regulation Z?

21             THE WITNESS:  I have read through Regulation Z, Your

22   Honor.

23             THE COURT:  Had you read it before you filed this

24   complaint?

25             THE WITNESS:  I believe so, yes.

1          THE COURT:  All right.  Then let me go back to the

2    second line.  After personal banking information it then says,

3    quote, so as to execute electronic transfers to repay the loan,

4    close quote.  What do -- when you say execute electronic

5    transfers, that -- doesn't that refer to transfers from a bank

6    account to a creditor as opposed to a credit card payment?

7          Let me rephrase the question.  Does -- when you say

8    here execute electronic transfers, what does that refer to?

9          THE WITNESS:  It refers to monthly -- the best way I

10   can answer, Your Honor, perhaps is to give an example.  It's a

11   monthly withdraw from a bank account.

12         THE COURT:  Okay.

13         THE WITNESS:  Whether it's a debit -- debit account

14   with a bank --

15         THE COURT:  Okay.

16         THE WITNESS:  -- or a credit card.

17         THE COURT:  But it's clear it's from a bank account,

18   right, as opposed to a credit card?

19         THE WITNESS:  It can be withdrawn from a credit card

20   too.

21         THE COURT:  Well, did you understand -- what did you

22   mean when you used that phrase in this complaint?

23         THE WITNESS:  What I meant when I -- with that phrase

24   is that the money was being taken out of Mr. Wolfington's bank

25   account.

1            THE COURT:  Okay, fine.  All right.  Thank you.

2            All right.  Now, I want to move ahead to paragraph

3    20.  I'm going to read -- this is also one sentence and I'm

4    going to read it into the record:  (Reading)

5                 "After discussing the inability of his son to pay the

6                 entire deductible in one lump sum, defendant agreed

7                 to extend credit to plaintiff to cover the balance

8                 owed, which consisted of an initial credit card

9                 payment of $200 on January 20th, 2016, with

10               subsequent monthly payments of $100, until the

11               balance of the deductible was fully satisfied."

12           Have I read that correctly?

13           THE WITNESS:  Yes, Your Honor.

14           THE COURT:  Okay.  What facts did you have that led

15   you to conclude that the defendant had agreed to extend credit

16   to plaintiff for the balance due?

17           THE WITNESS:  Well, Your Honor, I relayed back to

18   paragraph 23, paragraph 24 and the emails that were sent to Mr.

19   Wolfington by Rothman regarding the payments that were not

20   effectuated.

21           THE COURT:  Okay.

22           THE WITNESS:  Not the payments but the debits that

23   did not result in the transfer of the funds.

24           THE COURT:  Are you aware of that Regulation Z

25   requires a written agreement?

19

1                    THE WITNESS:  Yes, I am, Your Honor.

2                    THE COURT:  Okay.  And did you form an opinion at

3    that time that you had sufficient facts to believe that there

4    was a written agreement between the plaintiff and Rothman?

5                    THE WITNESS:  Yes, Your Honor.

6                    THE COURT:  And is that because of what the facts

7    that are stated in those paragraphs 23, 24 and the emails?

8                    THE WITNESS:  Yes, Your Honor.

9                    THE COURT:  Okay.  What conduct by the plaintiff can

10   you testify to which signified his agreement?

11                   THE WITNESS:  The fact that he provided the

12   information to the -- well, first --

13                   THE COURT:  What information did he provide?

14                   THE WITNESS:  Well, first, the initial payment was

15   made.

16                   THE COURT:  That was made by his father?

17                   THE WITNESS:  Right.

18                   THE COURT:  Yeah, okay.

19                   THE WITNESS:  And then subsequent to that --

20                   THE COURT:  Made by his father on his father's credit

21   card?

22                   THE WITNESS:  Right.

23                   THE COURT:  Okay.  Now, you -- and you believe that's

24   an agreement by the plaintiff?

25                   THE WITNESS:  I believe that the father would not --

1  it's an agreement on behalf of the plaintiff --

2          THE COURT:  All right.

3          THE WITNESS:  -- to make the payments.

4          THE COURT:  Okay.  Are you aware that Regulation Z

5  excludes down payments?

6          THE WITNESS:  I believe so, Your Honor.

7          THE COURT:  Let me read paragraph 1 and I'll show --

8  I'll be glad to show this to you:   (Reading)

9          "A person who -- and this is under 17 of Regulation

10         Z, under the creditor means someone -- a person who

11         regularly extends consumer credit that is subject to

12         a finance charge or is payable by rent and agreement

13         in more than four installments, parenthesis, not

14         including a down payment, closed parens, and to whom

15         the obligation is initially payable, either on the

16         face of the note or contract, or by agreement when

17         there is no note or contract."

18         Did I read that correctly?

19         THE WITNESS:  Your Honor, you read 17, Roman numeral

20  I?

21         THE COURT:  Yeah.

22         THE WITNESS:  Yes, Your Honor, you read that

23  correctly.

24         THE COURT:  All right.  Now, so it excludes down

25  payment, right?

1            THE WITNESS:  For purpose of definition of creditor,

2  yes.

3            THE COURT:  All right.  So do you still maintain that

4  you rely on the fact that the father by the father's credit

5  card had paid the down payment is any evidence of an agreement?

6            THE WITNESS:  Yes, Your Honor.

7            THE COURT:  Okay.  All right.  Now, next question.

8  In paragraph 21, it says, and this is also one sentence.  I'll

9  read it: (Reading)

10           "Plaintiff was then told by a member of the Rothman

11           Institute's business office that the financing of his

12           deductible only could occur if he voluntarily agreed

13           to monthly electronic payment deductions from his

14           personal checking account by Rothman Institute."

15           Did I read that correctly?

16           THE WITNESS:  Yes, Your Honor.

17           THE COURT:  All right.  Did you make any

18  investigation as to whether the plaintiff -- as to what the

19  basis was for this factual statement?  Since you had never

20  spoken to the plaintiff, what did you rely on that that was

21  accurate?

22           THE WITNESS:  I relied on my co-counsel.

23           THE COURT:  The same three lawyers you mentioned

24  before?

25           THE WITNESS:  Yes, Your Honor.

1          THE COURT:  Okay.  All right.  But you have no

2   personal knowledge on that?

3          THE WITNESS:  No.

4          THE COURT:  Okay.  All right.  But this paragraph

5   specifically states that Rothman required that the plaintiff

6   had to voluntarily agree to monthly electronic payment

7   deductions from his personal checking account, right?

8          THE WITNESS:  Yes, Your Honor.

9          THE COURT:  And you had no knowledge that he -- that

10  he had -- well, you didn't have any knowledge that he even had

11  a personal checking account, or did you?

12         THE WITNESS:  I did, Your Honor.

13         THE COURT:  What bank was it in?

14         THE WITNESS:  Your Honor, I did not inquire as to

15  which specific bank --

16         THE COURT:  Okay.

17         THE WITNESS:  -- Mr. Wolfington had a bank account

18  in.

19         THE COURT:  All right.  Then in paragraph 22, it

20  says, and I'm just going to read the first phrase: (Reading)

21             "At the time of agreeing to a financing plane --

22             plan, plaintiff did not receive any written

23             information, et cetera."

24         I'm not going to read the rest of it.  So you, do you

25  have any additional testimony as to facts you knew to support

1    the allegation that the plaintiff agreed to the financing plan?

2              THE WITNESS:  Any additional testimony other than

3    what I already related?

4              THE COURT:  Yeah.

5              THE WITNESS:  No, Your Honor.

6              THE COURT:  All right.  Now, all the testimony that

7    you gave, Mr. Rayz, was conduct of Rothman.  That Rothman

8    accepted the down payment.  That Rothman sent the email that's

9    set forth in paragraph 24 about payment of the account balance.

10   And then Rothman sent some confirming emails.  Can you state

11   any facts that are to your knowledge that plaintiff did

12   anything constituting an agreement -- that would constitute his

13   agreeing to what Rothman had proposed?

14             THE WITNESS:  After agreeing to the plan, Mr.

15   Wolfington proceeded with the surgery.

16             THE COURT:  Well, I want to know what the plaintiff

17   did.

18             THE WITNESS:  That's -- that's Mr. Wolfington, the

19   plaintiff.

20             THE COURT:  So it's your testimony that plaintiff

21   agreeing to have surgery constituted an agreement that

22   satisfies the requirements of Regulation Z?

23             THE WITNESS:  No, Your --

24             THE COURT:  Is that your testimony?

25             THE WITNESS:  No, Your Honor.  Your Honor --

1          THE COURT:  Well, then explain to me what you meant

2 by the plaintiff agreeing to have the surgery?

3          THE WITNESS:  Your Honor, if I recall Your Honor's

4 question correctly, your question was what evidence was I aware

5 of or did I know.

6          THE COURT:  What facts.

7          THE WITNESS:  What facts did I know that would

8 indicate to me that there was an agreement between Rothman and

9 the plaintiff.

10          THE COURT:  Well, it's clear, there's no dispute that

11 Rothman proposed an agreement.  There's no dispute about that.

12 I would like to know what facts you had that the plaintiff

13 agreed?  I thought your testimony just now was that by

14 undergoing the surgery that constituted as agreement?

15          THE WITNESS:  The fact that the initial down payment

16 was made.  The fact that the day after the down payment was

17 made, I believe it was the 21st of January, Mr. Wolfington

18 proceeded with -- proceeded with the procedure, with the

19 surgery.  Those things would indicate to me that he agreed

20 to --

21          THE COURT:  Now, what I -- there's no dispute that

22 Rothman proposed an agreement.  Okay.  Are you -- your

23 testimony that the plaintiff by undergoing the surgery, that

24 constituted an agreement that satisfies Regulation Z?

25          THE WITNESS:  No, it's the fact that -- the fact that

1  the plaintiff proceeded with the surgery indicates to me that

2  he agreed to the payment plan that Rothman has proposed.  In

3  addition to the surgery there was a payment made by plaintiff's

4  father, the initial down payment.

5            THE COURT:  Yeah, but that was before the surgery.

6            THE WITNESS:  Exactly, yes.

7            THE COURT:  That's a down payment.  I already showed

8  you under Regulation Z it excludes down payments.

9            THE WITNESS:  Your Honor, it doesn't exclude down

10 payment.  It excludes down payment for purpose of determining

11 whether somebody's a creditor.  Under the circumstances of this

12 case, however, Rothman is clearly a creditor because the

13 definition of creditor excludes down payment but there must be

14 four payments afterwards, monthly payments.  And here there

15 were four monthly payments.

16           THE COURT:  Okay.  My -- you haven't answered my

17 question, respectfully.  I want to know what the plaintiff did

18 that constituted an agreement?  The down payment was made by

19 his father.  Are you asserting his father was his agent for

20 purposes of Regulation Z?

21           THE WITNESS:  Your Honor, I'm not asserting that his

22 father was an agent.  I just I don't see any other reason why

23 the father would make the payment on his son's behalf other

24 than to indicate that the son agrees to the payment.

25           THE COURT:  Okay.  Okay.  But this paragraph 21 and

1  22, I -- my question is, is there anything else you can testify

2  to that constituted the plaintiff's agreement to what Rothman

3  had proposed other than what you've already testified to?

4          THE WITNESS:  No, Your Honor.

5          THE COURT:  Okay, fine.  All right.  Now, paragraph

6  23 reads as follows: (Reading)

7          "Wolfington received the following confirmation of

8          the initial payment associated with this financing

9          plan."

10         And this refers to the down payment that had been

11 made by the father on the father's credit card, right?

12         THE WITNESS:  Yes, Your Honor.

13         THE COURT:  Okay.  And paragraph 24, receives --

14 alleges a confirmation about a future payment from a different

15 credit card for $100; is that correct?

16         THE WITNESS:  Yes, Your Honor.

17         THE COURT:  All right.  Now, paragraph 25 then says:

18 (Reading)

19         "Although noted as, "paid via: credit card", the

20      above transaction was an electronic transfer from

21      plaintiff's person banking account."

22         Is that right?

23         THE WITNESS:  Yes, Your Honor.

24         THE COURT:  What facts do you have to support the

25 accuracy of that allegation?

1          THE WITNESS:  Based on my conversation with my co-
2   counsel, my understanding was that that -- within paragraph 24,
3   that entry, paid via credit card, was incorrect.  And in fact,
4   those subsequent paid payments, the install payments, were to
5   be subtracted from the bank account.

6          THE COURT:  Were supposed to be or had in fact?

7          THE WITNESS:  Were supposed to be subtracted from the
8   -- from the bank account.  Because this --

9          THE COURT:  Well --

10          THE WITNESS:  -- the email pointing --

11          THE COURT:  -- is that what paragraph 25 says?
12   Paragraph 25 says, the above transaction was an electronic
13   transfer.

14          THE WITNESS:  Your Honor, the paragraph 24 is not the
15   actual transfer.  Paragraph 24 is an email that says, this is
16   how we're going to take the money out.

17          THE COURT:  Okay.

18          THE WITNESS:  This is not an actual -- paragraph --
19   in other words, paragraph 24 does not confirm a payment of $100
20   on -- at the time the email was sent.

