**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ANDREW WOLFINGTON,** *individually and on behalf of all others similarly situated*<br><br>v.<br><br>**RECONSTRUCTIVE ORTHOPAEDIC ASSOCIATES II, P.C. a/k/a THE ROTHMAN INSTITUTE** | **CIVIL ACTION**<br><br>**NO. 16-4935** |

<u>**MEMORANDUM RE: RULE 11**</u>

Baylson, J.                                        September 29, 2017

## I.    Introduction

At issue is whether the Court should order Rule 11 sanctions against Plaintiff and/or Plaintiff's counsel.  In this case, Plaintiff requested Defendant perform surgery on his knee, but claimed that he could not afford to meet the requirements of Defendant's financial policy, which mandated that customers pay any remaining insurance deductible prior to surgery.  At Plaintiff's request, Defendant agreed to perform the operation, with Plaintiff paying a small down payment towards the deductible and agreeing to pay the balance of the deductible after the operation, without interest.  Plaintiff never paid any part of the balance due, but instead sued Defendant for failing to provide Plaintiff with information allegedly required under the Truth in Lending Act ("TILA").[1]

On December 22, 2016, the Court dismissed the Complaint with prejudice and *sua sponte* instituted Rule 11 proceedings to determine whether sanctions should be imposed against Plaintiff and/or his counsel because, "Plaintiff's counsel at least, if not Plaintiff himself, had

---

[1] Plaintiff also sued Defendant under the Electronic Fund Transfer Act ("EFTA"), alleging that Defendant failed to provide Plaintiff with information required under the EFTA when regularly withdrawing funds from Plaintiff's bank account.  Plaintiff later withdrew that claim and it is not considered on the issue of Rule 11 sanctions.

reason to know that this suit was groundless and could be construed as an attempt at extortion to avoid an obligation to pay the deductible."  (ECF 22, 2016 WL 7411527, at 1–2).

## II.    Relevant Factual[2] and Procedural History

By way of factual background, Andrew Wolfington ("Plaintiff") alleges that after he suffered anterior cruciate ligament ("ACL") and meniscus tears in his knee, he sought reconstructive knee surgery at the Rothman Institute ("Defendant").  (ECF 1, "Compl." ¶¶ 15–16).  Prior to the surgery, Plaintiff signed a document he received from Defendant entitled "Financial Policy," which stated, in relevant part, that to the extent Plaintiff's insurance had a deductible, Plaintiff "will be required to pay any outstanding deductible prior to [his] procedure." (Id. ¶17).  After Plaintiff signed the document, but several days prior to the scheduled knee surgery, Defendant contacted Plaintiff to inform him that the surgery could not be completed until Plaintiff paid the insurance deductible, which "exceeded $2,000."  (Id. ¶18).  The first two paragraphs of the Complaint set forth a summary of TILA and EFTA, and the policies they were enacted to further, and then Plaintiff alleges:

> 4.    Despite these plain truths, Defendant (defined herein) extended credit to Plaintiff and obtained Plaintiff's personal banking information so as to execute electronic transfers to repay the loan, yet failed to provide the necessary disclosures and written authorizations in accordance with the TILA, Regulation Z, the EFTA, and Regulation E.

> 5.    Upon information and belief, Defendant used these very same tactics on tens of other consumers who fall within the ambit of the protections of the TILA and the EFTA.

(Id. ¶¶ 4–5).

According to Plaintiff's Complaint, "Defendant agreed to extend credit to Plaintiff to cover the balance owed, which consisted of an initial credit card payment of $200 on January 20,

---

[2] The facts stated in this memorandum are drawn—at times verbatim—from those discussed in the Court's prior memorandum.  (ECF 22).

2016, and subsequent monthly payments of $100, until the balance of the deductible was fully satisfied." (Id. ¶ 20). This alleged financing arrangement was conditioned on Plaintiff "voluntarily agree[ing] to monthly electronic payment deductions from his personal checking account by [Defendant]." (Id. ¶ 21). The Complaint further alleges:

> At the time of agreeing to the financing plan, Plaintiff did not receive any written information regarding the financing, nor did he provide written authorization to allow automatic monthly payment deductions from his personal checking account.

(Id. ¶ 22).

Plaintiff's Complaint also alleges that Plaintiff received two "confirmation" emails from Defendant. The first email was dated January 20, 2016, and followed payment of $200 to Defendant via Plaintiff's father's credit card one day prior to the knee surgery. It stated:

> Dear Andrew Wolfington,
>
> You recently processed an online bill payment to Rothman Institute through our secure portal. We just want to say "thank you" for your payment; we appreciate your prompt attention. Here is your payment information:
> ------------------------------------------------------------------------
> Payment To: Rothman Institute
> Account Number: 1353706
> Account Type: Credit Card
> Amount: $200.00
> Credit Card: ************3065
> Date Submitted: 01/20/2016 01:32 PM
> Confirmation #: 820245481086813241

(Id. ¶ 23). The second email was also dated January 20, 2016. It stated:

> Dear Andrew Wolfington,
>
> The Rothman Institute has recently scheduled an online bill payment plan for your account balance. We just want to say "thank you" for your payment and appreciate your prompt attention.

Here is your payment information:
-------------------------------------------------------------------
Payment To: Rothman Institute
Patient Account Number: 1353706
Paid Via: Credit Card
Frequency: Once a month
Payment Amount: $100.00
Credit Card: ************8430
Date Submitted Online: 01/20/2016 01:34 PM
First Scheduled Pay Date: 02/21/2016 12:00 AM

(Id. ¶ 24).

Although the second email confirmation states that the scheduled payment was to be paid via "credit card," Plaintiff alleges that the monthly payments were paid via "electronic transfer from Plaintiff's personal banking account." (Id. ¶ 25). [3]

The Complaint also alleges: "Plaintiff did not receive any written notification prior to the withdrawal or charge to his account." (Id. ¶ 26). The Complaint does not provide any detailed facts as to how Defendant learned of Plaintiff's credit card, debit card, or bank account number. Presumably, Plaintiff or Plaintiff's father could have provided this information by telephone to Defendant. No party has produced any documentation that Plaintiff (or his father) ever provided any credit card, debit card, or bank account number to Defendant in writing or by email.

Plaintiff alleges in paragraph 38 of the Complaint: "Plaintiff did not receive a copy of a written authorization for the electronic transfers from his personal bank account." Paragraph 43 of the Complaint alleges that, "[a]s noted above, Plaintiff did not receive any advance notice of the electronic transfer from his account. As a result, Plaintiff faced the possibility of having his account overdrawn and incurring fees from his bank."

---

[3] During the Rule 11 hearing, one of Plaintiff's attorneys stated that he thought these withdrawals were to be made via debit card rather than bank transfer—although he stated that a debit card transaction was in his view a bank transfer. (ECF 43, "Tr." 68). The Court agrees it is generally accepted that a debit to a bank account can be made either through a debit card or a bank transfer.

As discussed in more detail below, Plaintiff's counsel had no grounds to make these allegations, when simple investigation would have revealed that Defendant never received any further payment from Plaintiff because Plaintiff did not have sufficient funds in his bank account. Nonetheless, Plaintiff's counsel brought Plaintiff's claims not only on behalf of Plaintiff, but also alleged that Plaintiff could serve as an adequate representative of "a class of similarly-situated individuals" who suffered supposed injuries because "Defendant used these very same tactics on tens of other consumers . . . ." (Id. ¶¶ 5, 44).