21          THE COURT:  No, I understand that.  It's saying
22   that's what's going to happen.

23          THE WITNESS:  Right.

24          THE COURT:  But it never happened, right?

25          THE WITNESS:  Well, I believe that the -- I believe

1  that Rothman attempted to take the money out of the bank

2  account.

3            THE COURT:  What's your basis for that?

4            THE WITNESS:  My conversations with my co-counsel and

5  also the emails that I reviewed that were sent from Rothman to

6  Mr. Wolfington.

7            THE COURT:  They attempted to take the money out of

8  the bank account or they did?

9            THE WITNESS:  I know that they attempted to take the

10 money out.

11           THE COURT:  Okay.  Thirty -- paragraph 38 reads as

12 follows: (Reading)

13           "As noted above, plaintiff did not receive a copy of

14           a written authorization for the electronic transfers

15           from his personal bank account."

16           Is that correct?

17           THE WITNESS:  Your Honor --

18           THE COURT:  What is the basis here for that factual

19 allegation?

20           THE WITNESS:  Your Honor, I apologize, which

21 paragraph?

22           THE COURT:  Thirty-eight.

23           THE WITNESS:  The basis -- the base of that paragraph

24 was my conversation with my co-counsel --

25           THE COURT:  Okay.

1          THE WITNESS:  -- that indicated the only

2  communications that Mr. Wolfington received from Rothman were

3  the emails, the two emails that were cited as well as the

4  emails that were sent after the payments were not paid.

5          THE COURT:  Okay.  I'm now going to show you another

6  document.  This is -- after the complaint answer -- after the

7  answer was filed the defendant then filed a motion for judgment

8  on the pleadings.  And the plaintiff responded with the

9  document ECF-16 filed on November 28th.  I'm going to hand you

10  a clean copy of that.

11          Now, this one, Mr. Rayz, at the -- on the last page

12  it says S slash, do you know if you actually signed this or

13  not?

14          THE WITNESS:  I'm sorry, Your Honor.  I'm looking

15  at --

16          THE COURT:  No, look at the last page.

17          THE WITNESS:  It's my electronic signature, Your

18  Honor.

19          THE COURT:  Yeah, all right.  So okay.  Did you --

20  were you involved in the drafting of this document at all?

21          THE WITNESS:  I believe --

22          THE COURT:  Or was this done by one of the co-

23  counsel?

24          THE WITNESS:  I believe that the initial draft was

25  made by Mr. Wells, but I reviewed it and edited it before it

1  was filed.

2          THE COURT:  Okay.  Now, I'd like you to turn to page

3  2.  And in the middle of the page there's a sentence that reads

4  as follows: (Reading)

5          "Plaintiff did, however, receive confirmation of the

6          $200 payment made on January 20th (paragraph 23), as

7          well as notification that his once a month payment

8          for the remaining "account balance" was to begin on

9          February 21st, 2016 (paragraph 24)."

10         Is that correct?

11         THE WITNESS:  Yes, Your Honor.

12         THE COURT:  All right.  And that, they refer to

13 paragraph 23 and 24, which we've already discussed, correct?

14         THE WITNESS:  Yes, Your Honor.

15         THE COURT:  All right.  Now, in the prior -- in the

16 prior sentence it says as follows: (Reading)

17         "At the time plaintiff entered the agreement,

18         plaintiff did not receive any written information

19         regarding the terms of the financing period."

20         (Paragraph 22)

21         Now, with regard to the phrase, at the time the

22 plaintiff entered the agreement, or is the plaintiff, as

23 counsel for the plaintiff, are you still making the same

24 contentions about the existence of an agreement that you made

25 in the complaint?

1              THE WITNESS:  Your Honor, I apologize, are you

2    referring to paragraph 22 of the complaint?

3              THE COURT:  Well, look at the -- this document.  I'm

4    looking at this document.  Yeah, it's -- refers to paragraph 22

5    of the complaint.  Do you see the sentence?

6              THE WITNESS:  At the time plaintiff entered the

7    agreement -- okay.

8              THE COURT:  It's the ninth line down.  It starts out,

9    at the time plaintiff entered the agreement.  Do you see that?

10   Here, I have it underlined.  Do you want to look at mine?  Are

11   you on the -- are you on page 2?

12             THE WITNESS:  Yes, Your Honor, page 2.

13             THE COURT:  At the time plaintiff entered the

14   agreement.  Do you see it there?

15             THE WITNESS:  Yes, I do.

16             THE COURT:  All right.  Does that -- is that a

17   reference to the agreement that you've already testified about?

18             THE WITNESS:  Yes, Your Honor.

19             THE COURT:  Okay.  Now, let -- now, I'd like you to

20   turn to page 7.  And the first sentence I'm going to read out

21   loud and then ask you a question about it: (Reading)

22             "In the instant matter plaintiff plainly -- plainly

23             alleged that one, the extension of credit occurred

24             prior to the surgery, two, he acknowledged the

25             agreement through the initial payment of $200, and

1      three, did not receive the necessary written

2      disclosures.  See complaint at paragraphs 15-24, 31-

3      32."

4      Do you see that?

5      THE WITNESS:  Yes, Your Honor.

6      THE COURT:  All right.  Do you see any contradiction

7  there, Mr. Rayz, with your prior -- with your testimony you've

8  given this morning about what constituted an agreement?

9      THE WITNESS:  Is Your Honor referring to the fact

10  that the initial payment was a down payment?

11      THE COURT:  Well, that's one thing.  Secondly, that

12  you're now saying the extension of credit was prior to the

13  surgery, where I think it's clear that a down payment can't be

14  an extension of -- well, the down payment is not evidence that

15  somebody's a creditor.  To me, you know, this may be a legal

16  issue, whether that could also be an extension of credit, I'll

17  leave open.  But here it says that the plaintiff acknowledged

18  the agreement through the initial payment of $200.  I thought

19  your testimony in the last half hour was to the contrary.

20      THE WITNESS:  Your Honor, I don't believe it was.

21  His father paid the $200 on his behalf.

22      THE COURT:  And you think that was an extension of

23  credit?

24      THE WITNESS:  I think --

25      THE COURT:  You think that was an agreement?

1          THE WITNESS:  I think that certainly indicates an

2   agreement on his behalf.

3          THE COURT:  Wouldn't the best -- wouldn't the best

4   evidence of an agreement be some contact by the plaintiff after

5   the surgery?  Either another credit card payment or authorizing

6   withdraws from his checking account or in some fashion actually

7   making a payment?  Wouldn't that have been the best evidence

8   that the --

9          MR. TAUBER:  Your Honor --

10          THE COURT:  -- plaintiff agreed?

11          MR. TAUBER:  -- I realize that the Court --

12          THE COURT:  You object?

13          MR. TAUBER:  -- is making inquiry here.

14          THE COURT:  All right.  You're right.  I'm going to

15   sustain the objection.

16          MR. TAUBER:  Thank you.

17          THE COURT:  All right.  I'll withdraw the question.

18   I don't have any other questions.  Ms. Ruccolo?

19                         CROSS-EXAMINATION

20   BY MS. RUCCOLO:

21   Q    Mr. Rayz, in paragraph 24, you indicated that you

22   understood that that was an indication the payments were

23   supposed to be deducted from a checking account with the number

24   that ended with 8430?

25   A    No, ma'am.  I -- I don't know whether it's a checking

CROSS-EXAMINATION - RAYZ                    34

1  account or a savings account or any type of account.  My

2  understanding was that the payments, the install payments were

3  to be taken --

4           THE COURT:  Well --

5  BY MS. RUCCOLO:

6  A    -- out of a bank account.

7           THE COURT:  -- it clearly says in paragraph 24,

8  credit card and then it has the usual asterisk and just has the

9  last four numbers.  You testified you understood that was a

10 reference to a credit card.

11          THE WITNESS:  Your Honor is referring to paragraph

12 24?

13          THE COURT:  Yeah, 24.

14          THE WITNESS:  No, Your Honor, I did not testify to

15 that.

16          THE COURT:  Oh, really?

17          THE WITNESS:  Paragraph 24 and the numbers, the

18 redacted numbers, where it says credit card with the last

19 digits showing up as 8430 --

20          THE COURT:  Yeah.

21          THE WITNESS:  -- my understanding was that those,

22 that sequence represents the account, the bank account number,

23 not the credit -- not a credit card account number.  Because my

24 understanding was that that monthly payment was to be

25 subtracted from a bank account.  The paid via information in

CROSS-EXAMINATION - RAYZ                    35

1  that email was incorrect --

2           THE COURT:  Well --

3           THE WITNESS:  -- incorrectly stated.

4           THE COURT:  -- there were subsequent emails where

5  Rothman said that the subsequent payments had to be made by a

6  electronic transfer from a bank account, right?

7           THE WITNESS:  Your Honor, I don't think that that's

8  what the subsequent emails stated.  I don't have them in front

9  of me, but I don't believe that they said --

10          THE COURT:  All right.

11          THE WITNESS:  -- that --

12          THE COURT:  Well, so the reference to a credit card

13 here is -- was incorrect by Rothman?

14          THE WITNESS:  Yes, Your Honor.

15          THE COURT:  Okay.  All right.  Next question.

16 BY MS. RUCCOLO:

17 Q    Did you confirm that Mr. Wolfington had a credit card with

18 the last four digits of those numbers or didn't have a credit

19 card with the last four digits of those numbers?

20 A    No, I did not.

21 Q    Did you confirm whether or not Mr. Wolfington had a bank

22 account, whether it was savings, checking or any kind of bank

23 account, that ended with those four numbers?

24 A    What I did was I spoke with my co-counsel, who my

25 understanding spoke with Mr. Wolfington regarding the bank

1  account that he had, the money that was taken out of that

2  account, if any, and how the payments were -- how the initial

3  payment and the installment payments were supposed to be made.

4  Q    So you had a number which was either a credit card number

5  or according to you was some kind of bank account number and

6  you took no steps to determine whether or not there was any

7  kind of account that existed in Mr. Wolfington's name with

8  those last four digits?

9  A    I don't think that's accurate.

10 Q    Why not?

11 A    Because I did a couple of things.  Number one, I relied on

12 my co-counsel.  Number two, I sent out inquiries to co-counsel

13 to find out if there was money taken out of the account.  My

14 understanding was that the installment payments were to be

15 taken out from the bank account, which is why paragraph 25 is

16 there.  Otherwise we wouldn't have put it in the complaint.

17 Q    But you don't even know if there was a bank account that

18 existed with those four digits?

19 A    I'm sorry?

20 Q    You don't even know whether or not there was a bank

21 account that existed with those last four digits --

22 A    I don't think that --

23 Q    -- isn't that right?

24 A    I don't think that's accurate, no.

25 Q    You only know it from what your co-counsel told you?  You

1  don't have any personal knowledge?

2  A    I did not -- yes, I don't have any personal knowledge

3  other than what -- what my co-counsel related to me.

4  Q    Okay.  And you didn't ask co-counsel to give you the name

5  of Mr. Wolfington's banks to go to the banks and see if you

6  could get the information, did you?

7  A    No.

8  Q    In paragraph 23, you assert -- you asserted in the

9  complaint that the $200 payment was part of the payment plan;

10 is that accurate?

11 A    Yes.

12 Q    Okay.  And it's reported that you're relying on the

13 receipt that's identified in the complaint on paragraph 23?

14 A    Yes.

15 Q    Okay.  And you'll agree with me that there's nothing in

16 that receipt from Rothman that says that payment was part of

17 any payment plan; isn't that true?

18 A    That's not true.

19 Q    Where does it say on this receipt that it's part of a

20 payment plan?

21 A    It says, you recently processed an online bill payment

22 through Rothman Institute through our secure portal.  We just

23 want to say thank you for a payment.  We appreciate your prompt

24 situation.  Here's your payment information.

25 Q    Where does it say payment plan?

CROSS-EXAMINATION - RAYZ                    38

1  A    See where it says the account number?

2  Q    Yes.

3  A    All right.  If you look in paragraph 24, it's the same

4  account number.

5  Q    And how do you know that account number didn't exist when

6  Mr. Wolfington signed the financial policy agreeing to pay the

7  deductible before surgery on January 12th, 2016?

8  A    I don't have the document you're looking at.  Can I take a

9  look at it --

10  Q    Absolutely.

11  A    -- before I answer?

12        MS. RUCCOLO:  May I approach, Your Honor?

13        THE COURT:  Yes.  Well, mark it, unless it's filed.

14        MR. TAUBER:  I think that's an exhibit to the 12(c)

15  motion.

16        THE COURT:  Yeah, I know, but if it's -- mark it as

17  an exhibit in this hearing.  Want to put D-1?

18        MS. RUCCOLO:  That's fine.

19        THE COURT:  Just mark it D-1.

20        MS. RUCCOLO:  Do you have D-1 in front of you?

21        THE WITNESS:  I do not.

22        MS. RUCCOLO:  Oh, I'm sorry.

23        THE COURT:  Well, let -- you know, as I understand

24  from the briefing, Ms. Ruccolo, that this is dated January

25  12th, 2016, before the surgery?

1          MS. RUCCOLO:  Yes, Your Honor.

2          THE COURT:  All right.  And I think the plaintiff's

3   counsel have agreed that this is not an -- this is not an

4   agreement for extension of a credit.  Am I right, Mr. Levant?