Defendant filed an answer to the Complaint (and counterclaim) on October 12, 2016. Given the initial pleadings, this case raised several issues which the Court felt deserved priority. Defendant contended it was not a "creditor" under TILA, and Plaintiff asserted that there were certain facts as to which he wanted prompt discovery. After an unrecorded Rule 16 telephone conference on October 28, 2016, the Court entered an order, which stated in part as follows:

> The Court further orders that each party should make the mandatory disclosures promptly, and shall also exchange documents, particularly pertaining to the Plaintiff's specific medical procedures and **financial transactions with the Defendant**. Defendant shall also produce information showing the number of creditors it has had for the 18 months prior to the filing of this suit. These documents should be produced within 21 days.

(ECF 9) (emphasis added).

Although the Defendant soon after conceded that it may qualify as a "creditor" under TILA, Plaintiff never produced any documents concerning his "financial transactions with the Defendant" despite this Court's very specific order to do so.[4]

---

[4] As discussed further below, more than six months later, at the time of the Rule 11 hearing on May 16, 2017, all of Plaintiff's counsel admitted they **still had not even seen** (let alone produced) Plaintiff's bank records, which would have demonstrated that Plaintiff never made any further payments to Defendant. (See ECF 43, "Tr." at 9–10, 35–37, 64–66, 73–74, 94, 96, 98–99).

Defendant filed a Rule 12(c) motion for judgment on the pleadings on November 7, 2016 (ECF 10). As detailed in the Court's December 22, 2016 memorandum (ECF 22), Defendant attached an affidavit and exhibits which provided factual information and asserted that no further payments had been made by Plaintiff to Defendant after the $200 down payment prior to the surgery. (ECF 10-4). In his response to the 12(c) motion, filed on November 28, 2016, Plaintiff did not admit or deny this serious assertion of non-payment but simply ignored the issue. (See ECF 16). However, Plaintiff did withdraw his EFTA claim by means of a footnote: "Although Plaintiff believes that his [EFTA] claim would survive Defendant's Rule 12 challenge, Plaintiff hereby voluntarily withdraws that claim so as to allow the parties, and the Court, to focus on Defendant's TILA violations." (Id. at n. 4).

Following additional briefing on that motion, which was considered pursuant to Rule 12(c) because it attached factual materials, the Court held a recorded telephonic conference with counsel. (See ECF 25). During that hearing, held on December 14, 2016, the Court asked counsel questions about "two issues that are important." (Id. at 3). The first question was "whether after this operation the plaintiff made any payments that had been agreed upon." (Id.). From there, the conversation continued as follows:

> PLAINTIFF'S COUNSEL: After the operation, which occurred in January, it looks -- based on our records, it looks as though defense attempted to make a withdraw in February which failed. So plaintiff made no --
> THE COURT: Make a withdraw from -- make a withdraw from what?
> PLAINTIFF'S COUNSEL: From his -- from his bank account.
> THE COURT: Yes.
> PLAINTIFF'S COUNSEL: And that was as alleged in the complaint, and those documents that we had were supplied to defendants.

THE COURT: All right. So the net result
is that the plaintiff never paid any of the
deductible, is that right?

PLAINTIFF'S COUNSEL: No. No, Your Honor. He made a
partial payment of $200 prior to the surgery.

THE COURT: Right. Okay. No, I understand
that. But how about after the surgery?

PLAINTIFF'S COUNSEL: After the surgery, Your Honor,
**there was no payment**, that is correct.

THE COURT: All right. All right. The
second question, is there anything in writing
confirming this arrangement?

PLAINTIFF'S COUNSEL: Your Honor, the only -- the
only information that we have is the confirmation
receipts with respect to an online bill payment plan
that was set up prior to the surgery that indicated
the $100 a month payments.

DEFENDANT'S COUNSEL: That's correct, Your Honor.
There was only an email from Rothman telling the
plaintiff that he was going to be on a payment plan
for $100 a month. **There's no signed agreement by the
plaintiff to make the payments.**

((<u>Id.</u>, at 3–4) (emphasis added)).

These statements by Plaintiff's counsel: (1) contradicted the factual allegations that Plaintiff had made further payments; (2) confirmed the allegation in paragraph 22 of the Complaint, cited above, that Plaintiff did not provide "written authorization" for any further payment; and (3) supports the Court's conclusion that there was no "written agreement," and that the arrangement between Plaintiff and Defendant was not an "extension of credit," as required by law.

The statements by Plaintiff's counsel above indicated that counsel may have secured Plaintiff's financial records of his financial transactions with the Defendant, as had been ordered

on October 28, 2016. Nonetheless, as further discussed below, later events showed that Plaintiff's counsel had not done this.

On December 22, 2016, the Court dismissed the Complaint with prejudice[5] and *sua sponte* instituted Rule 11 proceedings to determine whether sanctions should be imposed against Plaintiff and/or his counsel. (ECF 23). In its Order, the Court stated its conclusion that "Plaintiff's counsel filed this lawsuit without any regard to the requirements of the statute or the implementing regulations . . . [T]he lack of a finance charge or written agreement precludes any claims under TILA, as a matter of law." 2016 WL 7411527.

The only written agreement between the parties was the "Financial Policy," which contemplated payment of the deductible in full; Plaintiff's counsel has conceded this agreement is not subject to TILA. (Tr. 41, 84–85).

## III.   Legal Standards for Rule 11 Sanctions

Rule 11 provides in pertinent part:

> (b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> > (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> >
> > (2) the claims, defenses, and other legal contentions are warranted by the existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

---

[5] The admissions discussed above showed there was no genuine issue of material fact, so the pending motions were treated as a Rule 56 motion and summary judgment was entered for Defendant, which warranted dismissal of the Complaint.

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

(c) Sanctions

(1) *In General.* If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. . . .

(2) *Motion for Sanctions.* . . . If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.

(3) *On the Court's Initiative.* On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b).

(4) *Nature of a Sanction.* A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

Rule 11 provides a "reasonableness standard," such that "[t]he imposition of Rule 11 sanctions . . . requires only a showing of objectively unreasonable conduct." Fellheimer, Eichen & Braverman, P.C. v. Charter Tech., Inc., 57 F.3d 1215, 1225 (3d Cir. 1995). Reasonableness has been defined as "an objective knowledge or belief at the time of the filing of a challenged paper that the claim was well-grounded in law and fact." Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 289 (3d Cir.1991) (internal quotations omitted). In determining

reasonableness, courts examine several factors: "the amount of time available to the signer for conducting the factual and legal investigation; the necessity for reliance on a client for the underlying factual information; the plausibility of the legal position advocated; . . . whether the case was referred to the signer by another member of the Bar . . . [; and] the complexity of the legal and factual issues implicated." Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 95 (3d Cir. 1988). However, the court need not work mechanically through these factors when it considers whether to impose sanctions. Rather, it should consider the reasonableness of the inquiry under all the material circumstances. "[T]he applicable standard is one of reasonableness under the circumstances." Bus. Guides, Inc. v. Chromatic Commc'ns Ents., Inc., 498 U.S. 533, 551 (1991); accord Garr v. U.S. Healthcare, Inc., 22 F.3d 1274, 1279 (3d Cir. 1994).