5   Throughout your briefs this is not --

6          MR. LEVANT:  Independent -- independent of the

7   payment plan it is not.  Independent of the subsequent

8   communications that memorialize a payment plan this by itself

9   is not an extension of credit.

10         THE COURT:  All right.  Ask your question.

11  BY MS. RUCCOLO:

12  Q    Well, my question is, Mr. Rayz, you said that you think

13  that the payment of $200 was towards a payment plan because of

14  the account number?

15  A    I don't have the document.  The document you're referring

16  to, I don't have it.

17  Q    I'm talking about the complaint.

18  A    I'm sorry, which paragraph?

19  Q    The paragraph 23.

20  A    Yes, absolutely.

21  Q    And how do you know that that account number didn't exist

22  before January 20th or even exist at the time that Mr.

23  Wolfington signed the January 12th, 2016 policy?

24  A    I don't.

25  Q    Okay.  So the truth is you don't know, there's nothing in

1 the receipt in paragraph 23 that shows that this was a payment

2 on a payment plan?

3 A    No, I think that you're wrong on that.

4 Q    Okay.

5 A    As I indicated before, this, if you read through the -- if

6 you read through the paragraphs of the complaint the agreement

7 was for the initial down payment and then subsequent monthly

8 payments.  It's like if you're buying a car.

9 Q    Where do you have something from Rothman that says that?

10 A    Well, we have his email confirmation in paragraph 23 and

11 confirmation in paragraph 24.

12 Q    Okay.  In paragraph 23 it doesn't say anything about a

13 payment plan.  You agree with that?

14 A    It does not use the word payment plan.

15 Q    Okay.  And you agree with me that on January 12th, 2016,

16 Mr. Wolfington signed an agreement that he was responsible for

17 paying his deductible before surgery?

18         MR. TAUBER:  I'm going to object --

19 BY MS. RUCCOLO:

20 A    No.

21         MR. TAUBER:  -- to the legal conclusion that it was

22 an agreement.

23         THE COURT:  Overruled.

24 BY MS. RUCCOLO:

25 A    It's not.

CROSS-EXAMINATION - RAYZ                    41

1  Q    He signed a document saying I agree that payments of

2  deductibles are my responsibility before surgery?

3  A    Can I take a look at that?

4  Q    Yes.  That's what I marked as D-1.

5          THE COURT:  Yeah, show it to him.

6  BY MS. RUCCOLO:

7  A    If I recall, he did not agree to that because -- it

8  doesn't say what you claim it said.  It says, your insurance

9  plan may have a deductible.

10 Q    Well, look at the bottom above his signature.

11 A    Well, I --

12 Q    Doesn't it say, I have read, understood and agreed to the

13 above financial policy?

14 A    Yes, it's a financial policy, it's not a payment plan.

15 Q    Okay.  I understand that the charges not covered by our

16 insurance company as well as applicable co-payments and

17 deductibles are my responsibility?

18 A    If they exist.

19 Q    They existed in this case, didn't they?

20 A    Well, that's -- if you would simply let me finish.  If you

21 read through the middle of that, of this page, in bold

22 highlighted and underlined text it says, your insurance plan

23 may have a deductible, if there's an outstanding deductible

24 that has not been met on your plan, you will be contacted by

25 one of our financial counselors.  You will be required to pay

CROSS-EXAMINATION - RAYZ                    42

1  any outstanding deductible prior to your procedure.  So the --

2  to answer your question, if there was no deductible, he wasn't

3  agreeing to anything.

4  Q    But there was a deductible.  And he knew that on January

5  20th and that's why he made the $200 payment, isn't it?

6  A    No, because here's -- here's the issue that you have.  If

7  he -- let's say that he signed this form but he did not agree

8  to proceed with the surgery, Rothman wouldn't be able to sue

9  him for anything.

10 Q    Well, once he signed this document didn't Rothman schedule

11 his surgery?

12        THE COURT:  Well -- well, wait a minute.  The surgery

13 -- well, do you understand the current question?  Do you want

14 to repeat it?

15 BY MS. RUCCOLO:

16 Q    Didn't the surgery take -- didn't, when he signed this

17 document, didn't Rothman make arrangements for the surgery and

18 give him a date that the surgery was going to take place?

19 A    Yes, I believe so.

20 Q    Okay.  So it was an executory contract, right?

21 A    No, it was not.

22 Q    Well, one party was taking steps to do --

23        THE COURT:  Well --

24 BY MS. RUCCOLO:

25 Q    -- what they do.

CROSS-EXAMINATION - RAYZ                    43

1          THE COURT:  -- I don't see where this is getting us.

2          MS. RUCCOLO:  Okay, Your Honor.

3          THE COURT:  I mean he signed this document and he had

4     the surgery.

5     BY MS. RUCCOLO:

6     Q    Did you ever ask plaintiff or your co-counsel whether or

7     not plaintiff had any emails between himself and Rothman

8     agreeing to a payment plan?

9          THE COURT:  Well, he never talked to Mr. Wolfington.

10    BY MS. RUCCOLO:

11    Q    How about your co-counsel?

12    A    I can't say what my co-counsel -- I don't have firsthand

13    knowledge whether my co-counsel actually asked that question,

14    but I would be shocked if they did not.

15    Q    Did you ask your co-counsel whether or not they had any

16    emails from Mr. Wolfington agreeing to make payments on a

17    payment plan?

18    A    I believe that the emails that we had, including the --

19    the email that's referenced in paragraph 23, the email that's

20    referenced in paragraph 24, as well as the two subsequent

21    emails that Rothman sent to my client were evidence of -- of

22    Mr. Wolfington agreeing to a payment plan.  We're also

23    requesting that your counsel produce those emails that were

24    sent, including all of the financial records per the order of

25    the Court.  And we did not receive them.

CROSS-EXAMINATION - RAYZ                    44

1  Q    You didn't see any emails or ask your co-counsel whether

2  there were any emails from Mr. Wolfington to Rothman agreeing

3  to any payment plan?

4  A    I don't recall -- I don't recall seeing any emails from

5  Mr. Wolfington to Rothman concerning the payment plan.

6  Q    In paragraph 67 of the complaint -- do you still have the

7  complaint in front of you?

8  A    Yes.

9  Q    It says, defendant has debited plaintiffs and also on

10 information believed to contain the class members bank accounts

11 on a recurring basis without obtaining written authorization.

12 Did you have any documents in front of you to show that the

13 plaintiff's bank account was debited on a recurring basis?

14 A    Do I have it in front of me now?

15 Q    Did you ever --

16 A    Yes.

17 Q    -- before you drafted the complaint?

18 A    Yes.

19 Q    That it was debited?

20 A    Yes.

21 Q    The money was taken out?

22 A    No, no, no.  We have a -- you have a misunderstanding as

23 to what debited meant to me and what it still means.  The -- if

24 you're asking me if we have any evidence that Rothman attempted

25 to debit the account, yes, we have evidence that Rothman

1  attempted to debit the account.

2  Q    What account?

3  A    And that they in fact -- hold on.  And that they in fact

4  debited the account.  No money was taken out.

5  Q    What account?

6  A    That we learned -- that we learned after the complaint was

7  filed.  And that's why the paragraph that you're referring to,

8  which is part of the EFTA claim, the EFTA claim was dismissed.

9  Q    What account was debited?

10 A    The bank account, Mr. Wolfington's bank account.

11            THE COURT:  Well, is this the -- this is the

12 document.  Do you have that document there?  This is an email

13 dated February 21st, 2016 at 9:12 a.m.  I think that's what

14 he's referring to.  Let me show it to you.  Do you have it

15 there, Ms. --

16            MS. RUCCOLO:  I don't have it, Your Honor.

17            THE COURT:  All right.  Well, it's attached to

18 your --

19            MS. RUCCOLO:  Oh, it's attached to my papers?

20            THE COURT:  -- papers.  Here.  It's from your reply

21 at medfusion.net.  Sent Sunday, February 21st, 2016, 9:12 a.m.,

22 to Andrew Wolfington at Wolfington at something.com.  Subject:

23 Budget payment failed, dear patient, this is a notification

24 that the budget payment plan you had set up with the Rothman

25 Institute has failed.  Please contact Rothman Institute

1 immediately for additional information and assistance.  Is that

2 what you're referring to?

3          THE WITNESS:  That's one of them, yes, Your Honor.

4          THE COURT:  All right.  And there was one more?

5          THE WITNESS:  I -- yeah, I believe there was one from

6 June, June 21st, if I remember the date correctly.

7          THE COURT:  June?

8          THE WITNESS:  June 21st, yes.

9          THE COURT:  All right.  Next question.

10 BY MS. RUCCOLO:

11 Q    And did Mr. Wolfington take any steps to make the payment?

12          THE COURT:  Well, if you know.

13 BY MS. RUCCOLO:

14 A    I have not spoken with Mr. Wolfington.  I don't know if he

15 took any steps to make the payment that you're referring to.

16 Q    Do you remember getting a letter from me December 7, 2016?

17 A    Yes, ma'am.

18          THE COURT:  Well, show it to the witness.  You show

19 it to the witness.  What's it marked, D-2?

20          MS. RUCCOLO:  Yes, Your Honor.

21          THE COURT:  All right.  Go ahead.  It's a letter

22 dated December 7th, 2016 addressed to Mr. Rayz from Ms.

23 Ruccolo.

24 BY MS. RUCCOLO:

25 Q    And I indicated, as I pointed out to you when we spoke, in

```
 1  the complaint you specifically alleged the defendant deducted
 2  monies from your client's checking account and others.  I
 3  advised you that my client believed those allegations were
 4  false and requested that you provide him with evidentiary
 5  support.  Do you get that letter?
 6  A    I received that letter, maybe --
 7  Q    Okay.
 8            MR. TAUBER:  Again, I apologize for interrupting
 9  again, but I just reached some confusion about the
10  scope of this hearing because I -- maybe it's my confusion.
11  The Court issued an opinion.  In the opinion it had, it did not
12  address in any way at all issues about the complaint with
13  respect to electronic Fund Transfer Act claims.
14            THE COURT:  Right --
15            MR. TAUBER:  That claim --
16            THE COURT:  And the dropped that claim.
17            MR. TAUBER:  That claim was withdrawn.
18            THE COURT:  Yeah, all right.
19            MR. TAUBER:  In the context of these, this
20  correspondence --
21            THE COURT:  You're right --
22            MR. TAUBER:  -- and conversations.  And it was
23  done --
24            THE COURT:  Yeah, we're not going to go into the --
25            MR. TAUBER:  -- totally within the appropriate
```

**Caption overlay:**

```
                UNITED STATES DISTRICT COURT                 47
                EASTERN DISTRICT OF PENNSYLVANIA

ANDREW WOLFINGTON,           .    Case No. 2:16-CV-04935-MMB
            Plaintiff,       .
        v.                   .    U.S. Courthouse
                             .    601 Market Street
RECONSTRUCTIVE               .    Philadelphia, PA 19106
ORTHOPAEDIC ASSOCIATES       .
P.C. et al,                  .
            Defendant.       .    May 16, 2017
. . . . . . . . . . . . . . .     10:08 a.m.

                      HEARING TRANSCRIPT
             BEFORE HONORABLE MICHAEL M. BAYLSON
             SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Plaintiff           ROBERT LEVANT, ESQUIRE
Andrew Wolfington:          ALAN TAUBER, ESQUIRE
                            Levant Martin Tauber & Levin PC
                            820 North 18th Street
                            Philadelphia, PA 19103

For the Defendant           LAURA RUCCOLO, ESQUIRE
Reconstructive              Gephart Batchaan P.A.
Orthopaedic Associates,     8000 Midlantic Drive
II, P.C.:                   Suite 310
                            Mount Laurel, NJ 08054

Audio Operator:             J. LUTZ

Transcribed by:             KELLI RAY, CER-349
                            Lawrence Court Transcription & Video
                            P.O. Box 530790
                            DeBary, FL 32753
                            386.216.5921

          Proceedings recorded by electronic sound
recording, transcript produced by transcription service.
```

REDIRECT EXAMINATION - RAYZ                    48

1  context --

2               THE COURT:  Right.

3               MR. TAUBER:  -- of Rule 11.

4               THE COURT:  Sustain the objection.

5               MR. TAUBER:  Thank you.

6               MS. RUCCOLO:  Okay, Your Honor.

7               MR. TAUBER:  I just ask that --

8               MS. RUCCOLO:  I have --

9               MR. TAUBER:  -- to the -- all right.

10              THE COURT:  All right.  Next question.

11              MS. RUCCOLO:  I have no further questions, Your

12 Honor.

13              THE COURT:  Are you done?

14              MS. RUCCOLO:  Yes, Your Honor.

15              THE COURT:  All right.

16              MR. TAUBER:  Thank you.

17              THE COURT:  Redirect.

18              MR. TAUBER:  I have a few questions, Your Honor.

19                        REDIRECT EXAMINATION

20 BY MR. TAUBER:

21 Q   Mr. Rayz, just so it's clear, you -- I just want to -- you

22 were relying on your co-counsel and conversations that your

23 counsel had with Mr. Wolfington and his father, correct?