## IV.    The Court's Initiation of Rule 11 Proceedings

The Court initially instituted Rule 11 proceedings because counsel had no facts to assert there was a "written agreement" or "finance charge," as required by TILA and Regulation Z, and thus there was no "extension of credit," but merely an offer for delayed payment. (ECF 22).

Plaintiff's counsel's admission that Plaintiff did not make any further payment (ECF 25, at 4), also warranted inquiry concerning Rule 11. The Complaint had clearly alleged further payments had been made by electronic payment from Plaintiff to Defendant. The record now shows, without dispute, not only that no such payments were made, but that at the time the Complaint was filed, Plaintiff's counsel had failed to request or otherwise secure Plaintiff's financial documents—specifically any credit card, debit card or bank statements—despite their importance in the overall case. As the Court made clear at the evidentiary hearing—discussed below—this became an additional reason for the Rule 11 inquiry. (Tr. 99–101).

Thus, after receipt of the evidence discussed below, the Court has concluded that there are the following <u>four</u> separate reasons to consider Rule 11 sanctions:

1.  There was no "written agreement," and no "finance charge," as required by law, and thus no "extension of credit."

2.  Plaintiff's counsel failed to secure documents showing Plaintiff's "financial transactions" with Defendant, even after ordered by the Court to exchange such information on October 28, 2016— but also independently required as part of their reasonable investigation prior to filing the lawsuit on September 13, 2016.  <u>See</u> Fed. R. Civ. P. 11(b)(3).

3.  Several of the allegations in the Complaint were false, and if the records had been secured, it would have been obvious—contrary to the allegations in the Complaint—that no further payments were made, and that Plaintiff did not have sufficient bank funds at any relevant time from which a further payment could be made by an on-line debit to his debit card or checking account.

4.  Given the above reasons, Plaintiff's counsel had absolutely no grounds upon which to allege that Plaintiff could be an adequate representative for a class under Rule 23, Fed. R. Civ. P.

**V.  The Rule 11 Proceedings**

Attorneys whose names appear as counsel in the Complaint are as follows:

KALIKHMAN & RAYZ, LLC
Arkady "Eric" Rayz, Esquire [signature]
Demetri A. Braynin, Esquire

THE KEHOE LAW FIRM
Michael K. Yarnoff, Esquire

CONNOLLY, WELLS & GRAY, LLP

Gerald D. Wells, III, Esq.
Robert J. Gray, Esq.

The Court will review Plaintiff's counsel's declarations, their testimony at a hearing on Rule 11, and their two supplemental briefs, filed after the factual record was completed.

### A.    Declarations by Plaintiff's Counsel

After the Court instituted the Rule 11 proceedings, three of Plaintiff's counsel filed a declaration, subject to penalties of perjury, on February 10, 2017 (ECF 35, Ex. A–C), which are summarized as follows:

Mr. Wells asserted that he and Mr. Rayz were principally in charge of the litigation. (Ex. A, ¶ 41).  After detailing a number of conversations with co-counsel and with the Plaintiff, Mr. Wells indicated that he did not ever concede there was an absence of documents sufficient to constitute a written agreement under TILA.  Mr. Wells agreed that the "financial policy" which Plaintiff signed could not constitute a financing agreement under TILA.  (Id. ¶ 57).  But Mr. Wells reiterated Plaintiff's position that TILA liability arose from the email specifically referenced in the Complaint—which confirmed an "on-line bill payment plan."  (See id. ¶¶ 52–58).

Mr. Wells's affidavit does not contain any statements as to what, if any, records were secured from the Plaintiff, in compliance with the Order of October 28, 2016 or otherwise.

Mr. Yarnoff's declaration is similar in its detailed discussions of meetings with co-counsel, about TILA, and legal research.  (Ex. B).  However, there is no discussion of ever asking Plaintiff for documents concerning his financial transactions with Rothman, as required by the Order of October 28, 2016.

The declaration by Mr. Rayz is also similar, containing detailed discussions about TILA.  (See, e.g., id. ¶ 22).  Under the heading "Litigation of the Lawsuit," Mr. Rayz states that he and

Mr. Wells were the "primary attorneys responsible for litigating this matter and communicating with the Court." (Id. ¶ 25). He reiterated Mr. Wells's denial that there had ever been any concession or admission that there was no written agreement, and stated that this issue warranted Plaintiff initiating discovery to Rothman in November 2016. (Id. ¶ 30). Mr. Rayz also states that: "Rothman failed to comply with this Court's Order of October 28, 2016 [citing the October, 28, 2016 Order discussed above]," but fails to acknowledge that this Order applied to both Defendant and Plaintiff when it referred to "financial transactions" with Rothman. (Id. ¶ 31).

Nothing is stated in Mr. Rayz's declaration about any inquiry to the Plaintiff or Plaintiff's bank so that Plaintiff's counsel could comply with the Court's order. This omission is troubling.[6]

None of these attorney declarations made any comment about any request to the Plaintiff or his bank for any kind of documentation that would support his claim, such as bank account statements and credit or debit card records.

### B. Testimony by Plaintiff's Counsel

A hearing was held on May 16, 2017, at which all three of Plaintiff's counsel testified. See ECF 43. Plaintiff's counsel's direct testimony basically reiterated what they had placed in their declarations, and supports the imposition of Rule 11 sanctions. Three of the Plaintiff's lawyers who worked on this case testified, all of whose names appear on the Complaint, and who had filed sworn declarations.

---

[6] Rothman's filing of a Motion for Judgment on the Pleadings on November 7, 2016, with a supporting affidavit detailing its financial transactions with Plaintiff (ECF 10), complied with the Order of October 28, 2016.

None of Plaintiff's counsel testified they had, prior to filing the Complaint, requested or seen any documentary evidence to support the factual allegations of the Complaint other than the emails that Plaintiff sent to them.

### 1. Mr. Rayz

Arkady Rayz, Esquire characterized his role as lead counsel for the Plaintiff. (Tr. 8). The fact that he never met the Plaintiff or even talked to him individually on the phone does not have any weight in this analysis. However, in response to a question as to whether Mr. Rayz had ever reviewed the Plaintiff's bank account records, he testified that he had only reviewed the e-mails which the Plaintiff had received from Rothman, but agreed that they were not bank account records. (Tr. 9–10). He admitted that he has never seen Plaintiff's bank account records, he did not know the name of Plaintiff's bank; and he had never seen any credit card statement for the Plaintiff. (Id.).

Although he had never talked to Plaintiff, he learned from others subsequent to the filing of the Complaint that Wolfington "did not have any money in the account." (Tr. 14). Mr. Rayz said he learned this information from Mr. Wells, Mr. Gray, and Mr. Yarnoff and stated that "the gist of the conversation was that Mr. Wolfington did not have funds in the account. And that's why the subsequent payments did not result in the transfer of the funds from the account." (Tr. 15). These admissions contradicted allegations in the Complaint. (See, e.g., Compl. ¶ 26).

### 2. Mr. Yarnoff

Michael Yarnoff, Esquire did recall several direct conversations with Plaintiff, including a conference call on June 23, 2016. (Tr. 59). Mr. Yarnoff's testimony was similar, namely that at the time they filed Plaintiff's lawsuit, the only documentary evidence that Plaintiff's counsel possessed were two "confirmation" emails that were sent by Rothman to Plaintiff . (Id. 63).

Mr. Yarnoff testified that counsel asked Plaintiff for the bank records and "all the documentation he had" in November, 2016, but never received any bank records in the six months since that request. (Tr. 65). Instead, Plaintiff sent counsel certain documentation from Rothman and stated that "he believed that the payments were being taken out of his account." (Id.). The bank records plainly show that this was not true.