24 A   Yes.

25 Q   All right.

REDIRECT EXAMINATION - RAYZ                    49

1          MR. TAUBER:  Now, Your Honor, may I see Regulation --

2     a copy of Regulation Z that you read from?  I have a few

3     questions about that.  I do not have that in front -- I

4     don't have that.  I think you read to Mr. Rayz from that,

5     Regulation Z.

6          THE COURT:  Yes.

7          MR. TAUBER:  May I --

8          THE COURT:  Did I --

9          MR. TAUBER:  Oh.  May I approach?

10          THE COURT:  Is it still there?

11          THE WITNESS:  Your Honor, I don't think I have it.

12          THE COURT:  Wait a minute.  I read it to you.  I only

13 have one copy.  Wait a minute.

14          MS. RUCCOLO:  I have it.

15          THE COURT:  Here.  Here it is.

16          MR. TAUBER:  Thank you.  I think Your Honor read from

17 paragraph 17.

18          THE WITNESS:  17(I).

19          MR. TAUBER:  17(I).  If I may, just give me a moment,

20 Your Honor.  I didn't have a copy of the entire regulations at

21 my desk.

22          Okay.  Now, if I may read this again, Your Honor, to

23 preface a question?

24 BY MR. TAUBER:

25 Q    17(I) says, and Mr. Rayz, maybe you can read along:

REDIRECT EXAMINATION - RAYZ                    50

1  (Reading)

2              "A person who regularly extends consumer credit that

3              is subject to a finance charge or is payable by

4              written agreement in more than four installments."

5              And then there's a parenthetical that says:

6              (Not including a down payment.)

7              Is it my -- is it your understanding that this

8  portion of Regulation Z indicates that the four installments

9  may not be -- that the down payment may not be part of the four

10 installments or is it that the down payment is not part of the

11 payment plan?

12 A    The down payment is not part of the payment plan.  The

13 best way I can explain it is to give an example.  If somebody

14 comes in to buy a car they give a down payment and they have

15 monthly payments that they have to make.  If their monthly

16 payments are more than -- more than four, not including the

17 down payment, the transaction is subject to TILA.  If it's less

18 than three -- if it's less than four payments, the transaction

19 is not subject to TILA because the dealership that

20 presumptively sold the car would not be a creditor under TilA.

21 Q    Right.  But what this, the parenthetical is saying that

22 that down -- that you cannot consider the down payment as part

23 of the four installments --

24 A    Yes.

25 Q    -- is that your understanding?

1   A    Yes.

2   Q    All right.  It doesn't -- it doesn't necessarily mean that

3   the down payment is not part or a condition of the overall

4   payment plan; is that correct?

5   A    Absolutely.

6   Q    Okay.  Just, I just want to make that clear.  The

7   parenthetical, your understanding, is a condition -- conditions

8   whether or not it's part of the four installments, not the

9   broader plan?

10  A    Yes.

11  Q    Okay.  Because as the -- because as we've argued in our

12  brief, a payment plan can be memorialized by multiple writings,

13  correct?

14  A    Absolutely.

15  Q    And those writings can indicate that there was an

16  agreement to make a payment as part of a finance payment plan.

17  And that can be done in many different parts, correct?

18  A    Yes.

19  Q    Including installments, correct?

20  A    Absolutely.

21  Q    And as your -- is it your understanding that the amount --

22           MS. RUCCOLO:  Your Honor, he's leading, if this is

23  redirect.

24           THE COURT:  Well, it's redirect, but so --

25           MR. TAUBER:  All right.  Well, I apologize.

REDIRECT EXAMINATION - RAYZ                    52

1             THE COURT:  Go ahead.

2             MR. TAUBER:  I just want to make sure the record is

3   clear as to that regulation, how that Regulation Z --

4             THE COURT:  You can ask him about that.  I mean --

5             MR. TAUBER:  All right.

6   BY MR. TAUBER:

7   Q    Was it clear to you that the amount that Mr. Wolfington

8   owed as a result of the surgery based upon the payment plan

9   that was agreed to was going to take more than four

10  installments to complete?

11  A    Yes.

12  Q    Okay.  And that's independent of the down payment,

13  correct?

14  A    Yes.

15  Q    But it's also fair to say that the payment plan, that the

16  finance -- that the finance plan as was plead was paid partly

17  through the down payment and party through the future

18  installments, the installments, the monthly installments,

19  correct?

20  A    Yes.

21  Q    All right.  The down payment was paid by Mr.

22  Wolfington's --

23            THE COURT:  All right.  Just a minute.  But it still

24  requires a written agreement.

25            MR. TAUBER:  That's correct.

REDIRECT EXAMINATION - RAYZ                    53

1            THE WITNESS:  Yes, Your Honor.

2            THE COURT:  All right.  Go ahead.

3    BY MR. TAUBER:

4    Q    Regulation Z does not specifically state what constitutes

5    a written agreement, correct?

6    A    My understanding is that it does not.

7    Q    Okay.  And is -- in all -- in all -- in the research that

8    was done to prepare this complaint did anybody find a

9    definitive explanation of what constituted a written agreement?

10   A    No.

11   Q    There's case law that indicated that a written agreement

12   can be -- can be construed from --

13           MS. RUCCOLO:  Objection, Your Honor.  He's still

14       leading.

15           THE COURT:  Well, I'm going to sustain the objection

16   for a different reason.  The -- I'm not interested for purposes

17   of this hearing in legal research that was done.  I'm

18   interested in what facts were known to counsel --

19           MR. TAUBER:  Understood.

20           THE COURT:  -- at the time they drafted the complaint

21   and the response to the motion for judgment on the pleadings.

22           MR. TAUBER:  I understand.

23           THE COURT:  That to me is the key area here.

24           MR. TAUBER:  I understand.

25           THE COURT:  If you want -- I can leave for briefing

REDIRECT EXAMINATION - RAYZ                     54

1   if you want, the concept of what constitutes a written

2   agreement.

3           MR. TAUBER:  I understand.

4           THE COURT:  But it's not a topic, in my opinion, for

5   testimony.

6           MR. TAUBER:  I understand, Your Honor.  I -- my -- my

7   understanding from the Court's opinion or the impression I have

8   from the Court's opinion was that there was a significant --

9   that the principle issue here was whether or not the -- whether

10  or not there was a written agreement that could be -- could be

11  construed to fulfill Regulation Z.  I understand that there are

12  -- there may be some factual discrepancies in the complaint

13  that were discovered later, but those discrepancies were not

14  really material --

15          THE COURT:  Well, we can leave that for argument.

16  But --

17          MR. TAUBER:  Right.

18          THE COURT:  -- the witness has testified, the

19  questions that I asked him, about the basis for his believing

20  that there was a written agreement.  You're welcome to ask him

21  non-repetitive questions about that.  But I don't think his

22  testimony is relevant on a general concept of what constitutes

23  a written agreement.  He's welcome -- you're welcome to ask him

24  about what in this case --

25          MR. TAUBER:  Right.

1            THE COURT:  -- constituted a written agreement.  I

2   asked him a lot of questions about that and he answered them.

3            MR. TAUBER:  Right.

4            THE COURT:  Now, you're welcome to ask him more

5   questions about that --

6            MR. TAUBER:  Well --

7            THE COURT:  -- but I don't want to get into a

8   theoretical discussion --

9            MR. TAUBER:  I understand.

10           THE COURT:  -- of what is meant by the term written

11  agreement.

12           MR. TAUBER:  I understand.

13           THE COURT:  Okay.

14           MR. TAUBER:  I just think that there's -- there's a

15  distinction as to whether or not legally it could be argued

16  that there was a written agreement and what the plaintiff's

17  counsel's knowledge or understanding was when it plead the

18  case, whether they believed that --

19           THE COURT:  All right.

20           MR. TAUBER:  -- what they had --

21           THE COURT:  Well --

22           MR. TAUBER:  -- was sufficient.

23           THE COURT:  Well, first of all, you know, this

24  witness had never talked to the plaintiff and all his

25  information came from another co-counsel.  So that's another

REDIRECT EXAMINATION - RAYZ                    56

1 reason why I don't think his theoretical, not theoretical --
2 that his general belief of what is an agreement and what an
3 agreement is really that probative.  All right.  He answered a
4 lot of questions about that.  You're welcome to ask him about
5 facts in this case and whether they were a written agreement
6 and if so why.  Okay.
7        MR. TAUBER:  I understand, Your Honor.
8 BY MR. TAUBER:
9 Q   Do you have any reason to believe that Mr. Wolfington's
10 father paid this down payment without an understanding and
11 agreement and consent --
12        THE COURT:  Well --
13 BY MR. TAUBER:
14 Q   -- of his son?
15        THE COURT:  Did you discuss that with any of your co-
16 counsel?
17        THE WITNESS:  What was the question again?  I'm
18 sorry.
19        MR. TAUBER:  Concerning --
20        THE COURT:  Well, rephrase it.  It's a question of
21 whether he -- he never talked to Mr. Wolfington's father.  So
22 the issue is whether he ever discussed that with his co-
23 counsel.  I want to -- I want to have the testimony concentrate
24 on the witness's own conduct and conversations.  That's what is
25 relevant here.

1           MR. TAUBER:  I understand.  Your Honor, I think that

2 it's relevant both what he -- what he actually knew --

3           THE COURT:  Well, ask him a question.

4 BY MR. TAUBER:

5 Q    Well, do you have any -- did you ever obtain any

6 information to suggest that Mr. Wolfington's father made the

7 down payment without the consent, knowledge or agreement of his

8 son?

9 A    No, I know of no information that would indicate that.

10 Q    Okay.

11 A    He did not make the payment without his son knowing about

12 him -- knowing about it.

13           THE COURT:  Look, if you think of something else you

14      can recall --

15           MR. TAUBER:  All right.

16           THE COURT:  -- Mr. Rayz.

17           MR. TAUBER:  That's fair enough.  Thank you.  I --

18           THE COURT:  I'd like to move on to the next witness.

19           MR. TAUBER:  I have nothing else.  Thank you.

20           THE COURT:  All right.  Thank you.

21           THE WITNESS:  Thank you, Your Honor.

22           THE COURT:  All right.  Who would you like to call

23 next?  Does anybody want to take a break for five minutes?

24           MR. TAUBER:  I'm good.

25           THE COURT:  Who's the next witness?

1          MR. TAUBER:  Mr. Yarnoff.

2          THE COURT:  Okay.  All right.  You'll have to go get

3  him.

4          MR. TAUBER:  Okay.

5          THE COURT:  Mr. Rayz, has to stay -- has to step

6  outside.  You may get recalled, so you're going to have to stay

7  outside.  And please don't discuss your testimony with anybody

8  else.

9          THE WITNESS:  Understood, Your Honor.

10          MR. GETZ:  Your Honor, my name is John Getz

11  (Phonetic).  I was just going to use the restroom.  I'm not

12  going to speak with anyone.

13          THE COURT:  That's fine.  That's fine.

14          MR. GETZ:  Thank you.

15          THE COURT:  Okay.  Come on up, Mr. Yarnoff.

16          THE WITNESS:  Good morning, Your Honor.

17          THE COURT:  Swear the witness, please.

18          THE CLERK:  Remain standing.  Raise your right hand.

19          MICHAEL YARNOFF, PLAINTIFF'S WITNESS, SWORN

20          THE WITNESS:  I affirm, sir.

21          THE CLERK:  Please state your full name and spell

22  your last name for the record.

23          THE WITNESS:  Michael Keith Yarnoff, Y-A-R-N-O-F-F.

24          THE CLERK:  Thank you.

25          THE COURT:  Okay.  All right.  Mr. Yarnoff, good

1  morning.

2            THE WITNESS:  Good morning.

3            THE COURT:  All right.  I read your declaration here

4  and I'm not going to repeat it.

5            THE WITNESS:  Right.

6            THE COURT:  But I just want to ask you a number of

7  questions.

8            THE WITNESS:  Okay.

9            THE COURT:  The -- you had discussions with Mr.

10  Levant, correct?

11            THE WITNESS:  Right.

12            THE COURT:  Okay.  And you refer to him as referring

13  counsel; is that right?

14            THE WITNESS:  Right.

15            THE COURT:  Okay.  And that you then -- but did you

16  ever meet in person with the plaintiff, Andrew Wolfington?

17            THE WITNESS:  We had the conference call on June 23rd

18  with the plaintiff.

19            THE COURT:  All right.  Just answer my question.  Did

20  you ever meet with him in person?

21            THE WITNESS:  No, we did not meet.

22            THE COURT:  Have you ever met him in your life?

23            THE WITNESS:  We have not met him in person, that's

24  right.

25            THE COURT:  All right.  Do you know if any other

60

1 counsel in this case have met him in person?

2          THE WITNESS:  Other than referring counsel --

3          THE COURT:  Other than Mr. Levant.

4          THE WITNESS:  Right.

5          THE COURT:  But he's no longer counsel in this case,

6 right?  He was not on the --

7          THE WITNESS:  No.

8          THE COURT:  -- papers?  Okay.  So as far as you know,

9 the lawyers who may have listed on the complaint, that is with

10 the firm of Kalikhman and Rayz and the Kehoe law firm; that's

11 your firm?

12          THE WITNESS:  Kehoe.

13          THE COURT:  And Connolly, Wells and Gray.  As far as

14 you know, no lawyer in that firm has ever met with Mr.