Mr. Yarnoff admitted that counsel had not asked Plaintiff for any bank account statements before they filed the Complaint on September 13, 2016. (Id. 65–66).

As noted above, the Complaint specifically alleges that Defendant had obtained Plaintiff's personal banking information. (Compl. ¶ 4). When Mr. Yarnoff was asked what facts he had to support that allegation, he stated: "That was the documentation that he gave us from Rothman that said that they were going to withdraw the $100.00 and they had his bank account number and the authorization to do it." (Tr. 67). This statement is not supported by any evidence on the record, other than the two above-referenced emails, which cannot qualify as demonstrating Defendant's possession of "plaintiff's personal banking information." (See Compl. ¶ 4).

Mr. Yarnoff said that there had been "five, six or seven contacts" between counsel and the Plaintiff before the Complaint was filed, including e-mails. (Tr. 70–71).

### 3. Mr. Wells

Gerald Wells, Esquire testified similarly, but indicated that one of his partners, Robert Gray, Esquire, had conversations with the Plaintiff. (Id. 79). Mr. Wells did not talk to the Plaintiff at any point prior to the dismissal of the Complaint. (Id. 90, 93). Mr. Wells also said that he and an investigator, David Rabner, were communicating about this case. (Id. 80). Mr. Wells testified, consistent with the other witnesses, about the emails which form the basis of the allegations in paragraphs 24 and 25 of the Complaint. However, Mr. Wells also acknowledged

that counsel had never secured or examined the Plaintiff's bank statements or credit card or debit card statements.  (Id. 73).

## B.    Review of Financial Records

At the time of the Rule 11 hearing, none of Plaintiff's counsel had ever secured or reviewed Plaintiff's bank account statements.  Nonetheless, at the conclusion of the Rule 11 hearing, the Court provided another opportunity to Plaintiff's counsel to produce Plaintiff's bank records, which the Court initially ordered more than six months earlier.  (Tr. 94; see ECF 9). Plaintiff's counsel submitted Plaintiff's bank records to this Court via letter on June 5, 2017, and then later as an attachment to its first supplemental filing after the Rule 11 hearing.  (ECF 45, Ex A., "PNC").

The bank records—from PNC Bank—show a bank account number ending in "0393," with each debit card purchase reflected in the "description" column as, "8430 Debit Card Purchase."  (See PNC 1).  Thus, the bank records appear to confirm that the "Credit Card" ending in "8430" to which paragraph 24 of the Complaint refers is in fact a debit card.

The records contain consolidated financial information for each month from December 11, 2015 to January 12, 2017, such as starting and ending balances, average monthly balances, and total overdraft fees.  The records also contain specific line entries for each of the following categories: "Deposits and Other Additions," "Banking/Check Card Withdrawals and Purchases," "Online and Electronic Banking Deductions," and "Other Deductions."  There is sufficient data in each line entry to determine the date, amount, and type of payment made or received (e.g., debit card purchase, direct deposit, ATM withdrawal).  Of particular utility to the Court for present purposes is each month's "Daily Balance Detail," which provides a synopsis of Plaintiff's bank balance at the end of each day in which any bank activity occurred.

In their Rule 11 briefing, and throughout the Rule 11 hearing, Plaintiff's counsel highlighted their reliance on the "confirmation" emails Plaintiff received from Defendant on January 20, 2016. The second of those emails states that the "Payment Amount [of] $100.00" will be made to Defendant via Plaintiff's "Credit Card" ending in "8430" (i.e., Plaintiff's debit card) and with a "Frequency [of] Once a month," with a "First Scheduled Pay Date [of] 02/21/2016." (Compl. ¶ 24). Therefore, the Court reviewed Plaintiff's bank records with a particular emphasis on the funds contained in Plaintiff's bank account at the end of the 21st day of each month, beginning on February 21, 2016, until the Complaint was filed on September 13, 2016. Below is a chart detailing the relevant "Daily Balance Detail" entries:

| Date on bank record[7] | "Daily Balance Detail" |
|---|---|
| February 21, 2016 | $0.89 |
| March 21, 2016 | $8.46 |
| April 21, 2016 | $0.46 |
| May 21, 2016 | $67.00 |
| June 21, 2016 | -$3.28 |
| July 21, 2016 | $6.13 |
| August 21, 2016 | -$525.20 |

Therefore, on the 21st day of each month, there were insufficient funds in Plaintiff's bank account to enable Defendant to withdraw $100. Although various overage charges appear on Plaintiff's bank records, and Plaintiff's bank account at times carried a negative balance, no overage withdrawal initiated by Defendant appears in the bank records.

---

[7] Because a "Daily Balance Detail" only appears on days in which bank transactions occurred, the below entries may reflect the most recent date prior to the 21st day of the month for which a "Daily Balance Detail" is generated. For example, there are no entries for February 19-21, 2016 because no bank transactions took place on those days. Therefore, the chart data for February 20, 2016 and February 21, 2016 both reflect the "Daily Balance Detail" entry that followed the most recent bank transaction (i.e., February 18, 2016).

Plaintiff's counsel contend PNC's "standard overdraft coverage policy" demonstrates that it was not Plaintiff's lack of funds that led to Defendant's failed withdrawals.[8] (ECF 45, Ex. B, the "Policy"). The Policy is labeled, "Overdraft Notification," and it states that it "[a]pplies to consumer checking and money market products except Foundation Checking." (Id.). Plaintiff's counsel assume without asserting that the Policy applies to Plaintiff's account. (ECF 45, at 4–5). The Policy states in relevant part the following:

> <u>This notice explains our standard overdraft practices.</u>
>
> **What are the standard overdraft practices that come with my account?**
> We <u>do</u> authorize and pay overdrafts for the following types of transactions:
> - Checks and other transactions made using your checking account number
> - Automatic bill payments
>
> We <u>do not</u> authorize and pay overdrafts for the following types of transactions unless you ask us to:
> - ATM transactions
> - Everyday debit card transactions
>
> We pay overdrafts at our discretion, which means <u>we do not guarantee</u> that we will always authorize and pay any type of transaction.
>
> If we <u>do not</u> authorize and pay overdrafts, your transactions will be declined.

(Id.).

Although the Policy also states that PNC offers "overdraft protection . . . which may be less expensive than [PNC's] standard overdraft practices," it is clearly written in each of Plaintiff's monthly bank account records that Plaintiff has "Opted-Out" of "Overdraft Coverage." (Id.).

---

[8] As detailed below, this contention is belied by Plaintiff's counsel's testimony at the Rule 11 evidentiary hearing. <u>See</u> Tr. 14 ("My understanding is the reason why the transactions didn't go through is because Mr. Wolfington did not have any money in the account.")

Plaintiff's counsel focus on the portion of the Policy that states PNC pays overdrafts for "[a]utomatic bill payments," while seemingly ignoring the portions of the Policy that state:

> (1) PNC does not "authorize and pay overdrafts" for "[e]veryday debit card transactions";
>
> (2) PNC "pay[s] overdrafts at [PNC's] discretion, which means <u>[PNC] do[es] not guarantee</u> that [PNC] will always authorize and pay any type of transaction"; and
>
> (3) "[i]f [PNC] <u>do[es] not</u> authorize and pay overdrafts, your transactions will be declined."