15 Wolfington?

16          THE WITNESS:  In person, that's correct, Your Honor.

17          THE COURT:  Okay.  Now, you have talked to him on the

18 telephone?

19          THE WITNESS:  Numerous times.

20          THE COURT:  Have you ever talked to his father in

21 person?

22          THE WITNESS:  In person, no.

23          THE COURT:  Have you talked to his father on the

24 phone?

25          THE WITNESS:  The one time on the conference call --

1           THE COURT:  One time.

2           THE WITNESS:  -- June 23rd.

3           THE COURT:  Okay.  All right.  When you talked to the

4 plaintiff on the telephone, you said it was numerous times?

5           THE WITNESS:  Yes.

6           THE COURT:  What other lawyers have been with you on

7 those phone calls?

8           THE WITNESS:  At different times, John Kehoe was on

9 the phone with me.  Also, Bob Levant, I believe.

10          THE COURT:  Who, Bob Vant [sic]?

11          THE WITNESS:  Bob, yeah, Bob and also Alan.

12          THE COURT:  Bob Levant?

13          THE WITNESS:  Levant, right.

14          THE COURT:  All right.  He's your counsel in this

15 case?

16          THE WITNESS:  Yes.

17          THE COURT:  Okay.  And who else?

18          THE WITNESS:  And Alan also.

19          THE COURT:  Mr. Tauber?

20          THE WITNESS:  Yes.

21          THE COURT:  Okay.  But they, they were not on the

22 complaint at the time of the motion -- they were not on this

23 case when the complaint was filed or when the --

24          THE WITNESS:  That's correct.

25          THE COURT:  -- the judgment --

62

1              THE WITNESS:  That's correct.

2              THE COURT:  -- or the pleadings was --

3              THE WITNESS:  That's correct.

4              THE COURT:  -- granted.

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.

7              THE WITNESS:  So just to clarify, Your Honor.

8              THE COURT:  Yes.

9              THE WITNESS:  Yes.  The conference call that we had

10  on June 23rd where Andrew was on the phone, also Rob Gray

11  from --

12             THE COURT:  Mr. Gray?

13             THE WITNESS:  Mr. Gray was on the phone as well --

14             THE COURT:  Okay.  Thank you.

15             THE WITNESS:  -- and myself.  Right.

16             THE COURT:  All right.  Now, right in front of you

17  there is the complaint.  Do you see that?

18             THE WITNESS:  Okay.

19             THE COURT:  All right.  Now, did you ever ask Mr.

20  Wolfington to -- for documents?

21             THE WITNESS:  Yes.

22             THE COURT:  What documents did you ask him for?

23             THE WITNESS:  We asked him for documents that related

24  to the -- to this claim.

25             THE COURT:  Okay.  And can you recall now what he

1  sent you?

2           THE WITNESS:  It -- what we originally had from him

3  at the time of the filing of the complaint was a confirmation

4  that he paid $200, a --

5           THE COURT:  All right.  Then look at paragraph 23, is

6  that the confirmation that's stated in paragraph 23?

7           THE WITNESS:  Paragraph 23.  Yes, that's correct.

8           THE COURT:  And did he also send you the document

9  that's referenced in paragraph 24?

10          THE WITNESS:  Yes, he did.

11          THE COURT:  All right.  And did he send you other

12  documents?

13          THE WITNESS:  And then we had an additional email

14  from I believe June that said the May payment was not able to

15  be taken from his account.  That they --

16          THE COURT:  Right.  All right.  I'm going to show

17  you --

18          THE WITNESS:  -- that they tried to take the payment

19  but they couldn't take the payment.

20          THE COURT:  I'm going to show you that too.  Just let

21  me --

22          All right.  I'm going to mark this as Court 1.  I've

23  already read this into the record with Mr. Rayz, but this is --

24  it looks like this is a copy of the email: (Reading)

25               "From no reply at medfusion.net, dated February 21st,

1          2016, to Andrew Wolfington, subject: budget payment

2          failed.  Dear patient, this is the notification that

3          the budget payment plan that -- plan you had set up

4          with Rothman Institute has failed.  Please contact

5          Rothman Institute immediately for additional

6          information".

7          Is that the document you're referring to?

8          THE WITNESS:  No.

9          THE COURT:  That's not it?

10         THE WITNESS:  No.  That -- this is the document we

11  got after we were notified --

12         THE COURT:  All right.

13         THE WITNESS:  -- that payments weren't being -- that

14  the defendant said that payments were not taken out of the

15  account.  We then went back to Andrew and he then produced some

16  additional documents.  That was in November of 2000.

17         THE COURT:  Okay.  So this document you got from

18  Rothman as discovery or initial disclosure?

19         THE WITNESS:  No.  Andrew ended up finding these

20  documents.

21         THE COURT:  Oh, he did send them?

22         THE WITNESS:  But not until -- right, we did not see

23  them until November from him.

24         THE COURT:  All right.  Okay.  Now, let me just go

25  back.  At any time did he send you any bank statements for his

65

1  -- for a bank account that he had?

2          THE WITNESS:  We did not receive any bank statements

3  from him.

4          THE COURT:  Did you ask for them?

5          THE WITNESS:  We ultimately did ask for them, yes --

6          THE COURT:  When?

7          THE WITNESS:  -- in November.

8          THE COURT:  Was that before you filed the complaint?

9          THE WITNESS:  No, we -- what we asked him was all the

10 documentation he had.  What he sent us was certain

11 documentation from Rothman.  We then also asked him, you know,

12 and he provided the information that he believed that the

13 payments were being taken out of his account.

14         MR. TAUBER:  Your Honor, I'm just going to impose a

15 relevancy objection.  If we're not dealing with the electronic

16 funds transfer --

17         THE COURT:  Well, no.  Overruled.

18         MR. TAUBER:  -- I'm not sure --

19         THE COURT:  Just let me ask some questions.

20         Okay.  All right.  Let me -- the complaint was filed

21 September 13th, 2016, right?

22         THE WITNESS:  Right.

23         THE COURT:  My questions at the moment are limited to

24 what you had at that time.

25         THE WITNESS:  Right.

1           THE COURT:  At that time had you asked him for any
2  bank account statements?
3           THE WITNESS:  I don't believe so.
4           THE COURT:  All right.  Did you know if he had a bank
5  account?
6           THE WITNESS:  Yes, we did because the account was set
7  up to take the money out of the bank account.
8           THE COURT:  Well, do you know what bank it was at?
9           THE WITNESS:  I'd have to look back at the records.
10  I --
11          THE COURT:  Well, if he never sent you any bank
12  statements, how would you know what bank it was?
13          THE WITNESS:  I'm not sure.  I'd have to look at the
14  documents to see if the documents that he presented to us about
15  them taking the $100 withdraws had a bank.  And I think it
16  does.
17          THE COURT:  Okay.
18          THE WITNESS:  I believe it's -- I believe it was a
19  debit account.  And it's on paragraph 24, Your Honor.
20          THE COURT:  Okay.  Now, but paragraph 24, you see,
21  refers to a credit card.  You see it has that language?
22          THE WITNESS:  Right.  It's -- it was a debit card.
23          THE COURT:  It would have been a debit card?
24          THE WITNESS:  Yeah.
25          THE COURT:  Are you sure about that?

67

1              THE WITNESS:  I believe so.

2              THE COURT:  Okay.  Do you know what bank issued it?

3    Did you have any knowledge of that at the time the complaint

4    was filed?

5              THE WITNESS:  I don't remember, Your Honor.

6              THE COURT:  Okay.  Now, would you look at paragraph 4

7    of the complaint?

8              THE WITNESS:  Okay.

9              THE COURT:  Do you have it there?

10             THE WITNESS:  Yeah.

11             THE COURT:  All right.  There's a statement in there

12   that the defendant extended credit to plaintiff and obtained

13   plaintiff's personal banking information.  What facts did you

14   have to support the allegation that the defendant had obtained

15   plaintiff's personal banking information?

16             THE WITNESS:  That was the documentation that he gave

17   us from Rothman that said that they were going to withdraw the

18   $100 and they had his account number and the authorization to

19   do it.

20             THE COURT:  And then it says, "so as to execute

21   electronic transfers to repay the loan".  Do you see that?

22             THE WITNESS:  I'm sorry.

23             THE COURT:  The same sentence.

24             THE WITNESS:  Yeah, I see it.

25             THE COURT:  So the -- when you say personal banking

1  information, then the only facts you had to support that was

2  that apparently Rothman had gotten a debit card account for the

3  plaintiff; is that correct?

4          THE WITNESS:  Right.  And also the plaintiff telling

5  us that.

6          THE COURT:  The plaintiff's what?

7          THE WITNESS:  And also the plaintiff telling us that.

8          THE COURT:  Okay.  And -- now, when it says, so as to

9  execute electronic transfers, is that phrase include the

10 payment by use of a debit card?

11         THE WITNESS:  Yeah, with a debit card that's tied to

12 a bank account.  So the money --

13         THE COURT:  A debit card by definition --

14         THE WITNESS:  Right.

15         THE COURT:  -- is tied to a bank account.

16         THE WITNESS:  Exactly, right.

17         THE COURT:  All right.  So does that --

18         THE WITNESS:  I would say --

19         THE COURT:  -- constitute an electronic transfer?

20         THE WITNESS:  So I would say -- I would say yes.

21         THE COURT:  Okay.  All right.  Then in the last line

22 of this paragraph there's a reference to Regulation Z; do you

23 see that?

24         THE WITNESS:  I see it, Your Honor.

25         THE COURT:  All right.  Are you -- had you read

1  Regulation Z?

2           THE WITNESS:  I did not personally read Regulation Z.

3  We had, you know, I had other counsel in the case that was very

4  familiar with this.

5           THE COURT:  All right.  Who was that?

6           THE WITNESS:  Eric Rayz.  Gerry Wells, Rob Gray.

7           THE COURT:  Okay.  But as of this date, you had not

8  read Regulation Z; is that correct?

9           THE WITNESS:  No, I did not.

10          THE COURT:  Okay.  All right.  Then it says in

11 paragraph 5, on information belief defendant used these very

12 same tactics on tens of other consumers who fall within the

13 ambient of the protections of the Truth and Lending Act and the

14 Electronic Transfer -- Electronics Funds Transfer Act,

15 abbreviation TILA and EFTA.  Do you see that?

16          THE WITNESS:  Yes, I do.

17          THE COURT:  What was the basis of that allegation?

18          THE WITNESS:  I mean I can only speak to my -- to me

19 because the complaint was drafted with the assistance and

20 mostly by the -- Eric Rayz's firm and Gerry Wells' firm, but

21 that information was based on what the plaintiff told us as

22 well as what his father told us in that initial conversation.

23 And then I believe also with regard to additional research that

24 Gerry did on the topic.

25          THE COURT:  All right.  Well, did -- were you

1  personally involved in drafting this complaint or not?

2          THE WITNESS:  I was not, Your Honor.

3          THE COURT:  Did you do any research on it?

4          THE WITNESS:  I did not do the research, no, Your

5  Honor.

6          THE COURT:  All right.  Did you have any other

7  specific assignment or responsibilities?

8          THE WITNESS:  Just to review it obviously for typos

9  and nits and things like that.

10          THE COURT:  Okay.  So you --

11          THE WITNESS:  I was not -- I was not looking at it

12  for the substance.  That's why we had the other firms and

13  obviously involved in the case.

14          THE COURT:  All right.  Okay.  Did you ever -- but

15  you were in on the discussions with the plaintiff?

16          THE WITNESS:  Yes, I was the contact with the

17  plaintiff, yes.

18          THE COURT:  All right.  Now, about how many of those

19  do you think you had before the complaint was filed?

20          THE WITNESS:  Before the complaint was filed?

21  Probably between emails and phone calls, five, six, seven.

22          THE COURT:  There were also emails?

23          THE WITNESS:  Yes.  Yes, I would email back and forth

24  with him.  That's how I would probably communicate with him

25  more often than calling him because he worked full time so it

1  was difficult to get him on the phone sometimes, so email was

2  better for him.

3          THE COURT:  Okay.  All right.  Did you ever ask the

4  plaintiff whether he had any kind of written agreement with

5  Rothman, just as a factual matter?

6          THE WITNESS:  I believe that was discussed obviously

7  at the initial conference call on the 23rd.  And again, the

8  documents that he presented to us was the, you know, the

9  confirmation of the payment of $200, confirmation of the --

10 they were going to be taking the withdraws of $100.

11         THE COURT:  Okay.  Okay.  All right.  I don't have

12 any other questions.  Ms. Ruccolo?

13         Well, wait.  I do.  I'm sorry.

14         MS. RUCCOLO:  Okay.

15         THE COURT:  Also over there is a document that was

16 filed, a brief in opposition to the defendant's motion for

17 judgment on the pleadings; do you see that?

18         THE WITNESS:  Okay.  Your Honor, which --

19         THE COURT:  No, that's not it.

20         This one here.  This was filed November 28th, 2016.

21 Can you just look at that and see if you had any personal

22 responsibility for drafting that document?

23         THE WITNESS:  Again, Your Honor, other than reading

24 it for nits and --

25         THE COURT:  Okay.

1          THE WITNESS:  -- typos and things like that, no.

2          THE COURT:  I don't have any other questions.  All

3    right.  Ms. Ruccolo?