(<u>Id.</u>).  Notably, none of the dozens of overage charges in Plaintiff's bank records relate to a debit card transaction.

Plaintiff's counsel repeatedly stated at the Rule 11 evidentiary hearing that the alleged withdrawals occurred via debit card.[9]  (<u>See, e.g.</u>, Tr. 66, 68, 72–73).  Thus, Plaintiff's counsel's contention that the failed transactions were not due to Plaintiff's lack of funds is not credible.  It also misses the point: A reasonable investigation prior to filing this class action lawsuit would have included reviewing Plaintiff's bank records, and a review of the bank records would have revealed that: (1) Defendant made no withdrawals (via debit card or otherwise) from Plaintiff's bank account; and (2) Plaintiff did not even once have sufficient funds in his bank account on the 21st day of each month to pay Defendant.

## C.    Plaintiff's Supplemental Briefs

After the Rule 11 hearing, the Court allowed both parties to submit post-hearing briefs for the Court's consideration.  (Tr. 104).  Plaintiff's counsel submitted two supplemental briefs, the first on July 12, 2017 (ECF 45, "First Supp."), and the second on July 31, 2017 (ECF 47, "Second Supp.").

---

[9] The Complaint states that the "credit card" referenced in paragraph 24 is actually a "an electronic transfer from Plaintiff's personal banking account."  (Compl. ¶ 25).

###### 1.       Plaintiff's Counsel's First Supplemental Brief

Plaintiff's counsel's first supplemental brief argued that "there is no doubt that there was an agreement between the parties based on [their] conduct." (First Supp. 2). As in the hearing, counsel for Plaintiff again argued that "a written agreement can be constituted from a review of several documents." (Id.). Referring to Regulation Z's "written agreement" requirement as "vague" and urging the Court to "construe the writing requirement in the most liberal manner possible," Plaintiff's counsel claims the written "confirmation" emails contained the essential terms of an alleged "credit agreement." (Id. 4).

The second half of counsel's brief is dedicated to "how the status of the Plaintiff's bank account at the time in question could have impacted [their] judgment . . . ." (Id.). Plaintiff's counsel points to other "bill payment arrangements from the same bank account" as "vindicat[ing their] belief in their Client who genuinely believed and conveyed . . . his account had been debited." (Id. at 5). They also point to PNC's "standard overdraft policies" for support that "bill pay arrangements were covered by overdraft coverage." (Id. at 6). This argument misses an important point. What Plaintiff himself may have believed is relevant but does not excuse investigation by counsel. Plaintiff's counsel, who claimed expertise in this type of case, would surely have hesitated before filing this Complaint if they had seen Plaintiff's bank records.[10]

As detailed above, Plaintiff's brief does not address that:

> (1) "[e]veryday debit card transactions" are excluded from PNC's standard overdraft practices;

---

[10] Moreover, even if the bank records did actually vindicate counsel's mistaken belief that Plaintiff paid Defendant, the Third Circuit has expressly indicated in the context of affirming sanctions against class counsel that, "A shot in the dark is a sanctionable event, even if it somehow hits the mark." Garr v. U.S. Healthcare, Inc., 22 F.3d 1274, 1279 (3d Cir. 1994) (quoting Vista Mfg., Inc. v. Trac–4 Inc., 131 F.R.D. 134, 138 (N.D. Ind. 1990). That Court continued: "The court in Vista correctly stated the law, for if a lucky shot could save the signer from sanctions, the purpose of Rule 11 "to deter baseless filings" would be frustrated." Id. at 1279 (quoting Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393 (1990)).

(2) PNC explicitly states in their "standard overdraft practices" that "we pay overdrafts at our discretion, which means we <u>do not guarantee</u> that we will always authorize and pay any type of transaction;

(3) PNC explicitly states in their "standard overdraft practices" that "[i]f we <u>do not</u> authorize and pay overdrafts, your transactions will be declined; and

(4) Plaintiff had insufficient funds to pay Defendant on the 21st day of each month in the absence of PNC overdraft payments. (See <u>id.</u> at 6–7).

Instead, Plaintiff's counsel states they have "been unable to discern why . . . no installment payment was made, and believe[] that the only way to understand what went wrong is to obtain an explanation from Defendant, who was the party responsible for setting up the purported payment plan." (<u>Id.</u> at 8). As a result, Plaintiff's counsel "requests that the Court order [Defendant] to produce documents surrounding the creation of the supposedly successful bill pay program [so that] the Court could come closer to a complete understanding as to why the bill pay failure occurred." (<u>Id.</u>)

In attempting to shift the focus away from the absence of reasonable pre-filing diligence, Plaintiff's counsel further endeavor to avoid the facts. While counsel's brief states that they are "unable to discern why . . . no installment payment was made," Mr. Rayz—lead counsel for Plaintiff—explicitly testified at the Rule 11 evidentiary hearing: "My understanding is the reason why the transactions didn't go through is because Mr. Wolfington did not have any money in the account." Tr. 14. Mr. Rayz explained that he based this understanding on conversations with co-counsel Mr. Wells, Mr. Grey, and Mr. Yarnoff several months after the Complaint was filed. Mr. Rayz further testified that "the gist of the conversation was that Mr. Wolfington did not have funds in the account. And that's why the subsequent payments did not . . . result in the transfer of the funds from the account." Tr. 14–15.

Thus, although counsel purports to focus on "how the status of the Plaintiff's bank account at the time in question could have impacted judgment of Counsel" prior to filing this

class action lawsuit, they appear to ignore that the bank records plainly reveal that none of the alleged payments were actually made. (Id. at 4). It strains credulity that this revelation would not have led counsel to investigate further and ultimately realize that Defendant never withdrew any funds from Plaintiff's bank account.[11]

### 2. Counsel's Second Supplemental Brief

Plaintiff's counsel's second supplemental brief argues that the Court should not draw "[a]ny inference that Mr. Wolfington failed to conform to the Court's orders" by not testifying during the Rule 11 evidentiary hearing, and that Plaintiff's counsel should not be subject to sanctions for Plaintiff's EFTA claim because it was voluntarily dismissed before the motion for judgment on the pleadings was decided.[12]

Plaintiff's counsel also contend that the question of "whether Plaintiff made any payments after consummation of the agreement is simply irrelevant for purposes of TILA liability." (Second Supp. 1–2). Again, Plaintiff goes on to assert that "any issue as to why the payments did not go through can only be answered by Defendant." (Id. at 6). The Court has previously responded to these arguments.

---

[11] Notwithstanding their lack of pre-filing diligence, Plaintiff's counsel also would have started understanding "what went wrong" if they had followed this Court's Order, issued on October 28, 2016, ordering "each party [to] . . . exchange documents, particularly pertaining to the Plaintiff's specific medical procedures and **financial transactions with the Defendant**." ((ECF 9) (emphasis added)).

[12] The Court does not draw any inference from Plaintiff's decision not to appear during the Rule 11 evidentiary hearing and has chosen not to consider sanctions for Plaintiff's EFTA claim. Nonetheless, this Court does not credit counsel's contention that the Court could not impose sanctions for the voluntarily dismissed EFTA claim. See Schering Corp. v. Vitarine Pharm., Inc., 889 F.2d 490, 496 (3d Cir. 1989) ("To hold that a district court has no power to order sanctions after a voluntary dismissal is to emasculate Rule 11 in those cases where wily plaintiffs file baseless complaints, unnecessarily sap the precious resources of their adversaries and the courts, only to insulate themselves from sanctions by promptly filing a notice of dismissal."); Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 398 ("Even if the careless litigant quickly dismisses the action, the harm triggering Rule 11's concerns has already occurred. Therefore a litigant who violates Rule 11 merits sanctions even after dismissal.").