4                      CROSS-EXAMINATION

5    BY MS. RUCCOLO:

6    Q    Sir, you didn't obtain any records from the plaintiff to

7    show that he actually had a debit card account, did you?

8    A    Yes, we had the documentation that he had from Rothman

9    that indicated that he did because he gave them the

10   information.

11         THE COURT:  Well, did you have anything else other

12   than the one email referenced in paragraph 24?

13         THE WITNESS:  In terms --

14         THE COURT:  Is that your question?

15         MS. RUCCOLO:  Yeah, because it doesn't say debit

16   card, does it?  It says credit card.

17         THE WITNESS:  Right.  So the -- when we spoke to the

18   client, you know, the initial time he said it was a debit card

19   and it was coming from his account.

20   BY MS. RUCCOLO:

21   Q    Did you ask to see a statement from the account showing

22   that?

23   A    At that time, no, we did not.

24   Q    Did you ask to see a copy of the card to determine whether

25   or not it was a credit card or a debit card?

CROSS-EXAMINATION - YARNOFF                    73

1  A    We did not because he told us it was a debit card.

2            THE COURT:  Well, have you since then inquired about

3  that?

4            THE WITNESS:  We have multiple times, yes, Your

5  Honor.

6            THE COURT:  Have you received it?

7            THE WITNESS:  In terms of -- received what?

8            THE COURT:  Well, did Mr. Wolfington ever send to you

9  or your firm the statements from his debit card account?

10            THE WITNESS:  He reviewed them and indicated that

11  ultimately that the payments were not taken out.  But we --

12            THE COURT:  Well, did he --

13            THE WITNESS:  -- we did not get copies --

14            THE COURT:  -- ever send the statements to you?

15            THE WITNESS:  We did not get copies of the

16  statements, Your Honor, no.

17            THE COURT:  Did you ask for it?

18            THE WITNESS:  We did ask for them.

19            THE COURT:  And he refused to turn them over?

20            THE WITNESS:  I don't know if he refused.  I think it

21  was just the timing.  He had sent us those additional emails

22  also from Rothman.  This is the February one.  So between that

23  and between him telling us that he went and looked -- looked at

24  the bank statements, that we then understood that the payments

25  weren't being taken out, that they were attempted to but then

REDIRECT EXAMINATION - YARNOFF                    74

1  the payments weren't taken.  But that was in November.

2              THE COURT:  Well, would the bank -- does the bank --

3  would the bank -- if you know, would the bank statements show

4  whether Rothman had attempted to take them out?

5              THE WITNESS:  I'm only guessing but they --

6              THE COURT:  Well, don't guess.

7              THE WITNESS:  Yeah, I don't --

8              THE COURT:  Don't guess.

9              THE WITNESS:  -- I don't know.

10             THE COURT:  Don't guess.  All right.  Next, go ahead.

11  Next question?

12  BY MS. RUCCOLO:

13  Q    Sir, you just mentioned the February 21st email.  Do you

14  have that in front of you still?

15  A    Yes.

16  Q    Okay.  On that February 21st email it says budget plan

17  failed, right?

18  A    Yes.

19  Q    But it doesn't say that any attempts to make charges

20  against his bank account were ever made, does it?

21  A    I'm sorry, what's the question?

22  Q    Nowhere in this notification does it say we attempted to

23  make a deduction from your debit card and it failed, it just

24  says the payment plan failed, we didn't receive payment, right?

25  A    I mean I'm reading what it says and it says the budget

REDIRECT EXAMINATION - YARNOFF                    75

1  payment failed.

2  Q    Right.

3  A    Yes, so I'd answer that yes.

4  Q    Okay.  So nowhere in there does it say they attempted to

5  make any payments against his checking account or savings

6  account?

7  A    It doesn't say that in this document.

8            MS. RUCCOLO:  Okay.  I have no further questions.

9            MR. TAUBER:  May I, Your Honor?

10           THE COURT:  Redirect.

11           Can you pull the microphone closer?

12           THE WITNESS:  I'm sorry, yes.

13           THE COURT:  And talk right into it?  Thank you.

14                     REDIRECT EXAMINATION

15 BY MR. TAUBER:

16 Q    I just want to make sure the record is clear.  You were --

17 you had, I think you indicated, seven or eight personal

18 contacts with the plaintiff, Mr. Wolfington, prior to the

19 complaint being filed, correct?

20 A    I would say so, yes.

21 Q    And in those conversations Mr. Wolfington indicated that

22 he had a bank account that he agreed to have debited as payment

23 for the surgery he received from Rothman, correct?

24 A    That's correct.

25 Q    All right.  You also, I think you stated earlier --

REDIRECT EXAMINATION - YARNOFF                  76

1  initially that you had communications with Mr. Levant, who was

2  the first attorney Mr. Wolfington dealt with, correct?

3  A    Yes, that's correct.

4  Q    And in those conversations did you discuss Mr.

5  Wolfington's claim with Mr. Levant, his attorney?

6  A    Yes, I mean he brought the idea to us.  Of course.

7  Q    Did Mr. Levant demonstrate any knowledge of the facts of

8  Mr. Wolfington's case and claim?

9  A    Yes.

10 Q    Were you -- do you know Mr. Levant prior to this case?

11 A    Yes.

12 Q    Do you have any reason to doubt his veracity or his

13 integrity with respect to interviewing clients?

14 A    Not at all.

15 Q    Okay.  Did Mr. Wolfington ever say anything to you in the

16 course of those seven or eight conversations that led you to

17 doubt his honesty with respect to any fact in this case?

18 A    No, not at all.

19        MR. TAUBER:  Okay.  I have nothing further.  Thank

20 you.

21        THE COURT:  Okay.  Thank you.

22        THE WITNESS:  Thank you.

23        THE COURT:  I'd like you to stay outside, just in

24 case --

25        THE WITNESS:  Okay.

1          THE COURT:  -- anyone wants to recall you.

2          All right.  How many more -- you have Mr. Wells?

3          MR. TAUBER:  Just Mr. Wells.

4          THE COURT:  He's the last one?

5          MR. TAUBER:  Yes, that's it.  I mean he's the only

6   other one who signed the declaration so.

7          THE COURT:  All right.  Why don't you have him come

8   up?

9          MR. TAUBER:  I'm sorry, Judge, I do have one further

10  question.  I apologize.

11         THE COURT:  Yeah, go ahead.  Come back on the stand.

12         MR. TAUBER:  I have one other question for you.

13  Sorry.

14         THE WITNESS:  No problem.

15  BY MR. TAUBER:

16  Q    To your knowledge, did Mr. Wolfington read this complaint

17  or was he presented with the complaint?

18  A    Oh, yeah.  He was presented with the complaint, reviewed

19  the complaint, gave us the, you know, permission --

20         THE COURT:  When you say presented, was it emailed to

21  him?

22         THE WITNESS:  Yeah.  The -- yeah, the complaint was

23  emailed to him.

24         MR. TAUBER:  Okay.  That's all I have.

25         THE COURT:  All right.  Thank you.

1                THE WITNESS:  Okay.  Thank you.

2                THE COURT:  Let's just take a five minute recess.

3  All right?

4                MR. TAUBER:  Yes, sure.

5                THE COURT:  And then we'll call Mr. Wells.

6                THE COURT DEPUTY:  All rise.

7                THE COURT:  And then we'll -- I mean I'll allow a

8  briefing if you want to do that.  We'll talk about a schedule.

9  Okay.

10               MR. TAUBER:  Okay.

11               THE COURT:  All right.  Thank you.

12         (Court in recess from 11:32 a.m. until 11:39 a.m.)

13               THE COURT:  Okay.  Mr. Wells, ready?

14               Are you going to call any witnesses, Ms. Ruccolo?

15               MS. RUCCOLO:  I don't think I am, Your Honor, no.

16               THE COURT:  All right.

17               Mr. Wells?

18               THE WITNESS:  Yes.

19               THE COURT:  All right.  Come on up, please.

20               THE CLERK:  Please raise your right hand.

21                GERALD WELLS, PLAINTIFF'S WITNESS, SWORN

22               THE WITNESS:  I do so affirm.

23               THE CLERK:  Thank you.  Please state your full name

24  and spell your last name for the record.

25               THE WITNESS:  Gerald David Wells, III.  Wells, W-E-L-

1  L-S.

2          THE COURT:  Okay.  Mr. Wells, good morning and thank

3  you for submitting your declaration, which I reviewed.  I want

4  to ask you some questions about that.  And I've asked similar

5  questions to the other two witnesses.

6          Did you ever meet Mr. Wolfington, the plaintiff, in

7  person?

8          THE WITNESS:  I did not, Your Honor.

9          THE COURT:  Okay.  Had you ever met his father in

10 person?

11         THE WITNESS:  I have not, Your Honor.

12         THE COURT:  But according to your declaration, you

13 had a number of phone conversations with the plaintiff?

14         THE WITNESS:  Your Honor, my partner, Rob Gray, had

15 the conversations with the plaintiff.

16         THE COURT:  Were you on the phone in any of those?

17         THE WITNESS:  I was not.

18         THE COURT:  Okay.  All right.  Were you ever on the

19 phone with his father, with the plaintiff's father?

20         THE WITNESS:  No, Your Honor.

21         THE COURT:  Okay.  So you've -- you don't have any

22 knowledge of the factual background of the allegations in the

23 complaint?

24         THE WITNESS:  Just my review of the documents that

25 were supplied by the client to Mr. Kehoe's firm, which then I

1 believe forwarded on to my partner and my partner shared them

2 with me.

3           THE COURT:  All right.  The Kehoe -- the person in

4 the Kehoe firm was Mr. Yarnoff, right?

5           THE WITNESS:  Mr. Yarnoff and their investigator,

6 David Rabner, were communicating with Rob and I.

7           THE COURT:  Mr. Rabner?

8           THE WITNESS:  Yes, Your Honor.

9           THE COURT:  R-A-B-N-E-R?  What's his first name?

10          THE WITNESS:  David.

11          THE COURT:  Is he a lawyer or --

12          THE WITNESS:  No, Your Honor.

13          THE COURT:  All right.

14          THE WITNESS:  Your Honor, I'm sorry.  I know he was

15 with the FBI.  I do not know --

16          THE COURT:  Oh, okay.

17          THE WITNESS:  -- if he was a lawyer.

18          THE COURT:  All right.  He may have been.  He's not a

19 practicing lawyer?

20          THE WITNESS:  That's my understanding, Your Honor.

21          THE COURT:  Okay.  All right.  Would you -- in front

22 of you I put the complaint.  Do you see that?

23          THE WITNESS:  (No Verbal Response.)

24          THE COURT:  All right.  I want you to look at

25 paragraph 23.  Now, we've had a lot of testimony about this,

1   but it appears that everybody agrees that paragraph 23 refers

2   to a credit card payment that was made by the plaintiff's

3   father to Rothman for a $200 down payment before the surgery.

4   Would you agree with that?

5               THE WITNESS:  Your Honor, this is addressed to Andrew

6   Wolfington, the statement.  I'm not -- I know --

7               THE COURT:  If you don't know, just say you don't.

8               THE WITNESS:  I don't know, Your Honor.

9               THE COURT:  All right.  Okay.  Now, just read

10  paragraph 24 to yourself.

11              THE WITNESS:  Twenty-four, Your Honor?

12              THE COURT:  Yeah.

13              THE WITNESS:  Okay.

14              THE COURT:  All right.  Do you have any knowledge of

15  the facts supporting that paragraph?

16              THE WITNESS:  Your Honor, I believe in addition to

17  this there was an email, I think -- I believe it was to Andrew

18  telling him to go online to set up his online account.

19              THE COURT:  Okay.

20              THE WITNESS:  With respect to the online bill payment

21  plan.

22              THE COURT:  All right.  But you, since you never

23  discussed this, the facts with Andrew, you don't have any

24  knowledge of that directly from him?

25              THE WITNESS:  Correct, Your Honor.

1          THE COURT:  All right.  Do you see the phrase there,
2  credit card, the third line from the bottom, credit card and a
3  series of asterisks and then the numbers 8430?

4          THE WITNESS:  I do, Your Honor.

5          THE COURT:  Do you have any knowledge what that
6  refers to?

7          THE WITNESS:  No personal knowledge.

8          THE COURT:  Okay.  So you don't -- so after your
9  involvement in this case, if I understand your declaration, is
10 that you had reviewed the *Bright* case and you had some
11 discussions with your co-counsel about the legal validity of
12 the claim, is that -- would that be a fair summary?

13         THE WITNESS:  Yes, Your Honor, as well as --

14         THE COURT:  Okay.

15         THE WITNESS:  -- being the point person with the
16 Court for the two teleconferences.

17         THE COURT:  All right.  Okay.  And you were on the
18 phone call with me and defense counsel when you had the
19 discussion about the payment, right?

20         THE WITNESS:  I was the primary person on the call
21 for both calls.

22         THE COURT:  Right.  Okay.  Now, are you familiar with
23 Regulation Z?  Or were you at the time the complaint was filed?

24         THE WITNESS:  Yes, Your Honor.

25         THE COURT:  Okay.  Now, let me -- I think that's one

1  of the documents in front of -- yeah, okay.