## VI.     Discussion

At the conclusion of the testimony, the Court noted the significant gap between the testimony at the Rule 11 hearing and the factual allegations in the Complaint. (Tr. 95–102). The Court also emphasized its great concern that counsel had never secured or reviewed Plaintiff's bank account statements, even after the Rule 11 proceedings were instituted. (Id. 101–03). The Court made clear that this concern applied to the "written agreement" and "extension of credit" requirements as well as to the allegations regarding withdrawals from the Plaintiff's bank account. (Id. 32 39, 97).

All three of Plaintiff's lawyers admitted under oath that they did not ask Plaintiff to send them any of Plaintiff's bank records or credit card statements prior to filing the Complaint. (Id. 9–10, 65–66, 79). At that time, none of them even knew at which bank Plaintiff held a bank account.[13] Each claimed that they learned after the Complaint was filed that no money was ever withdrawn from Plaintiff's bank or credit card accounts to pay the debts owed under the alleged "agreement." Even at the time of the Rule 11 hearing, Plaintiff's counsel had never seen the Plaintiff's bank statements.

After considerable briefing, and the evidentiary hearing, the Court will make the following findings of fact and conclusions of law:

Plaintiff was put in contact with three attorneys who were in charge of this case: Arkady Rayz, Esquire, Michael Yarnoff, Esquire and Gerald D. Wells, III, Esquire. The approximate date when Plaintiff contacted the first lawyer, after a recommendation from Plaintiff's father, was on or before June 23, 2016. (Tr. 59, 61–62). None of these lawyers have ever met the Plaintiff in person, but the Court will not find that in any way violative of Rule 11 because, in

---

[13] In fact, lead counsel Mr. Rayz did not even know at the time of the hearing at which bank Plaintiff claimed to have a bank account. (Tr. 10)

today's world, the telephone (and e-mail) are well accepted and can offer satisfactory substitutes for in-person encounters. As to counsel's affidavits and testimony at the evidentiary hearing on May 16, 2017 (see ECF 43), the Court will find that all were generally credible in the sense that they testified accurately as to what they did or did not do in representation of the Plaintiff. However, the Court does not credit their explanations or attempted justifications.

The Complaint was not filed until September 13, 2016; approximately three months after Plaintiff's father first contacted counsel. Thus, there was ample time for counsel to fully investigate the substantive claims and to request or otherwise secure documents that would have corroborated and supported the Plaintiff's TILA claim, filed as a nationwide class action.

The Court finds that Plaintiff's counsel violated Rule 11. There was no reasonable or suitable investigation by Plaintiff's counsel as required under the standards of Rule 11. Under statutory language, regulations, and precedential opinions of the Third Circuit and other courts, there was no reasonable or legal basis to allege a "written agreement" or "extension of credit" under TILA and Regulation Z, individually or as a class action, particularly if a reasonable investigation had been conducted. Several complaint allegations were false, because of the failure to investigate.

### A. Failure to Investigate and Secure Bank Records

Counsel should have known from their telephone conversations with the Plaintiff, some of which are summarized as allegations in the Complaint, or were discussed at the evidentiary hearing, that Plaintiff's facts could not support the claims that were alleged. Prior to the filing of the Complaint, counsel never made the very simple request of the Plaintiff to secure and send his bank records. If the Plaintiff was unable to do so, counsel could have requested a consent form be signed by Plaintiff to secure the documents from the bank. In the absence of this readily

available documentation, and even any attempt to secure the documents, Plaintiff's counsel violated Rule 11.

Defendant has no immunity from litigation, but it is clear that groundless lawsuits against medical providers increase the cost of medical care, and increased expenses of medical providers have contributed to the drastic increase in health care costs which are a matter of public concern. Thus, public policy warrants sanctions when a groundless suit is filed against a medical provider. In view of the seriousness of the charges, even a most cursory check of Plaintiff's financial records would have been part of a reasonable investigation, especially because, as we now know, reviewing the records for any of the eight months from the Plaintiff's operation to the filing of the Complaint would have revealed that many allegations in the Complaint were false.

Plaintiff's attorneys should have known, as the bank records subsequently received reveal, that Plaintiff made no payment to Rothman after his surgery on January 21, 2016. In addition, the factual record shows Plaintiff did not at any relevant time have sufficient funds to make this payment. The Complaint falsely asserted in paragraph 25 that the "email confirmation" described an electronic transfer from Plaintiff's personal banking account. The Complaint went on to state in paragraph 26 that "Plaintiff did not receive any written notification prior to the withdrawal or charge of his account." This statement was utterly false as no withdrawal or charge to Plaintiff's account was ever made. Plaintiff's attorneys could have easily ascertained this fact by requesting Plaintiff's own debit card or bank account records. Even after the Court ordered production, and even after the Court dismissed the Complaint, Plaintiff's counsel did not secure the bank records. Only after the Rule 11 evidentiary hearing, at this Court's insistence, did Plaintiff's counsel obtain copies of Plaintiff's bank records. Those

bank records show that no payments were ever "withdrawn" or "deducted" from Plaintiff's bank account by Rothman.

Paragraph 67 of the Complaint continues with the false claims. Plaintiff alleges that "Defendant has debited Plaintiff's and also, on information and belief, the putative class members' bank accounts on a recurring basis . . . . " See also Compl. ¶ 68. The Plaintiff's bank account statements are very telling evidence of the Rule 11 violation. They confirm that Plaintiff's counsel could have very easily determined with minimal investigation prior to filing the Complaint that there was no basis in fact for many of the Complaint's allegations.

The bank records further show that Plaintiff did not maintain sufficient funds in his bank account to pay Rothman $100.00 each month beginning on February 21, 2016, suggesting the agreement alleged by Plaintiff in the Complaint did not exist. For example, Plaintiff's bank statement shows that on February 18, 2016, Plaintiff had a balance of 89 cents in his account and on February 22, 2016, his balance was negative $49.11.

Had Plaintiff's counsel taken the simple step of obtaining Plaintiff's bank records prior to filing the Complaint, it would have been obvious that allegations that Rothman was deducting $100.00 a month from Plaintiff's bank account beginning in February 21, 2016 were utterly false and not supported by the evidence.

**B.      No Written Agreement and No Extension of Credit**

The totality of evidence makes clear that there was no written agreement by Plaintiff to pay Rothman $100.00 a month from his bank account beginning February 21, 2016, as required by Regulation Z, and no extension of credit, which were the bases for dismissal of the Complaint.

Before concluding that there is a valid contract under Pennsylvania law, the court must "look to: (1) whether both parties manifested an intention to be bound by the agreement; (2)

whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration." ATACS Corp. v. Trans World Communications, Inc., 155 F.3d 659, 666 (3d Cir. 1998); see also Aircraft Guar. Corp. v. Strato–Lift, Inc., 103 F.Supp.2d 830, 836 (E.D.Pa. 2000) ("[C]ontracts are enforceable when parties reach a mutual agreement, exchange consideration, and have set forth the terms of their bargain with sufficient definiteness to be specifically enforced."). "Consideration 'confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in exchange for the original promise.'" Channel Home Centers v. Grossman, 795 F.2d 291, 299 (3d Cir. 1986) (quoting Curry v. Estate of Thompson, 332 Pa. Super. 364, 481 A.2d 658, 661 (1984)). Without consideration, a contract is unenforceable. Id. at 298–99.