2          All right.  Regulation Z, if you look at under 17,

3  the term creditor.  It says, "a person who regularly extends

4  consumer credit that is subject to a finance charge or is

5  payable by written agreement in more than four installments,

6  not including a down payment, et cetera".

7          Were you aware of the requiring -- well, first of

8  all, would you agree that in this case there's no finance

9  charge?

10          THE WITNESS:  That was my understanding, Your Honor.

11          THE COURT:  All right.  So then in order for Rothman

12  to be a creditor there would have to be a written agreement; do

13  you agree with that?

14          THE WITNESS:  There would have to be an agreement,

15  yes.

16          THE COURT:  Okay.  Did you come -- what to your mind

17  in this case constituted a written agreement?

18          THE WITNESS:  Your Honor --

19          THE COURT:  At least as of the time of the filing of

20  the complaint?

21          THE WITNESS:  Your Honor, the online bill payment

22  plan that was referenced in -- or that was in the email

23  confirmation or that was sent to Andrew Wolfington that's

24  referenced in paragraph 24, in reviewing that, that led me to

25  believe that there was an agreement and that that agreement was

84

1  for more than four payments.

2          THE COURT:  And was it -- well, what about it

3  constituted a written agreement?

4          THE WITNESS:  That the -- Your Honor, it's -- with

5  respect to that, I believe it's at least two part.  In part the

6  confirmation here of the online bill payment plan itself would

7  be a written agreement confirming here are the terms of the

8  payment.

9          THE COURT:  In the email?

10          THE WITNESS:  The email.  And then -- and I think

11  this is what's sort of what was I was getting at with respect

12  to the conference in December.  The scheduled online bill

13  payment plan that's referenced here, that document to the

14  extent of the document is what we wanted to receive from

15  defendant that I believe would also constitute a written

16  agreement for purposes of TILA.

17          THE COURT:  Well, are you aware of anything that the

18  plaintiff -- any document that the plaintiff signed indicating

19  his participation in a written agreement?

20          THE WITNESS:  My understanding, the only thing that

21  the client signed was the financial policy --

22          THE COURT:  All right.

23          THE WITNESS:  -- in January.  But I didn't believe

24  that constituted -- that wasn't the agreement.

25          THE COURT:  Okay.  Well, the -- I think you're --

1  that's this document here.  It was the one he signed before

2  the --

3          THE WITNESS:  Right, the January 12th.

4          THE COURT:  Right.  You're -- that's not a written

5  agreement that's used in Regulation Z, is it or is it?

6          THE WITNESS:  No, Your Honor.  I viewed this as at

7  best an agreement to a degree and therefore would not

8  constitute a written agreement for purposes of TILA.

9          THE COURT:  Okay.  Are you aware of any conduct by

10 the plaintiff that would have led you to allege there was a

11 written agreement in this case?

12         THE WITNESS:  Other than the payment of the initial

13 payment of $200?

14         THE COURT:  Yes.

15         THE WITNESS:  It was the payment of the $200 and it

16 was the establishment of this online bill payment plan.

17         THE COURT:  And by that you're referring to paragraph

18 24?

19         THE WITNESS:  Yes, the payment plan's reference in

20 paragraph 24.

21         THE COURT:  Okay.  All right.  I have no further

22 questions.  Go ahead.

23         MS. RUCCOLO:  I have no questions, Your Honor.

24         THE COURT:  All right.  Mr. Tauber?

25         MR. TAUBER:  Just briefly.

1                    REDIRECT EXAMINATION

2    BY MR. TAUBER:

3    Q    Mr. Wells, the online bill payment plan was for payment of

4    the deductible that was required to be made by Mr. Wolfington

5    for --

6              THE COURT:  Well, wait.  It -- I'm happy to have you

7    ask the question, but I'd like you to, since we've been

8    referring to the paragraph in the complaint, I'd like you to

9    refer it to -- rephrase your question in the context of

10   paragraph 23.  I think that's what you're talking about?  But

11   I'd like, if you don't mind, to direct the witness's attention

12   to paragraph 23, assuming that's what you're talking about.

13   That's the down -- $200 down payment.

14              MR. TAUBER:  Just one moment, Your Honor.

15   BY MR. TAUBER:

16   Q    Well, let me refer you to paragraph 20 of the complaint,

17   if I may read that --

18              THE COURT:  Go ahead.

19   BY MR. TAUBER:

20   Q    -- for convenience?  (Reading)

21              "After discussing the inability of his son to pay the

22              entire deductible in one lump sum, defendant agreed

23              to extend plaintiff -- extend credit to plaintiff to

24              cover the balance owed, which consisted of an initial

25              credit card payment of $200 on January 20th, 2016

1                  with subsequent monthly payments of $100 until the

2                  balance of the deductible is fully satisfied."

3          That's what paragraph 20 says.  So is it your

4    understanding or was it your understanding that the online bill

5    payment plan as referenced in paragraph, again, I guess later

6    in paragraph 24, was to pay this deductible that's referenced

7    in paragraph 20?

8    A    That's my understanding.

9    Q    Okay.  And the deductible, the payment of the deductible,

10   is it also that payment of the deductible was to be completed

11   by the initial down payment of $200 followed by these

12   installments of $100 a month until paid off, correct?

13   A    That was my understanding.

14   Q    All right.  And that was to satisfy the deductible that

15   was referenced in the finance policy that you were just showed

16   or -- I'm sorry, that's referenced in paragraph 17 of the

17   complaint?  I think you just saw that.  Or you referenced it,

18   it was the signed document by Mr. Wolfington.

19   A    It's my understanding, and I don't have the finance policy

20   in front of me, but it's my understanding the finance policy

21   didn't reference the amount but just that --

22              THE COURT:  Do you want to look at this?

23              THE WITNESS:  Yes.

24   BY MR. TAUBER:

25   A    The finance policy set up a number of different items, one

REDIRECT EXAMINATION - WELLS                    88

1 of which was that there would be if there was a deductible he
2 would have to pay.
3 Q    Okay.  And that finance policy was signed before the
4 surgery was done, correct?
5 A    Correct.
6 Q    But the -- but this online bill payment plan was agreed
7 to, or your understanding was, it was agreed to before the
8 surgery was done?
9 A    Correct.
10 Q    And it was intended that the installment payments would
11 occur after the surgery was done?
12 A    Correct.
13 Q    And that was to satisfy the deductible referenced in the
14 finance policy?
15 A    Correct.
16 Q    Which is not specifically identified but in concept the
17 deductible was -- that was the deductible that had to be paid?
18 A    Correct.  The deductible would be paid with the initial
19 payment before the surgery and then with a series of payments
20 after the surgery.
21 Q    All right.  Is it fair to say that these three documents
22 constituted the written agreement?
23        MS. RUCCOLO:  Objection, Your Honor.  It's a leading
24 question.
25        THE COURT:  Well, that's --

1          MR. TAUBER:  Well --

2          THE COURT:  -- sustained.

3    BY MR. TAUBER:

4    Q    Well, let me ask you then.

5          THE COURT:  You can rephrase the question.

6          MR. TAUBER:  All right.

7    BY MR. TAUBER:

8    Q    Mr. Wells, what in your mind constituted the entirety of

9    the written agreement?

10   A    The written agreement was the online bill payment plan,

11   which included the $100 a month payments that were scheduled to

12   occur.  I believe the first one was in February, after the

13   surgery.  As well as the initial payment of the deductible,

14   which occurred the day before the surgery.

15         THE COURT:  You mean the $200?

16         THE WITNESS:  The $200 deductible, yes.

17   BY MR. TAUBER:

18   Q    Now, the judge asked you whether you -- whether there was

19   a finance charge and I believe you had indicated to your

20   knowledge there wasn't, you never -- you never received a --

21   you never completed discovery with Rothman ascertaining whether

22   or not there may be some -- that there may be a finance charge

23   that could be included in this online bill payment plan at some

24   point?

25   A    We received no documents from Rothman, including no

RECROSS EXAMINATION - WELLS                    90

1  documents with their initial disclosures.

2          MR. TAUBER:  Okay.  That's all I have.

3          MS. RUCCOLO:  Your Honor?

4          THE COURT:  Yes.

5          MS. RUCCOLO:  May I ask one question?

6                    RECROSS EXAMINATION

7  BY MS. RUCCOLO:

8  Q    I think you had told --

9          THE COURT:  Pull the microphone closer.

10          MS. RUCCOLO:  I'm sorry.

11  BY MS. RUCCOLO:

12  Q    I think you had told us earlier that you had no

13  communications with the plaintiff, correct?

14  A    That's correct.

15  Q    Okay.  And you're understanding that the $200 payment was

16  part of a payment plan, that's not in any of the documents that

17  you had from Rothman, is it?

18  A    It's my understanding that Mr. Wolfington's only

19  interaction with Rothman had to do with the surgery that

20  occurred in January.

21  Q    All right.  Let me direct your attention to paragraph 23

22  of the complaint.

23  A    Paragraph 23?

24  Q    Yes.  That's the receipt for the $200 down payment, as you

25  referred to it, correct?

1  A    Correct.

2  Q    Okay.  There's nothing in that document that shows that

3  it's a down payment on a payment plan, correct?

4  A    With respect -- no, counsel, but I read this paragraph --

5  the receipt from Rothman in paragraph 23 and then the receipt

6  from Rothman in paragraph 24 as being joined.  I read them

7  conjunctively.

8           THE COURT:  Well, you know, you used the term

9  receipt.  I'm not sure -- the word receipt is not in the

10 document, but if that's your choice of words, that's your

11 answer.

12          All right.  Next question.

13 BY MS. RUCCOLO:

14 Q    And, sir, in the email from Rothman in paragraph 24,

15 there's nothing in that email that refers to the $200 payment

16 as part of any payment plan, is there?

17          THE COURT:  Well, it speaks for itself.  This is

18 about a $100 payment.

19          MS. RUCCOLO:  All right.  Okay.

20          MR. TAUBER:  May I just --

21          THE COURT:  Do you have any knowledge -- well, strike

22 that.  Never mind.

23          MS. RUCCOLO:  That's all the questions I have.

24          THE COURT:  Mr. Tauber?

25          MR. TAUBER:  Yeah, just briefly.

1                     FURTHER REDIRECT EXAMINATION

2   BY MR. TAUBER:

3   Q    Mr. Wells, in paragraph 20, the complaint refers to

4   conversations with the -- with the defendant Rothman about how

5   the deductible was going to be paid; is that correct?

6   A    Let me just read the paragraph.

7   Q    Sure.

8   A    That's correct.

9   Q    And that was based upon conversations that Mr. Wolfington

10  and/or his father had with the -- with Rothman about how the

11  deductible is going to be satisfied, correct?

12  A    That's my understanding, correct.

13  Q    And is it -- is it your understanding that -- or is

14  your belief that in an attempt to -- or in the pleading, in

15  the complaint that was drafted, paragraph 23 and 24, which

16  refers to certain emails, does that -- was that confirming

17  the understanding that was -- that is referenced in paragraph

18  20?

19           The written -- I mean what I want to say is that the

20  written confirmation for the agreement that was reached by the

21  plaintiff or on behalf of the plaintiff with Rothman?

22  A    Absolutely.

23           MR. TAUBER:  All right.  That's all I have.

24           MS. RUCCOLO:  Your Honor?

25           THE COURT:  Yes.

1                    FURTHER RECROSS EXAMINATION

2    BY MS. RUCCOLO:

3    Q    Is there anything in those emails in paragraph 23 and

4    paragraph 24 that say that -- that say what your understanding

5    was, that the $200 was part of the payment plan?

6             THE COURT:  It speaks for itself.  It doesn't say

7    that.

8    BY MS. RUCCOLO:

9    Q    And you didn't speak to the plaintiff so you didn't hear

10   it from him?

11            THE COURT:  We know that.

12            MS. RUCCOLO:  Okay.

13   BY MS. RUCCOLO:

14   A    No, I did not speak with the plaintiff.

15            MS. RUCCOLO:  All right.  I have no further

16   questions.

17            THE COURT:  All right.  Thank you.

18            All right.  Thank you, Mr. Wells.

19            All right.  You don't -- no other witnesses, right?

20            MR. TAUBER:  No, Your Honor.

21            THE COURT:  All right.

22            THE WITNESS:  May I be excused, Your Honor?

23            THE COURT:  Yeah, sure.

24            All right.  And your witnesses can come in if they

25   want.

1           All right.  Here's -- let me -- what -- without

2    drawing any legal conclusions from this, Mr. Tauber and Mr.

3    Levant, what is of concern to me is that -- and I don't fault

4    your -- the lawyers for not meeting with the plaintiff face to

5    face.  I don't, you know, a series of telephone conversations

6    is fine.  But in making the allegations that were made here it

7    is obvious that the plaintiff, in looking at paragraph 24, the

8    plaintiff must have given this, whether it says credit card but

9    the following paragraph implies that it could have been a debit

10   card or more likely was, never asked for the records of the

11   bank.  I mean the record of this case and this hearing

12   included, we have no idea what bank it was.  And what I'm going

13   to do is give you the opportunity, if you want it, to subpoena

14   the bank and produce the records.