The Court has previously concluded there was no written agreement. However, in addition, the record now reveals, because Plaintiff never made any further payments, there was no consideration given by Plaintiff whatsoever. Thus, any argument that there was an agreement between Plaintiff and Defendant, whether written or not, fails.

### C. Class Allegations

It is remarkable that counsel brought this case as a class action, on behalf of all patients of the Rothman Orthopaedic practice, under Fed. R. Civ. P. 23. The gravamen of the Complaint is that Rothman had been duty bound to make financial disclosures to the Plaintiff because this business arrangement with the Plaintiff was an "extension of credit." This Court has already rejected that characterization, and found in the earlier memorandum opinion, that the business arrangement with Rothman was just a delayed payment plan and did not involve an extension of credit.

However, not only did Plaintiff's counsel initiate and prosecute this Complaint improperly on behalf of Plaintiff, but they brought it as a class action, asserting that the Plaintiff was a suitable representative of a broad class defined as follows:

> Plaintiff brings this action as a nationwide class action for Defendant's violations of the TILA and the EFTA on behalf of the following class of individuals: All natural persons extended credit by Defendant, who: (i) entered into payment plans that consisted of four or more payments; (ii) who were not given disclosures mandated by the TILA during the applicable class period covered by this Complaint; (iii) who repaid the credit through electronic transfers from their personal bank account and (iv) who were not provided copies of a valid written authorization for the electronic transfers as mandated by the EFTA.

Paragraph 45 of the Complaint further alleges the following common questions of law and fact that "predominate over any questions affecting solely individual members of the action":

> a.    Whether Defendant is a "creditor," as that term is defined under the TILA;
>
> b.    Whether Defendant was required to issue written disclosures proscribed by TILA and Regulation Z;
>
> c.    Whether Defendant violated the TILA;
>
> d.    Whether Defendant was required to obtain written authorization and provide a copy of same to Plaintiff and the members of the class for the electronic transfers as proscribed by the EFTA and Regulation E;
>
> e.    Whether Defendant violated the EFTA; and
>
> f.    Whether Plaintiff and the members of the Class have sustained damages and, if so, the proper measure of damages.

Given the actual facts of this case, as the record now reflects, Plaintiff was clearly not a suitable representative of a broad class. The filing of the Complaint as a class action was particularly egregious. If the bank records had been secured, it would have been obvious that

there was no basis whatsoever to allege Plaintiff could represent a class. The record is not clear as to which of the attorneys interrogated the Plaintiff, or whether assumptions were made beyond what the Plaintiff shared. In any event, initiation of a class action lawsuit, under TILA, is a serious undertaking. Instead of facing a single claim, Defendant faced claims on behalf of many former and current patients. When a lawyer undertakes the responsibility of acting as counsel in a class action, they assume a significant responsibility of being accurate in their factual allegations.

The Federal Rules require that in a class action, "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Since the absent members of the class will be conclusively bound by results obtained by the class representative and his attorneys, the representative party acts a fiduciary for the class. Scott v. University of Delaware, 601 F.2d 76 (3d Cir. 1979), cert. denied, 444 U.S. 931 (1979). As a result, adequate representation, in addition to being required by Rule 23, is constitutionally mandated by due process requirements. Scott, 601 F.2d at 85 (citing Hansberry v. Lee, 311 U.S. 32 (1940)). Plaintiff's counsel failed to conduct a reasonable investigation by ensuring that Plaintiff could serve as an adequate representative for a class action.

## VII.  The Parties' Arguments

### A.  Plaintiff's Arguments Against Sanctions[14]

Plaintiff's main argument against sanctions is that their TILA claim was not only reasonable at the time that it was filed, but remains viable.[15]  In this respect, Plaintiff's

---

[14] Plaintiff's counsel contends that Rule 11 sanctions are unwarranted for their EFTA claim because they voluntarily dismissed the EFTA claim within 21-day safe harbor provided under Rule 11. However, the 21-day safe harbor does not appear to apply to court-initiated sanctions. See In re Miller, 730 F.3d 198, 206 (3d Cir. 2013) (remanding sanctions order for consideration of sanctions that do not "contain[] a safe harbor timing provision" such as the bankruptcy equivalent of today's Rule 11(c)(3) [which permits district courts to *sua sponte* initiate the sanctions process]). Nonetheless, the Court has chosen not to consider sanctions on the voluntarily dismissed EFTA claim.

arguments generally mirror those which were litigated previously during the motion for judgment on the pleadings, and the arguments will likely remain the same when the motion for reconsideration is briefed.

Plaintiff's counsel cites <u>In re Taylor</u>, 655 F.3d 274 (3d Cir. 2011) but the case does not support Plaintiff's arguments. The Taylors were bankruptcy petitioners who listed HSBC as a creditor in their Chapter 13 bankruptcy petition. In turn, HSBC filed a proof of claim with the bankruptcy court. However, two later pleadings by HSBC's attorneys in bankruptcy court each contained multiple inaccuracies. The bankruptcy judge imposed Bankruptcy Rule 9011 sanctions against HSBC and its attorneys, and the district court and circuit court, on review of the sanctions, analyzed them using Rule 11 precedent. The Third Circuit held there was no abuse of discretion by a bankruptcy court for imposing sanctions, and specifically stated that, "[c]entral to this case . . . is the degree to which an attorney may reasonably rely on representations from her client." 655 F.3d at 284. <u>See</u> <u>In re Gioioso</u>, 979 F.2d 956, 960 (3d Cir. 1992) ("[C]ases decided pursuant to [Fed. R. Civ. P. 11] apply to Rule 9011."). The district court had reversed all sanctions, on the grounds that the confusion in the case was attributable at least as much to the actions of Taylor's counsel as to HSBC's. But the Third Circuit reversed the district court and reinstated sanctions, concluding that the following four statements by HSBC and its attorneys "involved false or misleading representations to the court":

> (1) in the motion for relief from stay, the statements suggesting that the Taylors had failed to make payments on their mortgage since the filing of their bankruptcy petition and the identification of the months in which and the amount by which they were supposedly delinquent;

---

[15] In fact, Plaintiff has filed a motion for reconsideration of the Order granting, with prejudice, Defendant's motion for judgment on the pleadings. (ECF 31).

> (2) in the motion for relief from stay, the statement that the Taylors had no or inconsequential equity in the property;
>
> (3) in the response to the claim objection, the statement that the figures in the proof of claim were accurate; and,
>
> (4) at the first hearing, the attempt to have the requests for admission concerning the lack of mortgage payments deemed admitted.

Taylor, 655 F.3d at 283. Given that the representations were at least misleading (if not inaccurate), the court examined the reasonableness of the attorneys' inquiry prior to making their representations to the bankruptcy court.

In finding that the attorneys were unreasonable in relying on HSBC's representations, the court pointed to the HSBC's use of an automated system for informing the firm about their engagement and the relevant facts in the case as well as the fact that—as a result of the use of this automated system—the attorneys had no relationship with the client. "From the face" of the file, it "should have been evident" that "HSBC was not providing . . . adequate information." Id. at 285. For example, despite possessing no information "concerning the Taylors' equity in the home," one of HSBC's attorneys "specifically den[ied] that they had any." Id.