15           Now, what is also a mystery is that I'm inferring

16   from the other document that I marked Court Exhibit Number 1,

17   which is the email that was sent the next day, this is the

18   email that was sent February 21st, that's the day after the

19   operation, right?  I mean this, the implication that I draw

20   from this is that Rothman tried to make -- tried to receive

21   $100 from the card referenced in paragraph 24 with the last

22   four digits of 8430.  Wait a minute.  I'm sorry, I stand

23   corrected.  This is -- the date in January -- the date in

24   paragraph 24 is January 20th.  First scheduled pay date,

25   February 21st.  What was the date of the operation again?

1          MS. RUCCOLO:  January 20th, Your Honor.

2          THE COURT:  So it looks like this was going to be one

3  month ahead because this document that I marked Court 1 is

4  dated Sunday, February 21st, the date referenced here in

5  paragraph 24.  So the inference I draw from this, and if you

6  think I'm wrong, say so, is that the plaintiff prior to the

7  operation on January 20th gave someone from Rothman what may

8  have been a credit card but more likely a debit card with the

9  last four digits 8430.  Ms. Ruccolo, do you agree with that?

10         MS. RUCCOLO:  (No Verbal Response.)

11         THE COURT:  And then Rothman attempted to get $100

12 payment one month later on February 21st and it bounced.  This

13 is like a bounced check.

14         MR. TAUBER:  Right.

15         THE COURT:  Now, that could be either -- this email

16 doesn't say what happened.  It could be that the plaintiff

17 closed the account or that there wasn't any money in the

18 account or it was less than $100.

19         MR. TAUBER:  Right.

20         THE COURT:  But it would seem to me in a case of this

21 nature, Mr. Tauber and Mr. Levant, that your clients were under

22 an obligation to make some investigation about this before they

23 file a nationwide class action.  And, you know, they are

24 insisting in their testimony, there were some variations in the

25 testimony, but all three witnesses seem to believe that the

1  document referenced in paragraph 24 constitutes a writing as

2  required by Regulation Z.  That's clearly what their testimony

3  is.  And to have that belief and never try to get the bank

4  records, which would be a clear document that would be relevant

5  in any kind of discovery or trial, is -- it leaves, you know, a

6  lot of questions in my mind.  I'm just being candid with you.

7       MR. TAUBER:  I understand, Your Honor.  I just I

8  guess I'd like to respond to that in a --

9       THE COURT:  Well, you can do it now, but I'd rather

10  you get the records and file a brief.

11       MR. TAUBER:  I understand.  I just want to -- I just

12  feel that it's important to make this point though, I think

13  that -- again, my understanding was the Electronic Transfer --

14  Transfer Act claim was not on the table for the Rule 11.  But I

15  understand the Court's concern.  I would submit obviously that

16  counsel is entitled to rely on his client.  That I would submit

17  I believe that even under Rule 11 that counsel would not have

18  the obligation to go that far.  It may be good practice.  It

19  may be a safe thing.  I'm sure in the future that this mistake

20  -- or I don't want to call it a mistake, but that that level of

21  investigation will be pursued.

22       However, this was addressed totally appropriately

23  within the context of Rule 11.  I have no doubt that this --

24  counsel was mortified when they learned that these transfers

25  were not taken.  They upon the notification by counsel promptly

1  withdrew that claim.  I mean they promptly took action.

2           THE COURT:  They withdrew the EFTA claim.

3           MR. TAUBER:  Exactly.

4           THE COURT:  But the TAI [sic] -- the TILA claim --

5           MR. TAUBER:  Right.  And --

6           THE COURT:  -- was not withdrawn.  And the Regulation

7  Z is relevant.

8           MR. TAUBER:  Right.

9           THE COURT:  But, you know, you're getting close to

10 another important issue here.  And that is whether there was a

11 written agreement.

12          MR. TAUBER:  Understood.

13          THE COURT:  And, you know, the testimony of the three

14 witnesses is not entirely consistent on that point.

15          MR. TAUBER: Well, I -- I mean I'll respectfully

16 disagree on that.  But I will say this about whether there's a

17 written agreement.  That is under, as the Court well knows from

18 the complete absence and plus of any case law on this defining

19 what a written agreement is, Regulation -- I mean that is

20 completely an arguable point.  The one case, that *Bright* case

21 is obviously entirely distinguishable in a certain way.

22          THE COURT:  Look, you don't have to go past first

23 year contracts law to know what a written agreement is.

24          MR. TAUBER:  Well, I -- well, I would submit this.

25 That when you take those three documents together that writing

1  could easily be construed to confirm what the oral agreement

2  was.  And that's what Regulation Z says, an oral agreement can

3  be confirmed to writing.  And that writing doesn't have to be a

4  12 page document with all the clauses.

5              THE COURT:  I agree with you, but, you know, I'm

6  looking -- I'm still looking for some -- and I would agree with

7  you further that Rothman put out a writing which indicated that

8  it was willing to agree to the terms of the writing.  But I am

9  still looking for some fact known to your clients that the

10  plaintiff did something to confirm the existence of the

11  agreement.  The only thing he -- you could possibly say he did,

12  he gave them a either a credit card number or a debit card

13  number, which was worthless.

14              MR. TAUBER:  Right.  So --

15              THE COURT:  And the how that could constitute the

16  agreement to make a payment is beyond me.  That --

17              MR. TAUBER:  Well --

18              THE COURT:  -- that is the most serious issue here in

19  my mind.

20              MR. TAUBER:  I guess the --

21              THE COURT:  And not -- and your client is then not

22  getting his bank records --

23              MR. TAUBER:  Understood.

24              THE COURT:  -- even to this day is also something

25  that I find difficult to understand.

1              MR. TAUBER:  I understand the Court's point.  I think

2  what you're getting at -- and correct me if I'm wrong, is that

3  if Mr. Wolfington provide -- even if in the initiation of the

4  agreement he provided information that was completely false, I

5  guess, I guess it could be argued that there -- and I'm not

6  taking this point, but I'm just trying to understand the

7  Court's position because I -- I certainly would argue a

8  different legal point on this.  But I guess what the Court is

9  suggesting is that if that information -- if there was no basis

10 for -- if Mr. Wolfington provided an account that had no basis

11 in reality that was ever going to be honored, that this

12 agreement would ever be honored, there was in fact no

13 agreement.

14             THE COURT:  Yeah, well, look here.  None of this in

15 this courtroom, including your clients, who I think had a duty

16 to look into this, had any idea whether Mr. Wolfington in

17 reality had a card or whether he canceled it or it had any

18 money in it --

19             MR. TAUBER:  Right.  Understood.

20             THE COURT:  -- or anything else.

21             MR. TAUBER:  I understand.

22             THE COURT:  And one of your witnesses, if I

23 understood his testimony correctly, said that by agreeing to

24 undergo the surgery that constituted an agreement.  Now, that

25 is, to my mind, that is just not a realistic argument --

1          MR. TAUBER:  I believe --

2          THE COURT:  -- about anything.

3          MR. TAUBER:  -- that was part of the transaction --

4          THE COURT:  All right.  Well, let's --

5          MR. TAUBER:  -- that constituted.  But I understand

6  where the Court's coming from.  I think it's -- I believe the

7  Court is holding counsel to a standard beyond what Rule 11 and

8  the Third Circuit would.

9          THE COURT:  Well --

10         MR. TAUBER:  That said, I do appreciate the

11 opportunity to do -- to speak with counsel and review this and

12 see whether briefing and additional investigation is

13 appropriate.  We hear where you're coming from for sure.

14         THE COURT:  Well, let me make it clear.  I will hold

15 the record open if -- for either side to -- well, the defendant

16 is merely not in a position to contact Mr. Wolfington.  I'm not

17 going to make it subpoena him.  But if you, you should talk to

18 your client.  So this is how we're going to leave this.  If

19 they authorize -- if they authorize you to get the information

20 from Mr. Wolfington as to what bank he had --

21         MR. TAUBER:  Um-hum.

22         THE COURT:  -- and either, I don't know if he still

23 has those records to go back to 2016, and he would submit to

24 you and then you would submit to Ms. Ruccolo and the Court, the

25 bank statements for this card, 8430, for a whole year so we can

1  see exactly what was in there in January before the operation

2  down through until the complaint was filed.  Okay.

3          And now, if your clients don't want you to do that,

4  that's fine.  Then I would give Ms. Ruccolo the opportunity to

5  do it.  If she wanted to, she'd probably have to send Mr.

6  Wolfington a subpoena.  And he'd have to require the bank

7  records if he didn't still have copies of them.

8          Now, either we're all saying what I'm thinking and

9  asking for is not relevant.  All right.  I'll respect your

10 arguments.  And in that event, then we just ought to have

11 briefing on this issue.  But I'm just being candid with you

12 that I think in a situation like this where all the allegations

13 were made about his bank account and that the defendant

14 obtained -- suppose -- let's just assume that 8430 is a

15 fictitious number.  He just gave Rothman some numbers just to -

16 -

17          MR. TAUBER:  Right.

18          THE COURT:  -- get the surgery and get, move on.

19          MR. TAUBER:  Right.

20          THE COURT:  And there was nothing there.  You know,

21 that, how could that constitute an agreement?  On the other

22 hand, you know, maybe he had thousands of dollars in that

23 account but he was too sick or he had to use the money to save

24 his dying mother?

25          MR. TAUBER:  Right.

1            THE COURT:  I mean from one possibility he's a thief

2     and the other possibility he's a savior of his mother and

3     that's why there wasn't $100 in the account.

4            MR. TAUBER:  I understand where the Court's coming

5     from.

6            THE COURT:  All right.  So I don't know what --

7     nobody here knows what the answer is.  But if you don't think

8     it's relevant, then fine, but I think it is.

9            MR. TAUBER:  I understand.

10           THE COURT:  All right.

11           MR. TAUBER:  I save that argument, hopefully will not

12    have to make that argument.

13           THE COURT:  All right.

14           MR. TAUBER:  But we'll save that for another day.

15           THE COURT:  And I don't want to prolong this but --

16           MR. TAUBER:  Yeah.

17           THE COURT:  -- you know, I instituted the Rule 11

18    proceedings not because I like doing it, it's probably the

19    second or third time I've done it in my time as a judge, but I

20    felt there was a serious issue about whether there was

21    sufficient facts to institute a nationwide class action based

22    on the facts that were stated particularly in view of the fact

23    that no payment was made after the surgery.

24           MR. TAUBER:  Understood.

25           THE COURT:  Which led me to a lot of inferences, or

1  not a lot, but at least some inferences that the plaintiff here

2  was a really questionable character and that the law firm had

3  an obligation to do a thorough investigation, at the very

4  minimum require him to submit the bank statements.

5           MR. TAUBER:  Understood.

6           THE COURT:  Okay.  I've talked enough.

7           MR. TAUBER:  I understood.

8           THE COURT:  All right.  I'm going to -- here's what

9  I'm going to do.  I'm going to give you two weeks --

10          MR. TAUBER:  Okay.

11          THE COURT:  -- to get back to me by letter.  Is that

12 enough time?  Anybody going on vacation and you need more time

13 or something like that?

14          MR. KEHOE:  Your Honor, John Kehoe, from the Kehoe

15 law firm.

16          THE COURT:  Yes, sir?

17          MR. KEHOE:  We would obviously need to contact

18 Andrew.  And if we have three weeks just to deal with that.

19          THE COURT:  You want three weeks?

20          MR. KEHOE:  To reach out and get the records.

21          THE COURT:  All right.  I'll give you three weeks --

22          MR. KEHOE:  Thank you.

23          THE COURT:  -- to either get the records.  If you

24 need more time, talk to Ms. Ruccolo and let me know.  We'll

25 have this on a diary.  If you can submit the records by

1  agreement.  But I want a full year.  Is that understood?

2          MR. KEHOE:  Thank you.  I understand.

3          THE COURT:  The year of calendar year 2016.

4          MR. KEHOE:  Understood.

5          THE COURT:  Covering January 1 through December 31st

6  of this number.  And if you -- and it may be that -- another,

7  it may be necessary to have Mr. Wolfington come in and explain

8  them.  Maybe not.  Let's see what the records say.  Then, if

9  you want to do a briefing -- if you want to do briefing, I'll

10 allow some additional time for the briefing.

11         MR. TAUBER:  Very well.  Thank you, Your Honor.

12         THE COURT:  All right.  So I'll hear from you.  So

13 three weeks from today --

14         MR. TAUBER:  Three weeks.

15         THE COURT:  -- is May -- today is May 16th, three

16 weeks would be June 6th.  Are we all in agreement on that?

17         MR. TAUBER:  June 6th, yes.

18         THE COURT:  Okay.  June 6th.  All right.  Thanks very

19 much.

20         MR. TAUBER:  Thank you.

21         THE COURT:  Court is adjourned.

22         MS. RUCCOLO:  Thank you, Your Honor.

23         MR. TAUBER:  Good day, Your Honor.

24     (The proceeding concluded at 12:13 p.m.)

25                    *  *  *  *  *

1                **C E R T I F I C A T I O N**

2            I, Kelli Ray, court approved transcriber, certify

3    that the foregoing is a correct transcript from the official

4    electronic sound recording of the proceedings in the above-

5    entitled matter, and to the best of my ability.

6

7    *Kelli Ray, CER-349*

8    _____            DATE:   June 29, 2017

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25