### B.    Defendant's Arguments For Sanctions

Defendant asserts that Rule 11 sanctions are appropriate because "no attorney representing Plaintiff took even the minimal steps required under Rule 11 to ascertain that the facts alleged in the Complaint had any basis in fact." According to Defendant, a reasonable investigation would have involved examining Plaintiff's bank statements and attempting to determine if Plaintiff had a credit or debit card with the last four digits identified in the "confirmation" email, which Plaintiff alleged provided evidence of a written agreement. Defendant contends that several paragraphs of the Complaint are false as a result of the fact that no money was ever withdrawn from Plaintiff's bank account:

25.     Although noted as "Paid Via: Credit Card," the above transaction [referring to the scheduled payment plan email] was an electronic transfer from Plaintiff's personal banking account.

26.     Plaintiff did not receive any written notification prior to the withdrawal or charge to his account.

67.     Defendant has debited Plaintiff's and also, on information and belief, the putative Class members' bank accounts on a recurring basis without obtaining a written authorization signed or similarly authenticated for preauthorized electronic fund transfers from Plaintiff's and also the putative Class members' accounts, thereby violating [EFTA].

68.     In multiple instances, Defendant has debited Plaintiff's and also the putative Class members' bank accounts on a recurring basis without providing a copy of a written authorization signed or similarly authenticated by Plaintiff or the putative Class members for preauthorized electronic fund transfers, thereby violating [EFTA].

Defendant relies on Lieb v. Topstone Indus., Inc., 788 F.2d 151 (3d Cir. 1986), in which plaintiff sued for infringement but admitted during discovery that no portion of the alleged infringing cassette tape was in fact copied.  Because there was a clear statutory prescription that infringement involve "sound recording [through forms that] directly or indirectly recapture the actual sounds fixed in the recording," the defendant contended the claim was "filed in bad faith, was frivolous, and should not have been brought after reasonable investigation."  Id. at 153; see 17 U.S.C. § 114(b).  The district court granted defendant's motion for summary judgment but denied its application for attorney's fees under the Copyright Act.  On appeal, the Third Circuit stated that defendants may pursue Rule 11 sanctions on remand, even though "[w]hether defendants did properly present the Rule 11 contention to the district court is a matter of some doubt."  Lieb, 788 F.2d at 156.  The court then elucidated the relevant standards for the district court to apply, should it choose to consider the issue of Rule 11 sanctions on remand.

## C.   Other Third Circuit Cases Concerning Rule 11 Sanctions

In <u>Mary Ann Pensiero, Inc. v. Lingle</u>, 847 F.2d 90 (3d Cir. 1988), the Third Circuit reversed the district court's sanctions on the grounds that the pre-filing inquiry was reasonable.[16] Although the facts here are sufficiently distinct that they do not merit recital here, the Third Circuit urged that "proper Rule 11 analysis should focus on the circumstances that existed at the time counsel filed the challenged paper." <u>Id.</u> at 95.   Echoing the factors contained in the Advisory Committee Notes associated with the 1983 amendments to Rule 11, the court stated that, "[i]n gauging the reasonableness of an attorney's pre-filing inquiry," judges should consider "such factors as how much time for investigation was available to the signer; whether he had to rely on a client for information as to the facts underlying the pleading, motion, or other paper; whether the pleading, motion, or other paper was based on a plausible view of the law; or whether he depended on forwarding counsel or another member of the bar." <u>Id.</u>; <u>see</u> Fed. R. Civ. P. 11.

In <u>Simmerman v. Corino</u>, 27 F.3d 58 (3d Cir. 1994), the Third Circuit expanded the supervisory rule adopted in <u>Pensiero</u>—that all motions requesting Rule 11 sanctions be filed in the district court before entry of final judgment—to *sua sponte* sanctions orders initiated by district court judges.   Several months after granting summary judgment on some claims and dismissal on others, the district court imposed sanctions on its own initiative and with no prior notice to any party.   The majority opinion reversed the sanctions order for two reasons: (1) the sanctions were imposed more than three months after deciding the underlying case; and (2) the attorney was not given notice that sanctions were under consideration or an opportunity to respond.

---

[16] An additional ground, under a previous version of Rule 11, required all motions requesting Rule 11 sanctions to be filed in the district court before entry of final judgment.

### D.  Relevant Cases Outside the Third Circuit

Allen v. Utley, 129 F.R.D. 1 (D.D.C. 1990) arose out of a dispute over two joint bank accounts.  As described by that court, "[o]ne of the plaintiff's main arguments was that [the bank] breached its contracts . . . by wrongfully freezing the two joint accounts."  Id. at 4.  Plaintiff's counsel filed the breach of contract claim without ever examining the signature cards that the joint bank account holders had executed to open the joint bank accounts.  Id.  Notably, although various District of Columbia Code provisions applied to the relationship between the account holders and the bank, "the signature cards constituted the contracts of deposit upon which the plaintiff [bank account holder] based her claim."  Id.  In granting Rule 11 sanctions, the court noted that plaintiff and her counsel "brought a breach of contract action without first reading the contract!"  Id.  Plaintiff's counsel thereby fell short of conducting an "objectively reasonable inquiry."  Id.; see N. Illinois Telecom, Inc. v. PNC Bank, NA, No. 12C2372, 2015 WL 1943271, at *5 (N.D. Ill. Apr. 29, 2015), rev'd on other grounds sub nom. N. Illinois Telecom Inc. v. PNC Bank, N.A., 850 F.3d 880 (7th Cir. 2017) ("The district court did not abuse its discretion in finding that the breach of contract claim . . . was objectively baseless because [plaintiff] never had a contract with [defendant].  The problem with the sanctions award is procedural.").

In McGhee v. Sanilac Cty., 934 F.2d 89 (6th Cir. 1991), the Sixth Circuit reversed the district court's failure to grant Rule 11 sanctions pertaining to a defamation claim because "[a] reasonable investigation . . . would no doubt have revealed that the statements of which McGhee complained were true statements."  Id. at 93.  The Circuit Court noted that the case was not one in which "additional discovery was necessary to enlighten plaintiff's attorney to the fact that no claim existed."  Id.  Plaintiff's counsel "could have learned from [the plaintiff] himself that the

statements were true prior to the filing of the complaint." Id.; see Hilton Hotels Corp. v. Banov, 899 F.2d 40, 43 (D.C. Cir. 1990) (affirming Rule 11 sanctions because plaintiff's counsel failed to independently corroborate plaintiff's claims and relevant information was not largely in the control of defendant); S.A. Auto Lube, Inc. v. Jiffy Lube Intern., Inc., 842 F.2d 946, 948–49 (7th Cir. 1988 (reversing denial of sanctions for removal petition because counsel relied on the representations of other attorneys even though the "information was readily available," including "from the corporation's own books"), abrogated on other grounds by Mars Steel Corp. v. Cont'l Bank N.A., 880 F.2d 928 (7th Cir. 1989) (opting for a more deferential standard of review for Rule 11 motions).

## VIII.   Conclusion

For the reasons stated above, the Court finds sanctions under Rule 11 are warranted against attorneys Rayz, Yarnoff, and Wells.

An appropriate Order follows.

O:\CIVIL 16\16-4935 Wolfington v Reconstructive Ortho\16cv4935 Memorandum re Rule 11.docx